JUDGE SAND

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA | **INFORMATION** |
| - v. - | 08 Cr. ____ ( ) |
| JONATHAN CURSHEN, | |
| Defendant. | 09 CRIM 033 |

- - - - - - - - - - - - - - - - - X

JAN 15 2009

### COUNT ONE

**(Conspiracy to Commit Securities Fraud and Commercial Bribery)**

The United States Attorney charges:

**Relevant Entities and Individuals**

1. At all times relevant to this Information, Industrial Biotechnology Corporation ("IBC") was a Washington State corporation, with headquarters in Sarasota, Florida. IBC's common stock was publicly traded on the Pink Sheets, an inter-dealer quotation service that provided quotations, prices, and financial information for certain over-the-counter securities and issuers. IBC's common stock traded under the symbol "IBOT."

2. At all times relevant to this Information, JONATHAN CURSHEN, the defendant, and a co-conspirator not named as a defendant herein ("CC-1"), worked, among other things, as stock promoters based in San Jose, Costa Rica.

3. At all relevant times, an undercover Special Agent (the "UC") of the Federal Bureau of Investigation (the "FBI") purported to be a middleman representing stockbrokers who

held discretionary investment accounts on behalf of their respective clients.

### The Scheme To Defraud

4.      Beginning in or about October 2007, the UC began to communicate with JONATHAN CURSHEN, the defendant, and CC-1, through telephone calls that were consensually recorded.  The UC purported to be a middleman who had close relationships with various stockbrokers.  The UC represented to CURSHEN and CC-1 that the stockbrokers controlled investment accounts on behalf of their retail brokerage customers.  The UC further represented that the stockbrokers had complete discretion to choose which stocks to trade on behalf of their customers.

5.      The UC also explained, and JONATHAN CURSHEN, the defendant, and CC-1 agreed, that the UC would convince stockbrokers whom the UC had recruited to have their respective "customers" purchase stock that CURSHEN and CC-1 were promoting. When a "customer" was ready to purchase IBC stock, the UC would alert CC-1.  CC-1 then would submit corresponding sell orders for shares that were controlled by CURSHEN, CC-1, and other co-conspirators.  CC-1 then would fill the "customer's" stock order using sales of shares from accounts controlled by CURSHEN, CC-1, and other co-conspirators.  CURSHEN and CC-1, in turn, agreed to pay the stockbrokers and the UC a secret, undisclosed cash kickback of approximately 25 percent of the amount of the purchase orders placed by the "customers."  The UC represented

that, following any purchase of IBC stock and as part of the manipulation, the stockbrokers would hold the stock in their customers' accounts and would not sell it for a substantial period of time.

6. On or about November 27, 2007, the UC spoke with CC-1 in a recorded conversation. During the conversation, CC-1 and the UC discussed the possibility of the UC buying large quantities of a stock in exchange for a significant cash bribe. As an example, CC-1 told the UC that CC-1 presently had a deal in which CC-1 could "pay you [the UC] twenty points" if the UC purchased $3 million of the stock.

7. On or about March 4, 2008, the UC spoke with CC-1 in a recorded conversation. During the conversation, the UC explained that s/he worked with stockbrokers who controlled discretionary trading accounts on behalf of their retail brokerage customers, who had "extreme trust in these brokers." Notwithstanding the fiduciary obligation owed to these customers that arose from the stockbrokers' control of these discretionary trading accounts, the UC explained to CC-1, and CC-1 agreed, that the cash bribes totalling approximately 25 percent of the stock sold to the stockbrokers' customers would be concealed from the customers.

8. On or about April 8, 2008, the UC spoke with JONATHAN CURSHEN, the defendant, and CC-1 in a recorded conversation. During the conversation, the UC explained to both

CURSHEN and CC-1 that the stockbrokers whom the UC had recruited controlled discretionary accounts on behalf of their retail brokerage customers. As a result, the UC explained, and CURSHEN and CC-1 agreed, any stock that the UC arranged to be purchased by these customers was "going to stay in those accounts; whether they go up or down, they're going to stay there. And that's the reason that we've been charging the percent that we charge, because it's staying."

    9. On or about June 20, 2008, the UC spoke with CC-1 in a recorded conversation. During the conversation, CC-1 discussed having the UC begin arranging for the purchase of shares of IBC. The UC reiterated that the stockbrokers whom the UC had recruited controlled discretionary trading accounts on behalf of their retail customers. The UC and CC-1 agreed that the UC and the stockbrokers would be paid a commission of approximately 25 percent of the proceeds of the amount of stock purchased by the "customers," and that it would not be disclosed to "customers" who ultimately purchased the stock. The UC asked CC-1 to provide assurance that the official in charge of investor relations at IBC would never disclose the commission to any of the customers who were purchasing the IBC stock at the UC's direction. CC-1 assured the UC the commissions would not be disclosed, stating: "That's our business."

