Joseph A. Grob (JAG 7975)
Goldberg & Rimberg, PLLC
115 Broadway
New York, New York 10006
(212) 697-3250

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

09-CR-00033 (LBS)

UNITED STATES OF AMERICA

-v-

JONATHAN CURSHEN,

Defendant.

**DECLARATION OF JONATHAN CURSHEN IN SUPPORT OF
DEFENDANT'S MOTION TO VACATE HIS PLEA OF GUILTY.**

I, Jonathan Curshen, being duly sworn, hereby declare under the penalties of

perjury, the following:

1.      I am the defendant in this action and I submit this declaration in support of my

motion to vacate the plea and dismiss the indictment in this case.

2.      From 1998 until 2008, I operated a group of companies which included Red Sea

Management Limited ("RSM"), Sentry Global Securities ("SGS"), Sentry Global Trust (Nevis)

("SGTN"), Sentry Global Trust (St. Kitts) ("SGTK"), Global Financial Logistics ("GFL"),

International Legal Services Group ("ILSG"), and the Lao, Peralta Sanabria & Caravaca ("LPS &

C") Law Firm.

3.      Those businesses created different types of legal entities including corporations, trusts and foundations which were then used to establish brokerage and bank accounts as well as to title property around the world for use in estate planning.

4.      Many of the clients for whom these entities were created were professional accredited investors, who were involved in mergers and acquisitions.

5.      With respect to this case, in or around 2006, Mr. Andrew Badolato ("Badolato"), effected a reverse merger of a public company with a private company which ultimately formed International Biotechnology Corporation and whose securities traded in the United States as symbol  IBOT ("IBOT").

6.      Upon information and belief, IBOT, through Badolato, issued approximately 2.3 million shares of IBOT securities pursuant to 17 C.F.R. § 130.504 also known as Rule 504 of Regulation D ("Rule 504") which functioned as an exemption from registration with the Securities and Exchange Commission ("SEC").  As such IBOT was exempt from registration with the SEC pursuant to Regulation D.  See  17 CFR § 230.501 *et. seq.*

7.      Upon information and belief, two private Texas companies, believed to be named Eastern Capital and Big Game Holdings, and which were wholly owned by Badolato, purchased those shares.

8.      Subsequently, Mr. Badolato asked my firm, SGS, to help him raise capital and to find investors for those privately issues shares of IBOT stock.  Upon information and belief, Eastern Capital's shares were deposited into an account at SGS.  Mr. Badolato told me that he was willing to pay fees in order to raise capital for his new company and to facilitate the sale of the IBOT stock.

9.      Pursuant to Mr. Badolato's instructions, my firm sought to find financing by way of selling Mr. Badolato's Eastern Capital's shares of IBOT's securities in an offering that had been pledged and placed with SGS for sale in the market.

10.     Further, Mr. Badolato requested that the securities not be sold for less than $.50 per share as illustrated in the statement made by Badolato on behalf of IBOT in April 2009.  A copy of that statement is annexed hereto as Exhibit A and may be located at https://www.otciq.com/otciq/ajax/showFinancialReportById.pdf?id=20289. [1]

11.     Because Badolato, an officer and director of IBOT, was selling IBOT shares pursuant to an agreement between SGS and IBOT, and because SGS was essentially trying to effect a private placement of stock to assist IBOT in raising capital, SGS and I were acting as an agent for IBOT.

12.     From in or around 2007, Bruce Grossman, one of the consultants at SGS was working on finding buyers for the IBOT securities offering through Badolato.  *See* Exhibit  A.

13.     At some point in 2007, Charlie Moore ("Moore"), the undercover agent in this case, was introduced to Mr. Grossman and to me.  Moore was advised that there were several securities for which SGS was seeking investors.  Moore indicated that he had several brokers at a company called Jefferies & Company, Inc. ("Jefferies"), who controlled discretionary accounts on behalf of "whale" clients who would be willing to invest in the offering but only in exchange for a 25-30% fee.  Annexed hereto as Exhibit B are documents obtained from the Government indicating that the Brokerage firm being utilized to place the trades in this case was Jefferies.  Moore also insisted that we not disclose the fees to Jefferies customers.

