UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                    :

UNITED STATES OF AMERICA

                    :

       - v. -                   :         09 Cr. 033 (LBS)

                    :

JONATHAN CURSHEN,

                    :

           Defendant.

                    :

                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT JONATHAN CURSEHN'S MOTION TO WITHDRAW PLEA


                                  PREET BHARARA
                                  United States Attorney for the
                                  Southern District of New York
                                  Attorney for the United States
                                    of America.


AVI WEITZMAN
Assistant United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                            :

UNITED STATES OF AMERICA

                            :

           - v. -                        09 Cr. 033 (LBS)

                            :

JONATHAN CURSHEN,

                            :

                 Defendant.

                            :

                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT JONATHAN CURSHEN'S MOTION TO WITHDRAW PLEA

### BACKGROUND

**A.**     **Curshen's Criminal Conduct**

This case stems from an investigation conducted by the Federal Bureau of Investigation ("FBI") that utilized confidential informants and undercover FBI agents to pose as stockbrokers who, as part of a scheme to artificially inflate the price of stock, were willing to buy shares of stock in various companies in exchange for bribes that would be kept secret from the stockbrokers' customers.

As explained in more detail in the Complaint and Information against Curshen,[1] defendants Jonathan Curshen and Bruce Grossman (now a cooperating witness in this case) worked for an organization based in Costa Rica called Red Sea Management Limited ("Red

_____

[1] Curshen consented to the filing of the Information and to waive his right to a grand jury indictment on or about January 15, 2009.

Sea").  One of the services that Grossman and Curshen offered to their clients was stock promotion.  As part of their stock promotion scheme, Curshen and Grossman met with Andy Badolato, the CEO of Industrial Biotechnology ("IBOT").  Badolato controlled all of the free trading shares of IBOT.  Badolato initially wanted Curshen's help in selling three million of his IBOT shares.  Grossman and Curshen agreed that they could help Badolato promote the IBOT stock in exchange for a sizable payment.  Over the course of several meetings, Curshen, Grossman, and Badolato negotiated the payment structure.  They agreed that all three million IBOT shares would be sold by Red Sea.  Once the shares were sold, they would deduct the expenses incurred from selling the stock (i.e., bribes, promotional materials, mailers, etc.).  Of the remainder, Badolato would take half, and Curshen and Grossman would each take a quarter.

As part of that scheme, Curshen and Grossman met with an FBI undercover (the "UC") beginning in October 2007.  The UC posed as a middleman who worked closely with a stable of corrupt stockbrokers who were willing, in exchange for secret bribes, to buy questionable stocks with their clients' money.  Over the course of the next ten months, the UC had numerous conversations with Curshen and Grossman, many of which were consensually-recorded by the UC.  The UC told Grossman and Curshen that the stockbrokers with whom the UC worked had complete discretion over their clients' accounts; i.e., the stockbrokers made all the decisions on behalf of their clients about what stocks to buy and sell.  (Such discretion over the stockbrokers' customers' accounts rendered the stockbrokers fiduciaries, as explained below). In addition, the UC told Grossman and Curshen that in exchange for a bribe of 25% of the gross amount of stock purchased, the UC could ensure that the stock that the clients purchased would not be resold.

Grossman and Curshen eventually reached an agreement with the UC to pay the UC a secret bribe of 25% in exchange for the UC's efforts to coordinate the purchase of the stock of IBOT.  The UC told Curshen and Grossman that he initially needed to do a "test run," in which he would purchase a small amount of stock in order to ensure that the scheme was functioning properly.  Accordingly, in June and July 2008, the UC purchased 85,000 shares of IBOT for approximately $76,050.  In return, Curshen and Grossman wired the UC approximately $19,000, which amounted to a 25% bribe.

As the summer progressed, the UC continued to discuss with Grossman and Curshen the fact that he would soon begin to make large purchases of stock in IBOT and other companies. On September 4, 2008, on the eve of the date when the large buying was scheduled to commence, the UC met Curshen at a hotel room in New York.  During their meeting, which was recorded, Curshen explained what Red Sea did.  Curshen explained that Red Sea was structured as a law firm so that any dealings that Red Sea's clients engaged in would be protected by the attorney-client privilege.  In addition, Curshen agreed that the UC would purchase approximately $3.2 million of IBOT stock over the next few months.  Curshen also told the UC that he would like the UC to provide the same services for additional stocks that Curshen was promoting. Finally, Curshen agreed to pay the UC a bribe of 30 percent, rather than 25 percent, going forward.  Curshen was arrested at the end of the meeting, based on a complaint dated September 4, 2008.  Grossman was arrested in New Orleans the following day.  The criminal complaint against Curshen and Grossman charged them with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371.