    10. On or about June 27, 2008, the UC spoke in a recorded telephone conversation with CC-1. During the call, CC-1

and the UC discussed the manner in which the UC would instruct stockbrokers to bid to buy 20,000 shares of IBC stock that day at a price of $0.90 per share.

11.   On or about June 27, 2008, using an undercover brokerage account at a brokerage firm located in New York, New York (the "Brokerage Firm"), that purported to be owned by a "customer" of one of the UC's stockbrokers, the FBI purchased approximately 20,000 shares of IBC stock at a price of approximately $0.90 per share. The total cost of the 20,000 shares was approximately $18,000, not including commissions and fees.

12.   On or about June 30, 2008, the UC spoke in a recorded telephone conversation with CC-1. During the call, CC-1 and the UC discussed the manner in which the UC would instruct stockbrokers to bid to buy 20,000 shares of IBC stock that day at a price of $0.90 per share.

13.   On or about June 30, 2008, using the undercover brokerage account at the Brokerage Firm, the FBI purchased approximately 20,000 shares of IBC stock at a price of approximately $0.90 per share. The total cost of the 20,000 shares was approximately $18,000, not including commissions and fees.

14.   On or about July 1, 2008, the UC spoke in a recorded telephone conversation with CC-1. During the call, CC-1 and the UC discussed the manner in which the UC would instruct

stockbrokers to bid to buy 22,500 shares of IBC stock that day at a price of $0.88 per share.

15.  On or about July 1, 2008, using the undercover brokerage account at the Brokerage Firm, the FBI purchased approximately 22,500 shares of IBC stock at a price of approximately $0.88 per share. The total cost of the 22,500 shares was approximately $19,800, not including commissions and fees.

16.  On or about July 2, 2008, the UC spoke in a recorded telephone conversation with CC-1. During the call, CC-1 and the UC discussed the manner in which the UC would instruct stockbrokers to bid to buy 22,500 shares of IBC stock that day at a price of $0.90 per share.

17.  On or about July 2, 2008, using the undercover brokerage account at the Brokerage Firm, the FBI purchased approximately 22,500 shares of IBC stock at a price of approximately $0.90 per share. The total cost of the 22,500 shares was approximately $20,250, not including commissions and fees.

18.  In an email dated July 2, 2008, JONATHAN CURSHEN, the defendant, issued instructions that $19,000 be wired into the Undercover Bank Account. On or about July 3, 2008, as CURSHEN and CC-1 had previously agreed, approximately $19,000 was wire transferred to an undercover bank account in New York, New York, utilized by the FBI (the "Undercover Bank Account"), from

an account in the name of "Sentry Global Securities Limited" located in San Jose, Costa Rica. This payment constituted a kickback of approximately 25 percent of: (a) the approximately $18,000 worth of IBC stock purchased on or about June 27, 2008, by the purported "customer" of one of the stockbrokers working with the UC; (b) the approximately $18,000 worth of IBC stock purchased on or about June 30, 2008, by the purported "customer" of one of the stockbrokers working with the UC; (c) the approximately $19,800 worth of IBC stock purchased on or about July 1, 2008, by the purported "customer" of one of the stockbrokers working with the UC; and (d) the approximately $20,250 worth of IBC stock purchased on or about July 2, 2008, by the purported "customer" of one of the stockbrokers working with the UC.

19. On or about July 22, 2008, the UC spoke in a recorded telephone conversation with JONATHAN CURSHEN, the defendant. During the call CURSHEN and the UC discussed the manner in which the UC would purchase IBC stock on a going-forward basis. CURSHEN and the UC agreed that the UC would purchase approximately $2.5 million worth of IBC stock over the course of the ensuing three months. The UC and CURSHEN agreed that the UC would be paid a cash kickback of approximately 25 percent of the proceeds of the amount of stock purchased by the "customers," and that the kickback would not be disclosed to customers who ultimately purchased the stock. For example, the

UC asked CURSHEN to provide assurance that the cash payment the UC was being paid stayed "between you, me, [CC-1], and nobody else." CURSHEN assured the UC the secret cash payment would not be disclosed, stating that the commissions are "going to be completely private."

20. On or about August 12, 2008, the UC spoke with JONATHAN CURSHEN, the defendant, and CC-1 in a recorded telephone conversation. During the conversation, the UC explained to CURSHEN and CC-1 that, of the 25 percent kickback they were paying to the UC, the UC was keeping only five percent and paying the remaining 20 percent to the stockbrokers whom he had recruited. The UC further explained that the stockbrokers were keeping their 20 percent kickbacks secret from their "customers." CURSHEN and CC-1 provided additional assurances to the UC that the kickbacks would remain secret from the stockbrokers' retail brokerage customers.