---

[1] Upon information and belief, the OTCIQ site is designed to assist OTC traded companies communicate with investors.

14.     Later, Moore placed various orders for IBOT stocks through Jefferies and on or about July 3, 2008, Moore was wired a fee in the amount of $19,000 for the placement of the IBOT securities.

15.     With respect to the transactions at issue, I never had the intent to defraud anyone.

16.     Upon information and belief, Jefferies, at the times relevant to the criminal complaint and criminal information was a Securities Broker-Dealer, licensed by the National Association of Securities Dealers ("NASD") and the Securities and Exchange Commission ("SEC").

17.     Upon information and belief, Jefferies at the times relevant to the criminal complaint and criminal information was a Securities Broker-Dealer that dealt primarily with institutions, corporations and high net worth individuals.  It was my understanding that in order to establish a discretionary account at Jefferies, similar to the accounts touted by Moore in his conversations with Mr. Grossman and myself, the investor needed to deposit at least $1,000,000.[2]

18.     On September 4, 2008, I was arrested in connection with this case and charged with a conspiracy to commit securities fraud.  *See* Complaint, annexed hereto as Exhibit C.

19.     I subsequently appeared in Magistrate's Court in the Southern District of New York where a bail package was set.  The bail package imposed was a 1.2 million dollar personal recognizance bond, cosigned by 5 financially responsible persons, including my wife, father,

---

[2]   The deposit of $1,000,000 by any individual would make such an individual an "accredited investor" as defined by the securities and exchange commission in Rule 501 which is codified at Title 17 of the Code of Federal Regulations § 230.501.  Specifically, 17 CFR § 230.501 states, among other things, that an "accredited investor" is "[a]ny natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000." Such an investor is a sophisticated investor.

brother-in-law, rabbi, and sister-in-law.  Further, the bond was required to be secured by $150,000

cash and 2 properties in Sarasota, Florida.  My travel was restricted to the Southern and Eastern

Districts of New York, and Florida; I was to surrender travel documents and I was to be placed on

strict conditions of pretrial supervision.

20.     Upon my arrest, I was represented by Anthony Lombardino, Esq.

21.     In or around October 2008, within weeks of my arrest, the Government, with the

cooperation of the Government in Costa Rica, raided the offices of RSM, SGS, and the other

entities referenced in paragraph 3, above, which completely shut down those businesses.

22.     During the raid, my wife, Merly Barrios, was present.  She was told by the United

States Agents from the Federal Bureau of Investigation, who were participating in the seizure that

if she were to come to the United States, she would be arrested.  I found this strange and

disturbing as she is simply my wife and was not really involved in my business at all and because

her role is essentially that of a homemaker, wife and mother of our three small children.  She has

never been involved in my business other than in a very minor capacity.

23.     When the offices in Costa Rica were raided in such a violent manner, I realized

that the U.S. Government obviously takes a very dim view of me and my business and that they

were going to be coming after me in full force.

24.     From in or around October 2008 through December 2008, relatively little

happened in my case here in New York, and relatively nothing happened in connection with the

seizure in Costa Rica.

25.     On or about December 8, 2008, the Government provided my attorney, Mr. Lombardino, with a draft plea agreement for this case.  A copy of that agreement is annexed hereto as Exhibit D.

26.     When I reviewed the agreement with Mr. Lombardino, I maintained my innocence and told him that I wished to go to trial.  I believe I indicated that I did not want to plead guilty especially when the Department of Justice ("DOJ") had only recently raided my Costa Rica offices and we had no idea whether any new charges were going to be filed.   That agreement called for an offense level of 13 and a stipulated sentencing guidelines range of 12-18 months. *See* Exhibit D.  I told Mr. Lombardino that the only way that I would enter into such a plea agreement would be if my plea of guilty was going to cover other charges that might be filed against me in connection with the raid in Costa Rica.  I was also adamant that I wanted permission for my wife to travel to the United States to see me before any period of incarceration would commence.  I was also concerned that I would not have sufficient funds to defend against new charges as the Government had seized my funds and shut down my accounts.