4

**B.**     **Curshen's Guilty Plea**

Rather than risk a superseding indictment and trial on substantial federal fraud charges, Grossman, through defense counsel, and the Government negotiated a plea agreement by which Grossman would plead guilty to a single-count information that covers the conduct relating to the undercover operation and the scheme to commit securities fraud with respect to IBOT.  The Information charged him with participating in a conspiracy to commit securities fraud and commercial bribery, from in or about October 2007 through in or about September 2008, in violation of 18 U.S.C. § 371.

On or about June 24, 2009, Curshen pled guilty pursuant to the plea agreement he signed and entered into with the Government (the "Plea Agreement").  The plea was taken before Magistrate Judge Henry B. Pitman. In the plea agreement, Curshen agreed that he "hereby acknowledges that he has accepted this Agreement and decided to plead guilty because he is in fact guilty." At the plea proceeding before Judge Pitman, the Court placed Curshen under oath and, after asking questions about Curshen's mental state, physical condition, and ability to understand the proceedings, determined that Curshen was fully competent to enter an informed plea at this time.  (Plea Tr., attached as Exhibit J to Curshen's Affidavit, at 4-7).  Both defense counsel and the Government prosecutor ("AUSA") agreed that he was.  (*Id.* at 6-7).  Curshen confirmed that he was satified with the representation of all three of his attorneys: Mr. Lombardino, Mr. Ruggiero, and Mr. Jelen.  (*Id.* at 7).  The Court and the AUSA then summarized the elements of the offense with which Curshen was charged in the Information. (*Id.* at 8, 15-16).   The Court also discussed the rights Curshen was giving up by pleading guilty (*Id.* at  9-15).  Importantly, the Court specifically informed Curshen that he may plead not guilty, and

5

twice informed him that if he chose to plead not guilty and proceed to trial, he would have the right to the assistance of counsel at all stages of the proceedings, and if he could not afford an attorney, one would be appointed by the court.  (*Id.* at 12, 13).  Curshen affirmatively stated he understood these and all his rights.  (*Id.* at 12, 13).

The Court further discussed the plea agreement with Curshen.  Curshen confirmed that he read the plea agreement before he signed it and reviewed it with counsel, that he understood the agreement, that he voluntarily signed it, and that no one made any threats or otherwise forced him to sign the agreement.  (*Id.* at 4, 14).  Curshen also confirmed that there were no promises made outside of the plea agreement to induce his plea of guilty.  (*Id.* at 14). When asked "are you pleading guilty because you are in fact guilty," Curshen responded, "Yes, your Honor."  (*Id.*) Curshen then proceeded to explain the factual basis for his plea of guilty, stating:

> From October 2008 to September 2008 I conspired from outside New York with individuals including Bruce Grossman, Andrew Batalato and Trevor Ruiz to commit securities fraud and commercial bribery by knowingly and intentionally agreeing to pay and paying a middleman a 25 percent secret commission or bribe to have the stockbroker associates buy various securities of various companies, including the securities of Industrial Biotechnology Corporation, a Florida Corporation, for their customers, without disclosing those bribes or commissions to the customers.  In the course of the conspiracy we wired such bribes to a bank account in Manhattan. . . . .  On or about July 7, 2008, I caused approximately $19,000 to be transferred via wire at an account at a bank located in Cyprus to an account located in Manhattan, New York.

(*Id.* at 14-15). Judging Curshen's physical appearance, demeanor and his answers, Judge Pitman concluded that Curshen's plea was knowing and voluntary, that he was competent to enter a plea of guilty, and that the plea was supported by an independent basis in fact as to each of the essential elements.  (*Id.* at 17).  He therefore recommended that Judge Sand accept Curshen's plea, which Judge Sand did on July 28, 2009.

## ARGUMENT

## I.   THE COURT SHOULD DENY CURSHEN'S MOTION TO WITHDRAW HIS GUILTY PLEA

### A.   Applicable Law

Once a guilty plea has been accepted, a district court may permit a defendant to withdraw it prior to sentencing only if the defendant can show "a fair and just reason" for doing so. Fed. R. Crim. P. 11(d). A defendant, however, has no "absolute right to withdraw [his] plea of guilty." *United States* v. *Karro*, 257 F.3d 112, 117 (2d Cir. 2001) (internal quotations omitted). As such, the defendant bears the burden of demonstrating valid grounds for the withdrawal of his guilty plea. *United States* v. *Doe*, 537 F.3d 204, 210-11 (2d Cir. 2008).