21. On or about September 4, 2008, the UC met with JONATHAN CURSHEN, the defendant, in New York, New York. During that recorded conversation, CURSHEN offered to pay the UC approximately 30 percent of the amount of the purchase orders of IBC stock placed by the "customers" of the stockbrokers whom the UC had recruited.

## STATUTORY ALLEGATIONS

### The Conspiracy

22. From in or about October 2007 through in or about September 2008, in the Southern District of New York and elsewhere, JONATHAN CURSHEN, the defendant, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the Unites States, to wit, to commit: (a) fraud in connection with the purchase and sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; and (b) commercial bribery, in violation of the laws of the State of New York, by using the facilities of interstate commerce, in violation of Section 1952(a)(3) of Title 18, United States Code.

### Objects of the Conspiracy

### Securities Fraud

23. It was a part and an object of the conspiracy that JONATHAN CURSHEN, the defendant, together with others known and unknown, unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of

Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, in connection with the purchase and sale of IBC common stock, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### Travel Act: Commercial Bribery

24.   It was further a part and an object of the conspiracy that JONATHAN CURSHEN, the defendant, together with others known and unknown, unlawfully, willfully, and knowingly would and did travel in interstate and foreign commerce and use the mails and facilities in interstate and foreign commerce, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity, specifically, commercial bribery, in violation of New York State Penal Law Sections 180.00 and 180.03; and thereafter would and did perform and attempt to perform an act to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of such unlawful activity, all in violation of Title 18, United States Code, Section 1952(a)(3).

### Means and Methods of the Conspiracy

25. Among the means and methods by which JONATHAN CURSHEN, the defendant, and his co-conspirators, would and did carry out the conspiracy were the following:

    a. CURSHEN and his co-conspirators agreed to pay a secret bribe to the UC and the stockbrokers represented by the UC, in order to induce the stockbrokers to cause their retail "customers" to purchase and hold IBC stock.

    b. CURSHEN and his co-conspirators used the mails and facilities of interstate and foreign commerce in furtherance of the objects of the conspiracy.

### Overt Acts

26. In furtherance of the conspiracy and to effect its unlawful objects, JONATHAN CURSHEN, the defendant, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

    a. On or about July 2, 2008, CURSHEN caused approximately $19,000 to be transferred via wire from an account at a bank located in Cyprus to an account at a bank located in New York, New York.

    b. On or about August 12, 2008, CURSHEN and CC-1 spoke over the telephone with the UC regarding the purchase of stock in exchange for a secret cash bribe.

   c. On or about September 4, 2008, CURSHEN met in New York, New York with the UC and discussed the purchase of stock in exchange for a secret cash bribe.

   (Title 18, United States Code, Section 371.)

## FORFEITURE ALLEGATION

  27. As the result of participating in the conspiracy to securities fraud and commercial bribery in violation of Title 18, United States Code, Section 371, alleged in Count One of this Information, JONATHAN CURSHEN, the defendant, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offense, including but not limited to the following:

   a. The 20,000 shares of IBC stock purchased by the FBI on or about June 27, 2008;

   b. The 20,000 shares of IBC stock purchased by the FBI on or about June 30, 2008;

   c. The 22,500 shares of IBC stock purchased by the FBI on or about July 1, 2008;

   d. The 22,500 shares of IBC stock purchased by the FBI on or about July 2, 2008;

   e. The $13,000 credited to CURSHEN's account at Red Sea Capital Management in Costa Rica, which represents his portion of the kickback paid in this case.

## Substitute Asset Provision

a. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendant(s) up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981 and
Title 28, United States Code, Section 2461)

*[signature]*
LEV L. DASSIN
Acting United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

- v -

JONATHAN CURSHEN,

Defendant.

**INFORMATION**

09 Cr.    (LBS)

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
Title 18 United States Code, Sections 2, 371,
and 1952(a)(3).)

LEV L. DASSIN
Acting United States Attorney.

---

OK
January 15, 2009  Defendant signs Waiver of Indictment.
January 15, 2009  Filed Information.    Sand, J
January 15, 2009.                        Sand, J
Defendant present with attorney Marc J. Jeten in lieu of Anthony V. Lombardino (retained) AUSA Alexander J. Willscher present. Defendant is arraigned on count one of the Information & pleads not guilty as charged. By 2/24/09, deft counsel notify Court & Gov't of any motions contemplated based on discovery received to date. Gov't also submit a letter by 2/24/09 w/ respect to status of further discovery. Status conference set for 3/25/09 at 4:30. Present bail cont'd.
Gov't submits speedy trial exclusion order through 3/25/09.    Sand. J