27.     Later on December 8, 2008, Mark Jellen, Es.,, Mr. Lombardino's associate, accompanied me to the Costa Rican consulate in New York City.  During that trip, Mr. Jellen told me that the Government had more than 250,000 pages of documentation to be used as evidence against me in the instant case.  No such documents were ever shown to me and I believe that Mr. Jellen told me this to intimidate me in an attempt to convince me to plead guilty.  Again, however, I rejected the plea agreement.

28.     On January 5, 2009, I met with Mr. Lombardino and Mr. Jellen in their offices. Mr. Lombardino and Mr. Jellen urged me to accept the previously presented plea agreement and to enter a plea of guilty.  When I refused, I learned that Mr. Lombardino had already scheduled a

6

change of plea proceeding to take place on January 6, 2009, without my consent and even though I was refusing to plead guilty.

29.     After I refused to enter into the plea agreement, Mr. Lombardino suggested that I waive indictment and allow the Government to file an Information against me. I did not know why Mr. Lombardino asked me to waive indictment, but I agreed. A waiver of indictment was scheduled for January 15, 2009. A copy of the Criminal Information filed against me is annexed hereto as Exhibit E.

30.     On or about January 15, 2009, I met with Mr. Lombardino and Mr. Jellen in the eighth floor cafeteria at 500 Pearl Street. During that meeting, Mr. Lombardino disclosed for the very first time that he had a client named Michael Krome.[3] Mr. Lombardino explained to me that during Michael Krome's interrogation or debriefing, my name came up several times. He did not indicate that his client cooperated against me, but that was the clear implication. Mr. Lombardino did not tell me that he believed this to be a conflict of interest and he never disclosed this information to the Court.

31.     On or about January 15, 2009, I was also told that Mr. Lombardino was going to receive the discovery in the case. I do not know whether Mr. Lombardino ever received the discovery. I do know that I was never shown the 250,000 pages of discovery previously referenced by Mr. Jellen and I believe that Mr. Lombardino never saw that discovery either. To my knowledge, Mr. Lombardino never requested any discovery beyond the transcripts of telephone conferences with the undercover and the transcripts of my meeting with the undercover. Indeed, other than some transcripts, I was never shown or given any discovery to review by Mr.

_____

[3] Krome has a brother Ronald who is or was a paralegal for Mr. Lombardino.

Lombardino or Mr. Jellen.  Without all of the evidence, I never understood how it was that my defense counsel came to a conclusion of guilt or innocence.

32.     In or around February 2009, Mr. Lombardino introduced me to Lawrence Ruggiero, Esq.  Mr. Lombardino told me, for the very first time, that he was not equipped to handle a securities case on his own and that I should retain Mr. Ruggiero, who has a vast amount of experience in litigating criminal securities cases and who was even a former Assistant United States Attorney in the Southern District of New York.  Further, Mr. Lombardino and Mr. Ruggiero then negotiated a retainer amount to be paid to have Mr. Ruggiero enter the case.

33.     In or around February or March 2009, I executed a retainer agreement and paid Mr. Ruggiero $25,000 to represent me.

34.     By May 2009, I had had several conversations with Mr. Ruggiero relating to this case.  When I met with him, he did not seem to know the details of my case and he did not even know the names of all the parties involved in my case. He explained to me that he had reviewed what Mr. Lombardino had provided him with and that it was his opinion that pleading guilty was my best option.

35.     I told Mr. Ruggiero that I was innocent, that I did nothing illegal and that I wished to go to trial.  Mr. Ruggiero responded that if I wanted to go forward in defending myself in court, he would not be able to represent me because he already had a "fully retained client" who was scheduled to start trial in September of 2009, when my trial was scheduled to commence.  He stated that he would not be able to represent me at trial and that I would have to retain a new attorney if I wanted to go to trial.  When Mr. Ruggiero told me this, I became somewhat upset because I had just paid him $25,000, I had no financial resources to retain a new attorney (and Mr. Ruggiero knew this), and it appeared that he was trying to escape from representing me

8

further.  In hindsight, I believe that Mr. Ruggiero made the statements about not being able to represent me in order to coerce or induce me into signing the plea agreement.