A defendant may not "withdraw his guilty plea simply on a lark" and must not be permitted to "degrade the otherwise serious act of pleading guilty into something akin to a move in a game of chess." *United States* v. *Hyde*, 520 U.S. 670, 676-77 (1997). A guilty plea is a "grave and solemn act," not to be entered into or withdrawn lightly. *Id.* at 677 (internal quotation marks omitted). For this reason, the Second Circuit has found that a defendant "has no automatic entitlement" to withdraw his guilty plea, since "[s]ociety has a strong interest in the finality of guilty pleas, and allowing withdrawal of pleas not only undermines confidence in the integrity of our judicial procedures, but also increases the volume of judicial work, and delays and impairs the orderly administration of justice." *United States* v. *Maher*, 108 F.3d 1513, 1529 (2d Cir. 1997) (citations and quotations omitted); *accord United States* v. *Goodman*, 165 F.3d 169, 173 (2d Cir. 1999); *Williams*, 23 F.3d at 635; *see also Hill* v. *Lockhart*, 474 U.S. 52, 58 (1985).

In determining whether a defendant has demonstrated a "fair and just reason" for

withdrawing his plea, "a district court should consider, *inter alia*, (1) the amount of time that has elapsed between the plea and the motion; (2) whether the defendant has asserted a claim of legal innocence; and (3) whether the government would be prejudiced by a withdrawal of the plea." *United States* v. *Doe*, 537 F.3d at 210. Because the defendant bears the burden of demonstrating that valid grounds for withdrawal exist, "[t]he Government is not required to show prejudice when opposing a defendant's motion to withdraw a guilty plea where the defendant has shown no sufficient grounds for permitting withdrawal; however, the presence or absence of such prejudice may be considered by the district court in exercising its discretion." *United States* v. *Gonzalez*, 970 F.2d 1095, 1100 (2d Cir. 1992).

Where a defendant argues that a plea was not voluntary, withdrawal is not permitted unless the defendant has shown a "significant question of voluntariness." *United States* v. *Torres*, 129 F.3d 710, 715 (2d Cir. 1997). A claim of ineffective assistance of counsel in advising a defendant to plead guilty requires a showing that the counsel's "deficient performance undermine[d] the voluntary and intelligent nature of defendant's decision to plead guilty." *United States* v. *Arteca*, 411 F.3d 315, 320 (2d Cir. 2005).

A defendant's admissions during a plea proceeding, and any findings made by the judge in accepting the plea, "constitute[] a formidable barrier" to challenging the validity of the plea, as they "carry a strong presumption of verity." *Blackledge* v. *Allison*, 431 U.S. 63, 74 (1977). Thus, where a defendant allocutes that his plea is knowing and voluntary and not the product of threats or undisclosed promises and representations, a district court is entitled to rely on those statements in rejecting a defendant's subsequent contradictory factual allegations. "A defendant's bald statements that simply contradict what he said at his plea allocution are not

sufficient grounds to withdraw the guilty plea" and may be rejected summarily. *United States* v. *Torres*, 129 F.3d at 715-17.

A district court's refusal to allow a defendant to withdraw his guilty plea is reviewed for abuse of discretion. *Doe*, 537 F.3d at 211. A district court's findings of fact made in connection with its denial of a defendant's motion to withdraw his guilty plea will not be disturbed on appeal unless they are clearly erroneous. *See United States* v. *Goodman*, 165 F.3d at 173; *United States* v. *Gonzalez*, 970 F.2d at 1100.

**B.     Discussion**

Curshen has moved to withdraw his plea on three grounds.  First, he claims that he is actually innocent of the charges against him and there was no factual basis for the plea because (a) there was no requirement that his bribes to brokers be disclosed by the brokers, (b)  the brokerage firm's website allegedly informed customers that the brokerage firm may receive money other than the standard commission, and (c) Curshen had no intent to defraud.  Def. Mem. 8-12.   Curshen also contends that his plea was involuntary because allegedly (a) defense counsel threatened not to represent Curshen if Curshen proceeded to trial, and (b) Curshen was promised (i) that the plea would be a global resolution of other ongoing and unrelated investigations by a separate U.S. Attorney's Office, (ii) that his bail conditions would be changed, and (iii) that his wife would be free to travel to New York without risk of prosecution. Def. Mem. 13-14.  Third, and finally, Curshen contends that his counsel – he was represented by three attorneys in this case prior to his plea – were ineffective because they allegedly failed to review discovery and were laboring under alleged conflicts of interest.

All of Curshen's claims are contradicted by the record, Curshen's own prior statements, and governing law.  His motion to withdraw his guilty plea should be summarily denied.

### 1.    Curshen Cannot Show That He Is Actually Innocent

Curshen's principal claim is that he is innocent and there could be no factual basis for his guilty plea because the brokers had no duty to disclose the kickbacks and bribes that Curshen and Grossman agreed to pay to pump up the price of IBOT stock.  Curshen's claim ignores governing law.  His claim should be rejected.