36.     In May 2009, I continued to assert my innocence and I refused to sign the plea agreement.  I told Mr. Ruggiero that I would agree to plead guilty (even though I believed that I was innocent of the charges in this case) only if:

a)   he could get a commitment from the Government that my wife was free to travel to the United States and that she was not going to be arrested so that I could be reunited with my wife, whom I had not seen since October 19, 2008; [4]

b)   my bail travel restrictions could be enlarged and my pretrial supervision status could be changed from strict to regular supervision; and

c)   any disposition would be a global disposition and would cover anything related to the Costa Rica seizure.

37.     Between January and June 2009, I requested that Mr. Lombardino and Mr. Ruggiero secure a bail reduction on my behalf.  I explained that since the Government had seized my offices in Costa Rica and froze all my bank accounts, I needed a bail reduction just to have food to eat and to feed my children.  No application to reduce bail was made.

38.     Between January and June 2009, I also requested that Mr. Lombardino and/or Mr. Ruggiero contact Mr. Paul Pelletier at the DOJ in Washington, D.C., in order to determine the status of any potential prosecution arising out of the raid in Costa Rica, to defend me in a proactive manner in connection with that matter.  They both responded that I should let "sleeping dogs lie" and that by signing this plea agreement in New York, "we can wrap this all up."

---

[4] It is now 28 months since I have seen my wife.

39.     In May or June 2009, Mr. Lombardino became extremely ill and suffered a major stroke. I believe that the stroke rendered Mr. Lombardino unable to continue to represent me. From that point forward, I dealt with Mr. Ruggiero.

40.     In May or June 2009, before I decided to plead guilty, My father, Andrian Curshen, and I met with Mr. Ruggiero. I again resisted pleading guilty. I again made it clear that I was concerned about charges that might arise out of the raid on my offices in Costa Rica and that I wanted an assurance that no further charges would be brought against me. I also indicated that I would not plead guilty without an assurance that I could be reunited with my wife and that I would receive a bail modification.

41.     Mr. Ruggiero responded that (a) he was certain that the government would change my pretrial status from strict to regular and that my travel area would be enlarged; and (b) the Government would agree that I could be reunited with my wife with no fear of her arrest. Mr. Ruggiero then stated that since no other charges had been brought against me by the Government in the Southern District of New York, or any other jurisdiction, that the plea agreement in this case would be a global settlement and that no new charges would be brought against me. Mr. Ruggiero also stated that the Government was very interested in my cooperation and that my cooperation would reduce any sentence I was to receive and that when a defendant cooperates "good things happen" for them. He also stated that he had a good relationship with AUSA Willscher, that he had handled cases with him previously and that he could negotiate with Willscher to make certain that all of these things would be taken care of.

42.     Subsequently, Mr. Ruggiero told me that the Government had agreed to my conditions. I responded that I would agree to plead guilty, but that I did not know what to say since I really believed that I did nothing wrong. Mr. Ruggiero responded by preparing a factual

statement that he told me I could and should read on the date of my plea of guilty. A copy of the facsimile with the text that Mr. Ruggiero wanted me to tell the Judge is annexed hereto as Exhibit F. I would not have pleaded guilty had Mr. Ruggiero not promised me that the Government agreed to my conditions.

43.     Annexed hereto is an email that my father wrote to Mr. Ruggiero confirming that he also heard Mr. Ruggiero tell me that there was going to be a global disposition. *See* email from Andrian Curshen to Lawrence Ruggiero dated April 10, 2010. *See* Exhibit G.

44.     On June 1, 2009, Mr. Ruggiero wrote to me and told me that if I do not plead guilty by Wednesday June 3, 2009, the Government was going to withdraw the offer and supersede the indictment to add charges. *See* June 1, 2009 letter from Mr. Ruggiero to me, annexed hereto as Exhibit H. In that same letter, you can see that Mr. Ruggiero is urging me to plead guilty. *See* Exhibit H.