"The purpose of § 10(b) and Rule 10b-5 is to protect persons who are deceived in securities transactions -- to make sure that buyers of securities get what they think they are getting." *Chemical Bank* v. *Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir. 1984).  The motivating principle of securities law is to ensure that brokers present honest and accurate information to their clients. *SEC* v. *First Jersey Securities, Inc.*, 101 F.3d 1450, 1469 (2d Cir. 1996).   In passing the Securities Exchange Act, Congress "sought to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry."  *S.E.C.* v. *Zandford*, 535 U.S. 813, 819 (2002) (quotation marks and citations omitted).  As the Second Circuit noted in *United States* v. *Russo*, 74 F.3d 1383 (2d Cir. 1996), "[t]he Supreme Court has interpreted Section 10(b) and Rule 10b-5 expansively in accordance with congressional intent to minimize fraud in securities trading."  *Id.* at 1390 (citations omitted).  This "expansive approach" to §10(b) and Rule 10b-5 reflects the Supreme Court's view that frauds that "affect the 'integrity of the securities markets' . . . fall well within [§10(b) and Rule 10b-5]."  *In re Ames Dep't Stores Inc. Stock Litigation*, 991 F.2d 953, 966 (2d Cir. 1993)).

When dealing with a claim of securities fraud based on material omissions, a duty to disclose arises only when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them. *Chiarella* v. *United States*, 445 U.S. 222, 228 (1980).  Although it is true that there "is no general fiduciary duty inherent in an ordinary broker/customer relationship," *Independent Order of Foresters* v. *Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940 (2d Cir.1998), a relationship of trust and confidence does exist between a broker and a customer with respect to those matters that have been entrusted to the broker. *United States v. Szur,* 289 F.3d 200, 211 (2d Cir.2002). Most commonly, this fiduciary relationship exists in situations in which a broker has discretionary authority over the customer's account. *United States* v. *Skelly*, 442 F.3d 94, 98 (2d Cir. 2006); *Indep. Order of Foresters*, 157 F.3d at 940; *Press* v. *Chem. Inv. Servs. Corp.*, 988 F.Supp. 375, 386-87 (S.D.N.Y. 1997).  Thus, while it is true that "a registered representative is under no inherent duty to reveal his compensation," *Skelly*, 442 F.3d at 97, the existence of a fiduciary relationship changes that analysis.  Rather, as a fiduciary, the broker has an obligation to disclose any and all material facts to his customers, including the kickbacks and bribes paid to purchase particular stock.  *Szur*, 289 F.3d at 208; *United States* v. *Laurienti*, 611 F.3d 530, 540 (9th Cir. 2010) ("We agree with the Second Circuit that, when a relationship of trust and confidence exists between a broker and a client, a broker must disclose all facts material to that relationship. . . . A broker has a duty to disclose material information about a stock purchase if the broker and client have a fiduciary relationship or a similar relationship of trust and confidence.").

Here, the allegations in the Complaint and Information make clear that Curshen was told that the brokers to whom he was paying bribes had discretionary authority over their customers'

accounts, and they thus owed their customers fiduciary duties.  (Information ¶ 8; Cmplt. ¶¶ 10,

16).  Despite the brokers' fiduciary obligations to their clients, Curshen, Grossman, and others

agreed not to disclose highly material facts to the brokers' customers, including the fact that

Curshen would pay the brokers bribes to make purchases of IBOT stock in their customers'

accounts and, as a result of those bribes, the brokers would keep IBOT stock in the customers'

accounts irrespective of whether the price of the stock increases or drops. (Information ¶¶ 8-9,

19, 20; Cmplt. ¶¶ 11-16).   The existence of such kickbacks and bribes would have been

material, *Press* v. *Quick & Reilly, Inc.*, 218 F.3d 121, 130 (2d Cir.2000) (holding that extra

commissions on the sale of particular*542 securities products represent a "conflict of interest"

that is "material"), and Curshen's agreement to hide those under-the-table payments from the

brokerage account holders is classic securities fraud.