45.     When I spoke to Mr. Ruggiero in response to his June 1, 2009 correspondence, he reiterated that the plea offer was going to be withdrawn if I did not plead guilty immediately. He also told me that if I was contemplating going to trial, he would not be able to represent me because his fully retained client was going to take priority and that I would need to find new counsel to take over my case. He also led me to believe that even though details were not contained in the plea agreement, (a) the disposition would be global; (b) that my wife (was not going to be arrested and) would be permitted to travel to the United States (to reunite with me and my children); and (c) that my bail conditions would be modified.

46.     Unfortunately, I had no funds left to retain new counsel due, in no small part, to the seizure of my property and bank accounts and the dismantling of the businesses in Costa Rica. I was also completely distraught over being separated from my wife for what had been more than

seven months at that point.  When Mr. Ruggiero said he would not be able to represent me if I

persisted in demanding a trial, he scared me.  I had already paid Mr. Lombardino over $50,000 to

represent me but Mr. Lombardino was not truly able to represent me any further.  Then, at Mr.

Lombardino's insistence I retained Mr. Ruggiero and paid him an additional $25,000.

Remarkably, neither would discuss the ultimate facts with me and both persistently pushed me to

plead guilty.  Other than telling me to plead guilty, I do not know what other work they did on

this case.  To that end, in the summer of 2010, when my newly appointed attorney, Mr. Joseph

Grob entered the case, Mr. Ruggiero sent him very little in the way of case materials.  When Mr.

Grob contacted the prosecutor about the discovery, he was provided with a voluminous amount of

material that I had never seen before.  I truly believe that neither Mr. Lombardino, nor Mr.

Ruggiero, ever asked for, received or reviewed the voluminous materials provided to Mr. Grob in

August 2010.

47.     As a result of the pressure being placed upon me and based upon the promises

made to me, I finally agreed to plead guilty and a change of plea proceeding was scheduled.

48.     On June 24, 2009, I pleaded guilty before Magistrate Judge Pittman pursuant to a

plea agreement.  That agreement is annexed hereto as Exhibit I.  I understand that the plea

agreement did not contain the promises that Mr. Rugerrio made to me concerning the change in

my bail status and my wife being permitted to visit me.  I also acknowledge that the plea

agreement contains no language about the disposition being a global disposition.  When I asked

about this, I was simply told that there is an agreement about it being a global disposition and not

to worry.  I relied on that representation.

49.     In Court, when I pleaded guilty, I was asked a series of questions about whether

my plea was voluntary and whether there had been any threats or promises made to me that were

not in the agreement.  I responded that the plea was voluntary and that no threats or other

promises had been made.  *See* transcript from change of plea proceeding, annexed hereto as

Exhibit J.  I realize that this was not really true and that I was under oath at the time, but I was in

a very difficult position both financially and mentally, having been given advice to plead guilty

by my counsel, and  I felt I was backed up against a wall and had no choice.  I was not pleading

guilty willingly.  I only pleaded guilty because I was told:

a)   that I would be reunited with my wife (and that she would not be arrested if she came
     to the United States);

b)   that the change of plea was a good disposition because it would be a global
     disposition;

c)   that my chosen legal counsel would not be able try the case and that I would have to
     seek and retain other counsel to try the case when I had no funds to do so; and

d)   that my bail would be modified to allow me to travel more freely and that my pretrial
     supervision status would be changed from strict conditions of supervision to regular
     conditions of supervision.

50.     When I was asked if any promises had been made other than the promises

contained in the plea agreement, I responded no, because I was told that if I said yes, I would kill

the plea. [5]

51.     In July 2009, after I pleaded guilty, I repeatedly tried to contact counsel for

updates about my case, but was not able to obtain any information.  During that time, I recall that

---

[5] Prior to entering my plea of guilty, Mr. Ruggerio cautioned me that I should be careful in how I
answer any question put to me in the change of plea proceeding so that I would not mess up the
allocution and so the Judge would not reject the plea.

I again complained to my pre-trial officer and told him that I was not able to make contact with my legal counsel.

52.     In August 2009, I again made efforts to discuss my case with Mr. Ruggiero, but he failed to respond to me.  I became increasingly uncomfortable and upset with Mr. Ruggiero because I was scheduled to be sentenced in September, and he was refusing to speak with me.