      Moreover, this classic securities fraud was not cured by the representations on a website

that there may be additional, unspecified commissions paid to the brokerage firm.  That

disclosure, if made,  would not have been sufficiently definite or precise to validate and

immunize the substantial, under-the-table bribes Curshen was attempting to keep secret from the

brokerage account holders.  Indeed, the defendant's own authority proves that the disclosures on

the Jefferies website simply would have been insufficient.  *E.g., Laurienti*, 611 F.3d at 541-42

(receipt fo 5% commission from the purchase of certain house stocks is not adequately disclosed

with minimal or general disclosures).  The wealth of authority proves that the failure to disclose

a 25% secret commission that Curshen offered to pay in order to pump up the price of the stock

is securities fraud, plain and simple.  *See, e.g.*, *Chasins* v. *Smith, Barney & Co.*, 438 F.2d 1167,

1172 (2d Cir. 1971) (holding that "failure to inform the customer fully of its possible conflict of

interest, in that it was a market maker in the securities which it strongly recommended for purchase by [the plaintiff], was an omission of material fact in violation of Rule 10b-5"); *see also Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 756 F.2d 230, 242 (2d Cir. 1985) ( "Commissions that defendants receive on the CDs they sell to the public are relevant and must be disclosed."); *Szur,* 289 F.3d at 212 ("easily conclud[ing] that the payment of forty-five- or fifty-percent commissions" to brokers for the sale of a particular stock "is clearly significant and must be disclosed accurately.") ; *United States* v. *Santoro,* 302 F.3d 76, 80 (2d Cir. 2002) (citing *Szur* for the proposition that "[e]ven where a broker lacks discretionary investment authority . . . [he] has an affirmative duty to disclose all relevant information, including the receipt of excessive commissions"); *April 11, 2011United States* v. *Santoro*, 302 F.3d 76, 81 (2d Cir. 2002) ("Unlike customers who independently find their stocks and whose brokers merely execute trades at their command, customers who rely on investment recommendations reasonably trust their brokers to fully disclose all information pertinent to the recommendation and quality of the investment.").

In any event, even if the Government had not adequately alleged securities fraud, the allegations in the Complaint and Information were certainly sufficient to prove a violation of the Travel Act.  The payment of undisclosed, substantial bribes worth 25% of the gross amount of stock purchased is classic commercial bribery, particularly where, as here, Curshen and his co-conspirators agreed that the bribes would not be disclosed to the brokerage firms or their customers.  *Szur*, 289 F.3d at 212.

Finally, Curshen's claim that he had no intention to defraud defies the record.  Not only has the Government proffered substantial evidence in the Complaint, for example, that reflects

Curshen's intent to defraud, Curshen himself admitted that he conspired with others "to pay . . . a middleman a 25 percent secret commission or bribe to have the stockbroker associates buy various securities of various companies, including the securities of [IBOT], . . . for their customers, without disclosing those bribes or commissions to the customers."  That alone proves his intent to defraud.  Nothing more is needed.

**2.**      **Curshen's Claim that His Plea Was Involuntary Is Baseless**

Curshen also claims that his plea was involuntary because defense counsel allegedly threatened not to represent Curshen if Curshen proceeded to trial, and Curshen obtained certain promises that were not reflected in the plea agreement.  Neither claim has any merit.

It is well-established that a defendant's admissions during a plea proceeding, and any findings made by the judge in accepting the plea, "constitute a formidable barrier" to challenging the validity of the plea. *Blackledge* v. *Allison*, 431 U.S. 63, 74 (1977). The self-inculpatory statements made under oath at the defendant's plea proceeding carry a "strong presumption of verity." 431 U.S. at 74.

Under this standard, when a defendant allocutes in the course of pleading guilty that his plea is knowing and voluntary, and that no threats or additional promises not reflected in the plea agreement were made, a district court is entitled to rely on those statements in summarily rejecting a defendant's subsequent contradictory allegations that his plea was induced or coerced by substandard legal advice. "A defendant's bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea." *United States* v. *Torres*, 129 F.3d 710, 715-17 (2d Cir. 1997) (post-plea claims that guilty plea was involuntary because plea was entered out of fear that defense counsel was unprepared to go to trial

properly rejected when contradicted by plea allocution that defendant was not coerced or pressured into pleading guilty); *Hernandez*, 242 F.3d at 112-13 (district court properly summarily denied motion to withdraw guilty plea, because allegations, *inter alia*, that attorney ineffectively failed to advise defendant of consequences of plea and spent only five minutes reviewing plea agreement with defendant merely contradicted sworn representations at plea proceeding that defendant understood consequences of his plea and had reviewed agreement with his attorney).

Here, the defendant allocuted at his plea that no threats or force was used to cause him to plead guilty. (Plea Tr. at 14). With respect to the alleged threat that his counsel cannot represent Curshen should he choose to proceed to trial, the alleged "threat" is nothing of the sort. Even accepting the claim as true, Curshen was repeatedly advised at the plea that he could plead not guilty, insist on proceeding to trial, and that he would have the right to the assistance of counsel at that trial, including pro bono counsel if he could not afford an attorney. (*Id.* at 12, 13). The allegation that Curshen was told that his counsel would not be available to defend Curshen at a trial does not constitute the type of "threat" that would vitiate the voluntariness of the plea. Indeed, any suggestion that Curshen was threatened by his counsel is belied by Curshen's own statement that he was satisfied with the representation he was receiving from counsel. (*Id.* at 7).