53.     On September 1, 2009, I called Judge Sand's secretary, Genie, in a panic to ask for directions on what I should do, by stating to her that I had been abandoned by Mr. Ruggiero.  I was instructed to try to call my attorney again, which is what I did.

54.     Between September 2009 and January 2010, I spoke to Mr. Ruggiero on very few occasions.  Each contact was brief and he was not responsive to my questions.  More often than not, there was no return of my e-mails, faxes or telephone calls.  To me, it was clear that Mr. Ruggiero had abandoned me.

55.     In December 2009 or January 2010, having not been able to reach my legal counsel, I began the process of interviewing new counsel to see if I could locate new legal counsel to represent me.  To that end, in December 2009, I met with Edward J. M. Little , Esq. of Hughes, Hubbard and Reed.  Mr. Little advised me that he knew Paul Pelletier, the Deputy Chief of the Fraud Section at DOJ's Criminal Division, personally and that he believed that he could assist me.  I explained to Mr. Little that I had no funds because the Government had seized my assets and that I was hoping that the Government might be willing to release funds to allow Mr. Little to represent me.   Mr. Little agreed to contact Mr. Pelletier on my behalf.

56.      On or about January 14, 2010, at 12:33 P.M., Mr. Ruggiero called me for the first time in months to ask me if I had heard anything from anyone concerning my case in the Southern District of New York.

57.      Between January and March 2010, Mr. Little was in contact with Mr. Pelletier at DOJ on my behalf to see if he could negotiate the release of funds to be able to represent me. During this time period, Mr. Little advised me that the Government had indicated that it was planning to indict me in connection with the raid on the offices in Costa Rica, meaning that there was no global disposition.  When I learned this, I became very distraught as Mr. Ruggiero had previously told me that the plea in my case in the Southern District of New York was that of a global disposition.  At some time after that, Mr. Little advised me that no matter what, he would be unable to represent me because of an apparent conflict of interest.

58.      On March 18, 2010, I contacted Mr. Ruggiero to ask if there were any updates on my case, but received no response.  On March 29, 2010, I wrote to Mr. Ruggiero again and asked if there were any updates on my case.  This time, Mr. Ruggiero ultimately responded that I was finally scheduled for a presentence interview.

59.      In truth, every day since my plea, I felt that I should not have pleaded guilty.  As time marched on, I was not reunited with my wife and my pretrial status was never changed. Further, once Mr. Little told me that I did not really have the global disposition I had been promised, I decided I must find out how to withdraw my plea.

60.       On April 1, 2010, I was able to reach Mr. Ruggiero to ask whether and under what circumstances I could withdraw my plea of guilty.  *See* my email to Mr. Ruggiero dated April 1, 2010, annexed hereto as Exhibit K.

61.     On or about April 8, 2010, Mr. Ruggiero wrote to me and stated "if you are contemplating trying to get your guilty plea back you should consult with another lawyer about that issue. The potential conflict I would have in an attempt to withdraw your plea prevents me from advising you about that matter." Mr. Ruggiero's statement took me by surprise as he knew I had no money to hire a new lawyer. Mr. Ruggiero's email to me is annexed hereto as Exhibit L.

62.     On or about April 9, 2010, I again contacted Mr. Ruggiero to complain about the fact that the promises that he made in connection with the plea, were false. *See* Email to Mr. Ruggiero dated April 9, 2010, annexed hereto as Exhibit M. In that email, I reiterated that the only reason that I agreed to plead guilty was because Mr. Ruggiero stated that there would be a "global" disposition; less travel restrictions; a change in my pre-trial status from strict to regular; and that my wife would be permitted to travel to the United States to be reunited with me. I also asked what had happened with the multi-page proffer that I had previously sent to him. *See* Exhibit M. My father also wrote to Mr. Ruggiero complaining about the fact that there was no global disposition as previously promised. *See* Exhibit G.