In addition, Curshen's claim that his counsel made him certain promises – including that the plea would constitute a global resolution of all investigations against him – is baseless. After all, the plea agreement, which Curshen acknowledges having reviewed, expressly stated that in consideration for his plea, Curshen "will not be further prosecuted criminally by this Office . . . for engaging in a scheme to defraud from in or about October 2007 through in or about

September 2008, by agreeing to pay a secret cash bribe in exchange for the purchase of [IBOT]

stock." *See* Plea Agreement at 2.  The immunity provision was no broader since the other

investigations into Curshen were not being conducted by the U.S. Attorney's Office for the

Southern District of New York.  Moreover, Curshen himself acknowledged at the plea

proceeding that there were no promises made outside of the plea agreement to induce his plea of

guilty. (Plea Tr. at 14).  Had any additional promises been made, Curshen could have and should

have said so.

Moreover, the evidence he now puts forth to support his claim of additional promises to

induce his guilty plea is self-serving.  The first time anybody ever suggested that there were

promises relied upon by Curshen that were not reflected in the plea agreement was in an e-mail

from Curshen's father to defense counsel on April 9, 2010, approximately 10 months after

Curshen's guilty plea proceeding.  *See* Ex. G to Curshen Aff.  Curshen's father claimed that he

did not discuss the e-mail with his son or "anyone else in any way shape or form." *Id.*  But, is it

merely a coincidence that the e-mail was sent just 9 days after Curshen asked his counsel

"[u]nder what circumstances can I move to withdraw my plea"? *See* Ex. K to Curshen Aff.

Furthermore, is it any coincidence that the e-mail was sent a mere two hours after Curshen was

informed that his counsel could not represent him in connection with a withdrawal motion given

a potential conflict. Ex. L to Curshen Aff.  Indeed, Curshen responded to counsel's statement

with surprise and apparent disappointment. *Id.*  If Curshen truly had received false promises

from his counsel, wouldn't he have said so much earlier?  Wouldn't Curshen have sought

counsel from someone other than the attorney who allegedly was ineffective?  The fact that the

only evidence to support his claim that false promises were made by his counsel post-dates his

decision to seek withdrawal and was an email drafted by Curshen's own father reflects the self-serving nature of his claim. Indeed, given that Curshen indisputably has waived the attorney-client privilege in this motion, the fact that he did not secure an affidavit from his counsel admitting that counsel had made these representations to Curshen speaks volumes.

Finally, Curshen's newfound claim that his counsel promised a global resolution of all the Government's investigations only serves to refute his claim that he is legally and factually innocent and that he had no intent to defraud.  Curshen could not allocute to a global plea unless he admits that he in fact is guilty of a crime that needs global resolution.  How could Curshen both lack an intent to defraud and be disappointed, to this day, at the lack of a global plea agreement?

### 3.  Curshen Has Failed to Show that His Counsel Were Ineffective

Finally, Curshen claims that his counsel were ineffective because they allegedly failed to review discovery and were laboring under alleged conflicts of interest.

To prevail on a claim of ineffective assistance of counsel, a defendant must (i) overcome a "strong presumption" that his counsel's conduct was reasonable and show that his representation "fell below an objective standard of reasonableness" under "prevailing professional norms," and (ii) "affirmatively prove prejudice," that is, show that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* v. *Washington*, 466 U.S. 668, 687-88, 693-94 (1984); *accord United States* v. *De La Pava*, 268 F.3d 157, 163 (2d Cir. 2001); *United States* v. *Best*, 219 F.3d 192, 201 (2d Cir. 2000). The burden is on the defendant to establish both elements.  *Strickland* v. *Washington*, 466 U.S. at 687.

Under the first prong of the *Strickland* analysis, the reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, bearing in mind that [t]here are countless ways to provide effective assistance in any given case and that [e]ven the best criminal defense attorneys would not defend a particular client in the same way." *United States* v. *Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quotation marks omitted). Thus, under *Strickland*,

> [an attorney's] strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.

*Strickland*, 466 U.S. at 690-91. Moreover, "[i]n assessing the attorney's performance, a reviewing court must judge his conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct,' *Strickland*, 466 U.S. at 690, and may not use hindsight to second-guess his strategy choices." *Mayo* v. *Henderson*, 13 F.3d at 533; *see also United States* v. *Jones*, 918 F.2d 9, 11-12 (2d Cir. 1990); *Strouse* v. *Leonardo*, 928 F.2d 548, 553 (2d Cir. 1991).