63.     Mr. Ruggiero finally agreed to meet with me on April 20, 2010, to discuss my concerns.

64.     On April 20, 2010, I met with Mr. Ruggiero and his associate in the 8th floor cafeteria at 500 Pearl Street. At that time, we discussed a number of items including the 2.4 million dollars in funds that were frozen by the DOJ, visiting my mother in California, speaking to the DOJ regarding the potential for further prosecution and withdrawing my guilty plea. Amazingly, once Mr. Ruggiero heard that 2.4 million dollars of my funds were frozen, he immediately, and in my presence, called Mr. Paul Pelletier and left him a voice mail. Mr. Ruggiero, knowing I had no other funds, stated that I needed to retain him further in order to have

16

him continue to contact DOJ concerning this case and the potential prosecution that might arise out of the seizure in Costa Rica.  I explained to him that I didn't have any money and that he should ask Mr. Pelletier to release some of my frozen funds as a retainer.  During that meeting, it became crystal clear to me that there was no global settlement, that Mr. Ruggiero never before even discussed a global settlement on my behalf and that he had lied to me in the first instance to trick me into pleading guilty.

65.     On April 21, 2010, after the April 20, 2010 meeting, I wrote to Mr. Ruggiero again to memorialize what he had promised me on April 20, 2010.  *See* my April 21, 2010 email annexed hereto as Exhibit N.

66.     On April 28, 2010, Mr. Ruggiero wrote to me to advise me that he had spoken to the prosecutor in connection with the Costa Rica seizure/investigation and that the prosecutors first wanted a commitment that I would plead guilty before having any discussions with me.  I was also advised that the Government or Mr. Pelletier was not going to liberate any funds for a retainer.

67.     On May 5, 2010, during my pre-sentence investigation interview, I overheard Mr. Ruggiero tell Probation Officer Ferrall that Mr. Ruggiero had been ill and that he had just undergone a liver transplant.  This may account for why Mr. Ruggiero was out of contact me for a substantial period of time, but it makes me question whether Mr. Ruggiero was well enough to pay proper attention to my case and give it the attention it required in the first instance.

68.     On May 27, 2010, I explained to Mr. Ruggiero that I could not afford his continued representation and that I needed immediate help in securing a Federal Public Defender to represent me in connection with this case and my desire to withdraw my plea. I then petitioned the Court and asked that Ruggiero be replaced.

17

69.   On or about June 10, 2010, my current attorney, Joseph A. Grob, was appointed to represent me.  I asked Mr. Grob to assist me in vacating my plea and he told me that he needed to first understand my case before he could properly advise me of my options.

70.   As I understand it, from June through December 2010, Mr. Grob has been working with me and reviewing the voluminous file with tens of thousands of documents that were obtained from the Government just in connection with the instant prosecution.  As I noted above, I do not believe that Mr. Ruggiero or Mr. Lombardino ever received or reviewed the volume of discovery provided to Mr. Grob.

71.   Mr. Grob has advised me of the many risks inherent in moving to vacate a plea including, but not limited to, the facts:

a)   that there was significant delay before making the motion to withdraw my plea;

b)   that I could be charged with perjury for having made false statements at the time of my plea or in connection with the instant motion;

c)   that I will likely lose the 3 level reduction in my guidelines level for acceptance of responsibility; and

d)   that I could face an obstruction of justice enhancement at sentencing.

Nevertheless, I maintain my innocence and wish to withdraw my plea of guilty.

72.   As indicated above, I do not believe that Mr. Lombardino and Mr. Ruggiero properly represented me.  I believe that they lied to me about the scope of the plea agreement and they failed to assist me in negotiating a global settlement as I had requested from the day I learned of the raid on my Costa Rica offices.  After more than one and half years since pleading guilty and more than two years and four months since last seeing my wife, I believe my decision to

18

plead guilty was wrong and coerced by my attorney, and this affidavit is an attempt to set things

right in my own mind so that I can live with myself.

73.     I truly believe that I did nothing wrong in this case.

74.     I do not deny that the undercover, Charlie Moore, bought IBOT stock through his

so called "brokers"  and I do not deny that the undercover received a wire of $19,000 in New

York that I assisted in sending to him.