Under the second prong, a defendant must meet the "heavy burden" of showing "actual prejudice." *Strickland*, 466 U.S. at 692. The defendant "must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Lockhart* v. *Fretwell*, 506 U.S. 364, 369 (1993) (quoting *Strickland*, 466 U.S. at 687). The reviewing court must assess "whether, absent counsel's deficient performance, there is a reasonable probability that the outcome of the proceeding would have been different." *Mayo*, 13 F.3d at 534. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Id.* (quoting *Strickland*, 466 U.S. at 694).

18

"Ineffective assistance of counsel during plea negotiations can invalidate a guilty plea and make granting withdrawal appropriate, to the extent that the counsel's deficient performance undermines the voluntary and intelligent nature of defendant's decision to plead guilty." *United States* v. *Arteca*, 2005 WL 1404571, at *4 (2d Cir. June 16, 2005) (citations omitted); *see also Cullen* v. *United States*, 194 F.3d 401, 404 (2d Cir. 1999); *United States* v. *Gordon*, 156 F.3d 376, 380 (2d Cir. 1998); *Boria* v. *Keane*, 99 F.3d 492, 496-97 (2d Cir. 1996). To establish a Sixth Amendment violation, the defendant must establish that his attorney in fact failed to communicate a plea offer or failed to provide adequate advice about the plea offer and his sentencing exposure. *United States* v. *Gordon*, 156 F.3d at 380; *Boria* v. *Keane*, 99 F.3d at 496-98.

A defendant cannot establish prejudice merely by showing that counsel's errors had "some conceivable effect" on the result, for "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Strickland*, 466 U.S. at 693. Moreover, "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart* v. *Fretwell*, 506 U.S. 364, 369 (1993). Thus, "the prejudice component of the *Strickland* test . . . focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Id*. at 372.

Here, the defendant has failed to satisfy either prong of *Strickland*. Given the overwhelming evidence of the defendant's guilt, as reflected in the numerous recorded conversations detailed in the complaint and the existence of an undercover officer and a cooperating witness who would testify against Curshen, counsel was far from objectively

deficient in recommending that Curshen plead guilty.  Moreover, counsel was able to negotiate a plea agreement that resulted in a stipulated Guidelines range of only 12-18 months' imprisonment and a five-year statutory maximum sentence of imprisonment.  Given the potential superseding indictment that would have been filed against Curshen and his exposure should he be convicted after trial, the plea agreement negotiated on Curshen's behalf proves counsel's effectiveness.

In addition, given the strength of the evidence against Curshen, counsel's advice in recommending the plea agreement did not cause Curshen any prejudice.  Given the number of witnesses and recordings against Curshen, and the quality of the evidence against him, a conviction after trial would have been all but assured.  Indeed, Curshen had no legal defense to the crime since the brokers who he conspired to bribe owed fiduciary duties to their customers. *Panuccio* v. *Kelly*, 927 F.2d 106, 109 (2d Cir. 1991) ("In addition, our assessment of whether the defendant would have gone to trial but for counsel's errors 'will depend largely on whether the affirmative defense likely would have succeeded at trial.' It is worth noting that this prong of the inquiry is not satisfied merely by Panuccio's testimony that he would have gone to trial had he known of the defense, as Panuccio in effect argues, since a defendant's testimony after the fact 'suffers from obvious credibility problems.'").  Thus, counsel's recommendation that Curshen plead guilty pursuant to the plea agreement did not cause Curshen any actual prejudice.

Finally, Curshen's allegations about his counsel's alleged conflicts of interest are insufficient.  The Sixth Amendment right to assistance of counsel includes the right to be represented by an attorney who is free from conflicts of interest. *See, e.g., Wood* v. *Georgia*, 450 U.S. 261, 271 (1981); *United States* v. *Schwarz*, 283 F.3d 76, 90 (2d Cir. 2002). This right would

be violated if the attorney has "(1) a potential conflict of interest that result[s] in prejudice to the defendant, or (2) an actual conflict of interest that adversely affect[s] the attorney's performance." *United States v. Levy,* 25 F.3d 146, 152 (2d Cir. 1994). "An attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action." *Schwarz*, 283 F.3d at 91 (internal quotation marks omitted). An attorney has a potential conflict of interest if "the interests of the defendant may place the attorney under inconsistent duties at some time in the future." *United States* v. *Kliti*, 156 F.3d 150, 153 n. 3 (2d Cir. 1998); *United States v. Armaza,* 280 F.Supp.2d 174, 178-79 (S.D.N.Y. 2003).