75.     I do, however, deny that there was any fraud involved in my conduct.  Further, I do

not believe that there was any deception on my part or on the part of SGS, because Jefferies, in

various locations on its website and in its materials, unequivocally discloses to its customers that

Jefferies and/or its employees may receive extra compensation in connection with securities

transactions.   For example, annexed hereto as Exhibit O, is a document obtained from the

Jefferies website at http://www.jefferies.com/pdfs/ManagingConflictsOfInterestJIL.pdf which

outlines Jefferies policies on conflicts of interest and which discloses the various potential

conflicts of interest that are likely to occur and which discloses that Jefferies

> receives or will receive from a person other than the client, an inducement
> in relation to a service provided to the client, in the form of monies, goods
> or services, other than the standard commission or fee for that service.

*See* Exhibit P.

76.     Annexed hereto as Exhibit P, is a copy of the Terms of Business  ("TOB") for

Jefferies that was obtained from the Jefferies  website at

http://www.jefferies.com/pdfs/TermsOfBusinessJIL.pdf.  The terms of Jefferies business

specifically requires that each Jefferies customer acknowledge that such customer agrees to do

business with Jefferies notwithstanding the fact that there may be a conflict of interest including

but not limited to receiving "payments or other benefits" for placing an order.  *See* Exhibit P at § 13.7.

77.    It is my contention that the disclosures on the Jefferies website regarding possible payments from third parties and the similar disclosure in the Jefferies TOB makes it clear to any Jefferies client that Jefferies employees may receive additional and unreported commissions or fees.  Thus, any investor who is a client of Jefferies is (1) a sophisticated investor and (2) knows that Jefferies or its employees sometimes get financial remuneration from third parties.  Because the Jefferies website makes such a disclosure to its customers, the alleged agreement not to disclose the commissions to Jefferies customers was not deceptive because Jefferies customers were already clearly aware that unreported commissions do get paid.[6]

78.    In my case, the fact that Jefferies posts disclosures on its websites and requires that clients agree to allow Jefferies to provide services despite any payments that may be received by third parties is tantamount to consenting to such payments and should not constitute commercial bribery.  *See* Exhibit Q  (TOB at 13.5 and 13.5.7, 13.7 and 14.3).

79.    Based upon all of the above, I believe that I am not guilty, and that my attorney, Mr. Ruggiero, coerced and misled me into pleading guilty by making me promises that were not contained in the plea agreement.  Indeed, it now appears that those promises were never even

---

[6]  In the discovery materials provided to my attorney, there was an audio recording and transcript from a September 4, 2008 meeting between me and the undercover, wherein we discuss the transactions at issue and the transactions going forward.  In that meeting, the undercover officer asks me if the securities at issue need to "sit" in the accounts of the customers, meaning that they should be held and not sold.  I responded that the brokers/customers may sell the securities purchased if they so choose.  Thus, I never intended to defraud anyone or manipulate any markets.  A copy of the relevant pages of the transcript is annexed hereto as Exhibit Q.  I realize it is only a draft transcript but I have no other way to show this to Your Honor.

discussed with the Government.  Mr. Ruggiero made several promises to me that that were total fabrications and he told me that he would not represent me if I proceeded to trial.  As such, my plea was involuntary and coerced.

80.     Moreover, I submit that Mr. Lombardino had a conflict of interest that was never waived and never brought to the Court's attention, namely that he was representing a person named Michael Krome, who appears to have been cooperating against me during that representation.  The advice I was given by Mr. Lombardino and Mr. Ruggiero about pleading guilty is certainly suspect when Mr. Lombardino, who was my lead counsel, was apparently representing someone who appears to have been cooperating against me on some level.

81.     Additionally, as I noted above, I do not believe that Mr. Lombardino or Mr. Ruggiero represented me properly because they never received or reviewed the relevant audio recordings or the 93,000 plus pages of discovery produced to my new attorney, Mr. Grob.  Further, they failed to conduct a proper investigation before telling me that I had to plead guilty.  Moreover, by telling me to plead guilty, I believe that they sacrificed me for the benefit of another client, namely, Michael Krome.

WHEREFORE, I respectfully request that my plea of guilty be vacated and that I be permitted to go to trial.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed:    February 14, 2011
             New York, New York


_____
Jonathan Curshen