In order to establish that an actual conflict of interest has adversely affected the performance of defense counsel, the petitioner must show "that counsel's interests diverged from the defendant's on some material legal or factual issue and resulted in 'an actual lapse in representation.'" *Triana* v. *United States*, 205 F.3d 36, 40-41 (2d Cir. 2000). This is a three-part showing. First, the petitioner must show an actual conflict of interest, that is, that the "attorney's and defendant's interest diverge with respect to a material factual or legal issue or to a course of action." *United States* v. *Moree*, 220 F.3d 65, 69 (2d Cir. 2000) (internal citations and quotation marks omitted). Second, the petitioner must demonstrate an "actual lapse in representation" that resulted from the conflict. "An actual lapse in representation is demonstrated by the existence of some plausible alternative defense strategy not taken up by counsel." *Id.* (internal quotation marks and citations omitted).  Third, the petitioner must show that the alternative defense was "inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."

21

*Id.* (internal quotation marks and citations omitted.) (emphasis in original). In other words, the petitioner must show that "trial counsel chose not to undertake [the alternative strategy] because of his conflict." *Winkler* v. *Keane*, 7 F.3d 304, 309 (2d Cir.1993).

In this case there was no actual or potential conflict of interest. Assuming *arguendo* that his allegations about former counsel Mr. Lombardino are true – that Mr. Lombardino was also represented one of Curshen's co-conspirators – those allegations do not prove his ineffectiveness, as that is a waivable conflict which had been disclosed by Lombardino to Curshen. In any event, Curshen acknowledges that, by the time of the plea, he was being represented by Mr. Ruggiero, not Mr. Lombardino. Whatever conflict of interest Lombardino faced is simply irrelevant. Moreover, the allegations against defense counsel Ruggiero do not show a conflict of interest. All defense attorneys have multiple clients and all defense counsel have to allocate their time among their various clients. The allegations made here do not constitute a legally-cognizable conflict of interest and are insufficient to overcome the strong presumption that counsel acted within the wide range of reasonable professional assistance. *See Ajayi* v. *United States*, 2005 WL 2105548, at *1-2 (S.D.N.Y. 2005) ("Petitioner claims that defense counsel's responsibilities in other trials distracted them from their duties in his case, thus creating a conflict of interest. Though petitioner may believe that defense counsel should have devoted more time to his case, he has failed to allege a conflict of interest in the legal sense.").

    **4.    The Equities Counsel Against Withdrawal**

Finally, the Court should deny Curshen's motion to withdraw given the lapse of time since Curshen's plea and the substantial prejudice the Government would face should Curshen's plea be vacated.

Curshen's plea occurred on June 24, 2009.  He did not move to withdraw his plea until February 2011, approximately 20 months later.  The passage of nearly two years between his plea and his motion to vacate is "so extraordinary as to warrant denial of the motion on that basis alone." *United States* v. *Dukagjini*, 198 F.Supp.2d 299, 302 (W.D.N.Y. 2002) ("[T]he longer it takes a defendant to seek withdrawal, the less likely his reasons will justify permitting withdrawal of the plea.").  Indeed, the fact that the defendant's delay was caused, to some degree, by efforts to cooperate with federal prosecutors in Washington, D.C. (*see* 11/20/10 transcript in this case), does not excuse the delay in filing this motion; rather, it shows that the motion is little more than sour grapes after his cooperation went nowhere.

Finally, the Government would be prejudiced by withdrawal at this point of the prosecution.  This case has been reassigned to a new prosecutor and a new FBI agent, neither of whom were initially involved in the charging of this case or the investigation.  Moreover it has been three and one half years since the investigation began.  The recollection of witnesses has obviously deteriorated over the years. There is no fair and just reason to permit the defendant to withdraw his guilty plea at this late stage.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully requests that the Court

summarily deny, without an evidentiary hearing, the defendant Jonathan Curshen's motion to

withdraw his guilty plea.

Dated: April 11, 2011
      New York, New York

                           Respectfully submitted,
                           PREET BHARARA
                           United States Attorney


By:   /s/ Avi Weitzman
         Avi Weitzman
         Assistant United States Attorneys
         Tel. No.: (212) 637-1205

## **AFFIRMATION OF SERVICE**

AVI WEITZMAN hereby affirms pursuant to Section 1746 of Title 28, United States Code:

1.      I am an Assistant United States Attorney in the office of Preet Bharara, United States Attorney for the Southern District of New York.

2.      On April 11, 2011, I caused a true and correct copy of the foregoing Government's Memorandum of Law in Response to Defendant's Motion to Withdraw His Guilty Plea to be served by electronic mail and the Court's Electronic Case Filing system on:

> Joseph Grob, Esq.
> Counsel for Jonathan Curshen

3.      I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. § 1746.

Dated:       New York, New York
             April 11, 2011

                                        /s/ Avi Weitzman_____
                                        AVI WEITZMAN

25