Joseph A. Grob (JAG 7975)
Goldberg & Rimberg, PLLC
115 Broadway
New York, New York 10006
(212) 697-3250

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br><br>v.<br><br>JONATHAN RANDALL CURSHEN<br><br>Defendant. | 09-Cr-33 (LBS) |

**SENTENCING MEMORANDUM**

Goldberg & Rimberg, PLLC
BY: Joseph A. Grob (JAG 7975)
115 Broadway
New York, New York 10006
(212) 697-3250

## TABLE OF CONTENTS

INDEX TO EXHIBITS……………………………..………………………………….p. iii

I.      INTRODUCTION……………………………………………………...….p.1

II.     APPLICABLE LEGAL STANDARDS………………………………...p. 1

      A.     Jonathan's Personal Background……………….………………p.2

            i.     Jonathan's Personal Background Prior to the Offense……………....p.2

            ii.    The Circumstances Surrounding the Offense………………………p. 5

            iii.   Jonathan's Personal Background Subsequent to the Offense……….p. 6

            iv.   Jonathan's Mental Health Status……………………………….…p. 8

      B.     The Guidelines Calculations……………………………………...…p. 8

            i.     The Stipulated Guidelines Offense Level……………………………p. 8

            ii.    The Impact of Jonathan's Motion to Withdraw the Plea of Guilty….p. 9

                 a.    Jonathan Should Be Afforded A 3 Level Reduction For Acceptance Of Responsibility Notwithstanding The Fact That He Filed A Motion To Vacate The Plea Of Guilty………...p. 9

      C.     Post *Booker* Sentencing Considerations…………………………….p. 10

            i.     The Guideline Calculations in this Case Overstate Jonathan's Culpability…………………………………………p. 12

      D.     Other Factors to Consider in Determining What Sentence to Impose....p. 15

            i.   The Seriousness of the Offense; Promoting Respect for the Law; and Providing Just Punishment…………….....................................................p. 15

            ii.  Providing Adequate Deterrence and Protecting the Public from Further Crimes of the Defendant………………………p. 16

            iii. Providing the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner………………..p. 17

iv.  Avoiding Unwarranted Sentencing Disparities…………………..…p 18

v.  Jonathan's Personal Circumstances, His Family
Circumstances and His History of Good Deeds Warrant
the Imposition of a Non-Guideline, Non-Custodial Sentence………p. 19

a.  Jonathan's ADHD…………………………………………p. 19

b.  Jonathan as a Person and his Good Deeds
and Acts of Kindness…………………………………………p. 20

c.  Jonathan's Children and Family Circumstances…………....……p. 25

**E.**   **What Sentence To Impose?**...................................................................p. 27

**CONCLUSION**……………………………………………………… ……..p. 29

## INDEX TO EXHIBITS

| | |
|---|---|
| EXHIBIT A | Plea Agreement |
| EXHIBIT B | Hospital Records Valley Hospital Ridgewood, N.J. |
| EXHIBIT C | Amended Disclosure Statement for the Renewable Corp. |
| EXHIBIT D | Badolato disclosure on behalf of IBOT in April 2009 |
| EXHIBIT E | Documents obtained from the Government indicating that the Brokerage firm being utilized to place the trades in this case was Jefferies & Co. in New York and amount of shares purchased by the Government |
| EXHIBIT F | Document reflecting commission payment |
| EXHIBIT G | Letter of Merly Cushen |
| EXHIBIT H | Appearance Bond Southern District of Florida |
| EXHIBIT I | Translated of letter from therapist in Costa Rica. |
| EXHIBIT J | Jonathan Curshen's letter to Judge Sand |
| EXHIBIT K | Price chart obtained from Government Regarding IBOT. |
| EXHIBIT L | Copy of the judgment and the indictment in *United States v. Jadidian* |
| EXHIBIT M | Copy of transcript for sentencing in *United States v. Jadidian* |
| EXHIBIT N | Letter of Joseph Bartel |
| EXHIBIT O | White color crime sentencing analysis from *United States v. Parris.* |

| EXHIBIT P | Sentencing transcript from *United States v. Curtis* |
|---|---|
| | |
| EXHIBIT Q | Letter of Dr. Craig Schacher |
| | |
| EXHIBIT R | Letter of Scott Barr |
| | |
| EXHIBIT S | Letter of Bob Deighton |
| | |
| EXHIBIT T | Letter of Mark L. Tishman |
| | |
| EXHIBIT U | Letter of Ronald Sheridan, Jr. |
| | |
| EXHIBIT V | Letter of Rabbi Chaim Steinmetz |
| | |
| EXHIBIT W | Letter of Kelly Deitz Henderson |
| | |
| EXHIBIT X | Letters of  Lawrence Gillston and Seth Gillston |
| | |
| EXHIBIT Y | Letter of Jonathan's father Andrian Curshen |
| | |
| EXHIBIT Z | Letters of other friends and family members |
| | |
| EXHIBIT AA | Letters of ███████████ Curshen. |
| | |
| EXHIBIT BB | Letter regarding ████ Curshen from the Jewish Family and Children's services. |
| | |
| EXHIBIT CC | Letter from Jonathan's current therapist. |
| | |
| EXHIBIT DD | Transcript of conversation between The Undercover and Jonathan Curshen |
| | |
| EXHIBIT EE | Document regarding costs of imprisonment. |

# GOLDBERG & RIMBERG PLLC

115 BROADWAY – 3RD FLOOR
NEW YORK, NEW YORK 10006
Tel: (212) 697-3250
Fax: (866)651-3196 (Writer's Direct)

September 6, 2011

**BY HAND**

Hon. Leonard B. Sand
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY   10007

Re:   United States v. Jonathan Randall Curshen
09-cr-00033 (LBS)

Dear Judge Sand:

This letter is respectfully submitted on behalf of defendant Jonathan Randall Curshen ("Jonathan"), and in connection with his upcoming sentencing, which is scheduled to take place on September 13, 2010, at 10:00 A.M.

## I.   INTRODUCTION

On June 24, 2009, Jonathan pleaded guilty, pursuant to a plea agreement with the Government, to participating in a conspiracy to commit securities fraud and commercial bribery in violation of 18 U.S.C. § 371.  A copy of the plea agreement is annexed hereto as **Exhibit A**.

The plea agreement in this case contemplates certain stipulations based upon the United States Sentencing Guidelines (the "Guidelines").  Specifically, the agreement contemplates a Guidelines base offense level of 8 pursuant to U.S.S.G. § 2B4.1(a).  *See* Exhibit A. The agreement contemplates that Jonathan's Guidelines level should be increased by 8 levels, to level 16, because the value of the benefit conferred was over $70,000 but less than $120,000.  *See* Exhibit A. The agreement then contemplates a 3 level reduction, to level 13, for acceptance of responsibility pursuant to U.S.S.G. §§ 3E1.1(a) and (b).  Further, the agreement provides that Jonathan should be assigned to criminal history category I because he has no criminal history points.  See Exhibit A.

As will be discussed more fully below, the facts and circumstances in this case warrant the imposition of a lower, non-Guideline sentence, than the sentence called for by the Guidelines and Plea agreement in this case.

## II.   APPLICABLE LEGAL STANDARDS

When imposing sentence, the Court is required to consider the United States Sentencing Guidelines (the "Guidelines") together with all of the factors set forth in 18 U.S.C. § 3553(a) in determining what is a reasonable sentence in each individual case.  *See United States*

Hon. Leonard B. Sand
September 6, 2011
Page 2 of 29

*v. Booker,* 543 U.S. 220, 125 S. Ct. 738 (2005) ("*Booker*").  The overarching command of § 3553(a), is the Parsimony Clause, which instructs district courts to impose a sentence "sufficient, but not greater than necessary" to accomplish the goals of sentencing.  Section 3553(a)(2) states that such purposes are:

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a).

In determining what a proper sentence is in each individual case, the Court is further directed to consider: the nature and circumstances of the offense and the history and characteristics of the offender; the kinds of sentences available; the kinds of sentence and the sentencing range established in the Sentencing Guidelines; the policy statements issued by the Sentencing Commission; the need to avoid unwarranted sentence disparities among similarly situated defendants; and the need to provide restitution to any victims of the offense.  *See* 18 U.S.C. § 3553(a)(1), (a)(1)-(7).

**A.      Jonathan's Personal Background.**

i.    Jonathan's Personal Background Prior to the Offense.

Jonathan is a 47 year old white male, born in Flushing, New York on December 17, 1964.  He is the older of two children born to Andrian Curshen and Helen Gillston.  Jonathan's parents have been divorced since 1995.  Jonathan's father, Andrian, is 76 years old, he is a licensed real estate broker and he resides in Glen Rock, NJ.  Andrian previously worked as a General Manager for Expediters of the Printed Word/Mercury Air Freight in New York City.

Jonathan's mother, Helen, age 70, resides in San Jose, California, with her current husband Bruce Matzner.  Jonathan's mother suffers from several medical conditions including but not limited to diabetes and high blood pressure.  As a result of her severe and uncontrollable diabetes, Jonathan's mother had to have her leg amputated in August 2010.

Jonathan's sister, Caroline (Curshen) Brown, age 44, is a homemaker and resides in Sarasota, Florida, with her husband and their 2 children, Erica and Tyler.

Jonathan reports that when he was young his family travelled around a lot because of his father's work in the international air freight business.  As a result of that travelling,

Hon. Leonard B. Sand
September 6, 2011
Page 3 of 29

Jonathan had the opportunity to visit different countries and to experience different aspects of international culture.  From 1968 to 1980, Jonathan resided in New York, Toronto and Berkshire County, England.  In England, he attended Desborough Boys School, located in Maidenhead, England from which he graduated in 1979. While in England, at around the tender age of 12 or 13, Jonathan began to use and abuse alcohol and other substances.

      In 1980, after returning to the United States, Jonathan and his family resided in Glen Rock, New Jersey.  Jonathan enrolled in and attended the Glen Rock High School, also located in Glen Rock, New Jersey.  While in high school, Jonathan appeared to be very depressed and he continued to use and abuse alcohol as well as controlled substances including but not limited to marijuana, cocaine, amphetamines and barbiturates.

      In June 1981, when Jonathan was only 16 years old and while still attending high school, Jonathan had a severe



In October 1981, Jonathan was

**Exhibit B**.

      In June of 1982, Jonathan dropped out of high school and moved to Dallas, Texas, where he resided until 1983.  While residing in Dallas, Jonathan worked at and managed a local Shakespeare Beethoven and Company, a book and music store located throughout the southern U.S.

      In or around 1983, Jonathan returned to live in Glen Rock, NJ.  At that time, he initially obtained employment with the accounting department of USA Cable Network.  In 1984, Jonathan left USA Cable and went to work for The Metropolitan Life Insurance Company. While at Metropolitan Life, Jonathan studied for and passed the NASD Series 7 exam, but never activated his license.  Additionally, in 1984, Jonathan also obtained his Graduate Equivalency Diploma from the State of New Jersey.

      In 1985, while working, Jonathan also enrolled in and completed approximately 5 academic credits at the Bergen Community College in Paramus, New Jersey.  Later in 1985, Jonathan moved to Los Angeles, California, where he resided for approximately one year.

      Subsequently, Jonathan relocated to Vancouver, British Columbia, where he resided for the next few years.  In Vancouver, Jonathan started getting involved in the Stock

Hon. Leonard B. Sand
September 6, 2011
Page 4 of 29

Market.  He organized and formed a company called Hollywood Promotions, which represented a number of development stage companies, many of which were located in Canada and the U.S. In this role, he worked to raise seed and investment capital for these various companies.

In or around 1989, Jonathan sold Hollywood Promotions to his partner.  He then relocated to Miami, Florida, and began to work as a consultant for Mark Properties, one of the largest real estate ownership groups in Dade and Broward counties in Florida.  Also in 1989, Jonathan met and became involved in a consensual relationship with Rita Mercedes Reyes.  In April 1989, Jonathan and Rita married and they relocated temporarily to Philadelphia, Pa., where he worked as a consultant to Centaur Financial, a small investment firm.

In 1990, Jonathan and Rita moved to Sarasota, Florida.  In Sarasota, Jonathan initially obtained employment with the Aegon Financial Group.  During this time, however, Jonathan was using and abusing alcohol and narcotics regularly.  In late 1990, Jonathan hit a low point and he was admitted to Sarasota Memorial Hospital in Sarasota, Florida, as a result of his addictions.  At Sarasota hospital, Jonathan received some addiction counseling and treatment. For the next few years, Jonathan continued to struggle with his addictions to illegal narcotics and to alcohol.  In 1993, Jonathan was able to mount a successful battle against his addictions and he stopped using.  From 1993 to date, Jonathan has been an active member of Narcotics Anonymous and he has lived a drug and alcohol free life.  He continues to attend Narcotics Anonymous meetings to date.

In or around November 1993, Jonathan started a company called Southern Assurance Group, Inc.  Initially Southern Assurance sold life and health insurance and annuities. Beginning in 1994, Southern Assurance became involved in providing comprehensive assistance to development stage companies in the area of corporate finance and corporate structuring.

In or around 1994, Jonathan began to travel to Central America, where his wife and her family originated.  Jonathan developed an affinity to Central America and he became interested in living and working there in the future.

From 1991 through November 1997, Jonathan and his wife resided together in Sarasota, Florida.  The couple had not children and  parted company in 1997, but did not formally divorce until February 1999.

In or around 1997, Jonathan formed Red Sea Management Ltd, in Costa Rica ("Red Sea").  Red Sea specialized in things like offshore company incorporation, offshore asset protection, and investments.  Red Sea subsequently developed into Sentry Global Securities ("SGS") and Sentry Global Trust ("SGT"), which was licensed and regulated by the Federation of St. Kitts and Nevis and even maintained offices on those Islands.  Subsequently, the corporation was renamed International Legal Services Group ("ILGS").  From 1998 and until his arrest in connection with this case in 2008, Jonathan was working at Red Sea, SGS, SGT and ILGS.  Subsequent to Jonathan's arrest in this case, the offices of Red Sea, SGS and SGT were raided by the Costa Rican authorities who were aiding the United States in an investigation.

Hon. Leonard B. Sand
September 6, 2011
Page 5 of 29

In or around 1996, Jonathan met his current wife Merly Barrios.  In or around1997, after Jonathan and his first wife separated, Jonathan and Merly started to develop a romantic relationship which ultimately blossomed into their current marriaige.  Jonathan and Merly have had three children together;  were born in the United States, while ▮▮▮▮ was born in Costa Rica.

In or around 2004-2005, Jonathan was appointed as the Honorary Consul General of Saint Kitts and Nevis to Costa Rica.  That position was revoked following his arrest in this case in 2008.

In September 2008, Jonathan was arrested for his alleged involvement in the fraud alleged in this case.[1]

ii.    <u>**The Circumstances Surrounding the Offense.**</u>

In or around 2005 or 2006, Andrew Badolato ("Badolato"), effected a reverse merger of a public company with a private company which ultimately formed International Biotechnology Corporation and whose securities traded in the United States as symbol  IBOT ("IBOT").  *See* Amended Disclosure Statement for the Renewable Corp., annexed hereto as **Exhibit C**.

Subsequently, Badolato asked Jonathan and his companies Red Sea Management and Sentry Global Securities to help Badolato to raise capital and to find investors for those privately issues shares of IBOT stock.  Badolato told Jonathan that he was willing to pay fees in order to raise capital for his new company and to facilitate the sale of the IBOT stock.

Pursuant to Badolato's instructions, Red Sea sought to find financing by way of selling Mr. Badolato's shares of IBOT's securities, which had been previously pledged and placed with SGS for sale in the market.  Mr. Badolato requested that the securities not be sold for less than $.50 per share as illustrated in the statement made by Badolato on behalf of IBOT in April 2009.  A copy of that statement is annexed hereto as **Exhibit D** and may be located at https://www.otciq.com/otciq/ajax/showFinancialReportById.pdf?id=20289. [2]

---

[1] In or around 2000, the Securities and Exchange Commission prosecuted a civil claim against Jonathan arising out of a stock promotion program related to a penny stock called "Freedom Golf."  *See Securities and Exchange Commission v. C. Jones and Co. et.al.*, 03-cv-00636-WDM-KLM.  In March 2009, the Court concluded, among other things, that in early 2000, Curshen knowingly or recklessly reposted projections and other financial information about Freedom Golf, which he should have known to be false.   The Court further found that Jonathan knowingly failed to disclose that he was being paid to promote Freedom Golf and was selling the company's stock while touting the company.  As part of the judgment issued, Jonathan was ordered to pay a penalty of $66,235 plus prejudgment interest.
[2] Upon information and belief, the OTCIQ site is designed to assist OTC traded companies communicate with investors.

Hon. Leonard B. Sand
September 6, 2011
Page 6 of 29

From in or around 2007, Bruce Grossman, one of the consultants/stock promoters at Red Sea and SGS was working on finding buyers for the IBOT securities that Badolato was trying to sell.  Later in 2007, Charlie Moore ("Moore"), the Government's undercover agent in this case, was introduced to Mr. Grossman and to Jonathan.  Moore indicated that he had several brokers at a company called Jefferies & Company, Inc. ("Jefferies"), who controlled discretionary accounts on behalf of "whale" clients who would be willing to invest in the offering but only in exchange for a 25-30% fee.  Annexed hereto as **Exhibit E** are documents obtained from the Government indicating that the Brokerage firm being utilized to place the trades in this case was Jefferies & Co. in New York ("Jeffries").  Moore also insisted that Jonathan and his employees not disclose the commission and/or fees to Jefferies' customers.

From June 27, 2008 through July 2, 2008, Moore placed various orders for IBOT stocks through Jefferies.  The total number of IBOT shares purchased by the Government through Moore was 85,000.  On June 27, 2008, the Government bought 20,000 shares, on June 30, 2008, the Government bought 20,000 shares, and on July 1 and 2, 2008, the Government bought 22,500 shares on each day.  *See* **Exhibit E**.

On or about July 3, 2008, Moore was wired a commission/fee in the amount of $19,000  for the purchase/sale of the 85,000 shares of IBOT.  *See* **Exhibit F**.  Payment of that commission was authorized by Jonathan, but came from a trust account belonging to Badolato and or his company.  *See* **Exhibit F**.

Contrary to the recitation of facts outlined in the Government's sentencing letter dated September 2, 2011 ("Gov. Mem.')  (at page 14, paragraph 1, line 4), there was never any agreement or requirement that any brokers buy and "HOLD" and/or  not sell IBOT stock.  In fact, the transcript of the meeting between Mr. Curshen and the undercover agent reveals the opposite.  When asked a question about holding or letting the IBOT securities sit in the brokerage account without being sold (in order to manipulate the price of the stock), Jonathan replied to the undercover as follows:

"They can. If they want to sell, they can sell."[3]

Such a statement completely belies the Government's contention that this was a pump and dump scheme where the securities would be held.   In fact, neither the criminal complaint not the Information filed against Jonathan allege such a pump and dump scheme.

On or about September 4, 2008, Jonathan was arrested for his role in the offense.

### iii.   <u>Jonathan's Personal Background Subsequent to the Offense</u>.

After his arrest on September 4, 2011, Jonathan was arraigned in Magistrate Court in the Southern District of New York where a bail package was set.  The bail package imposed was a 1.2 million dollar personal recognizance bond, cosigned by 5 financially responsible

---

[3] A copy of the relevant section of that transcript is annexed hereto as Exhibit DD.

Hon. Leonard B. Sand
September 6, 2011
Page 7 of 29

persons, including Jonathan's wife, father, brother-in-law, rabbi, and sister-in-law.  Further, the
bond was secured by $150,000 in cash and 2 properties in Sarasota, Florida, and Jonathan's
travel was restricted to the Southern and Eastern Districts of New York.

       In October 2008, within weeks of Jonathan's arrest, the Government, with the
cooperation of the Government in Costa Rica, raided the offices of Red Sea, SGS, and SGT,
which completely shut down those businesses.

       During the raid, Jonathan's wife, Merly Barrios, was present.  She was told by the
United States Agents from the Federal Bureau of Investigation, who were participating in the
seizure, that if she were to come to the United States, she would be arrested.  As a result of the
statements made by the above-referenced FBI Agent in Costa Rica, Merly has been terrified of
traveling to the United States because she is afraid that she will be arrested.  If both she and
Jonathan are arrested and/or incarcerated, she is concerned that there will be nobody to take care
of their children.  Jonathan has been seeking to secure safe passage for Merly to travel to the
United States to join him and help raise the children with him for the last 3 years, but has been
unable to secure written assurances that Merly will not be arrested, and accordingly, Merly has
been unable to travel to the United States to be with Jonathan since his arrest in 2008.

       When Jonathan realized that Merly would not be able to travel to the United
States and realizing that he might serve jail time, he wanted to be able to spend as much time
with his children as possible, and thus, Jonathan and Merly opted to allow the children to spend
whatever time they could with Jonathan by allowing them to attend school in the United States.
In her letter to Your Honor (**Exhibit G**), Merly explains:

> My life for the past three years, has been truly challenging and
> painful to such degree that one can only describe it as a true
> living hell.  I have been forced to live alone, without my
> husband and children during this period.  The uncertainty of
> my husband's situation and the fact that we were unsure of
> how long the judicial process might take, and what the eventual
> outcome might be, made us decide the unthinkable.  Against
> my motherly instincts, I have agreed to sacrifice my time with
> our children and have allowed them to spend the last three
> years exclusively with their father, limiting myself to only
> occasional visits.  This was to provide the opportunity for our
> very young children to spend as much time possible with their
> father.  The result of which has been a situation where no
> mother would wish for nor would agree to under normal
> circumstances.

*See* **Exhibit G**.

       Since his arrest in this case, Jonathan has endeavored to live an honest and law
abiding life.  From November 2009 through July 2011, Jonathan worked for Gimmee Jimmy's

Hon. Leonard B. Sand
September 6, 2011
Page 8 of 29

Cookies, a commercial bakery located at 27 Cutter Avenue, Hawthorne, New Jersey.  Initially, Jonathan's job location was the Paramus Park Mall in Paramus, New Jersey, where he simply worked as a cookie salesman.  Subsequently, Jonathan worked at the company's headquarters and he was involved in advertising, distribution and promotion.

In or around February 2011, Jonathan was indicted in the Southern District of Florida, under Indictment # 11-cr-20131-JEM, in connection with his alleged participation in a 2003-2008 securities fraud scheme related to a security known as Co2Tech.  Jonathan was released pursuant to a significant bail package in that case and the terms of his bond include electronic monitoring and GPS location detection services.  *See* **Exhibit H**.  Indictment 11-cr-20131-JEM is currently scheduled for trial for January 17, 2012.

Finally, as this Court is aware, in February 2011, Jonathan filed a motion to vacate the previously entered guilty plea in this case.  On July 13, 2011, Your Honor denied that motion.

    iv.    <u>Jonathan's Mental Health Status</u>.

As noted above, Jonathan has been suffering from depression and some mental health issues since his adolescence.  *See* **Exhibit B**.  Additionally, Jonathan has been suffering from Attention Deficit and Hyperactivity Disorder (ADHD) for most of his adult life.  In that regard, Jonathan's former therapist from Costa Rica indicates that Jonathan has been undergoing therapy at least from 2003 through 2008, when he was arrested.  *See* **Exhibit I**.

    **B.**    **<u>The Guidelines Calculations.</u>**

    i.    <u>The Stipulated Guidelines Offense Level</u>.

In the plea agreement, the parties agreed that the November 2008 sentencing Guidelines applied to this case and that the offense is governed by U.S.S.G. §§ 2B4.1 and 2E1.2.  *See* **Exhibit A**.  The plea agreement calculates a base offense level of 8 pursuant to U.S.S.G. § 2B4.l(a). *Id.*  The plea agreement next contemplates an 8 level enhancement pursuant to U.S.S.G. §§ 2B4.l(b)(l) and 2B1.1(b)(I)(F) because the alleged "improper benefit to be conferred" was more than $70,000, but less than $120,000.  Before any other adjustments, the above calculations yield an adjusted base offense level of 16.

The agreement also contemplates a 2 level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1 (a) and an additional 1 level reduction pursuant to U.S.S.G. § 3E1.1(b) for a timely plea of guilty.

Hon. Leonard B. Sand
September 6, 2011
Page 9 of 29

    ii.  <u>The Impact of Jonathan's Motion to Withdraw the Plea of Guilty.</u>

      a. Jonathan Should Be Afforded A 3 Level Reduction For
        Acceptance Of Responsibility Notwithstanding The Fact
        <u>That He Filed A Motion To Vacate The Plea Of Guilty.</u>

    Notwithstanding the Government's request that Jonathan be denied any credit for acceptance of responsibility because he moved to vacate his previously entered plea of guilty, the Court may still afford a Guidelines level reduction for acceptance of responsibility.

    U.S.S.G. § 3E1.1 provides for a 2 or 3 three-level decrease in defendant's offense level calculation where defendant "clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1. According to the Guideline, "[a] defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right." *Id; see also* U.S.S.G. § 3E1.1, comment. (n.3).

    An attempt to withdraw a plea, however, does not automatically disqualify a defendant from seeking a downward adjustment for acceptance of responsibility. *United States v. Hirsch,* 239 F.3d 221 (2D Cir. 2001), *quoting*, *United States v. Negron,* 967 F.2d 68, 73 (2d Cir. 1992). Rather, the Court "must evaluate the reason for the attempt to withdraw the plea and assess the acceptance-of-responsibility question in that light." *United States v. Negron,* 967 F.2d at 73. In *Negron, supra*, the Court cited to U.S.S.G. § 3E1.1, Application Note 2, and stated that where the motion to vacate did not relate to a claim of factual innocence, a reduction for acceptance could be afforded to a defendant. The court explained further that in situations where a defendant admits being a member of the conspiracy but disputes the amount of narcotics involved should not result in a denial of an adjustment for acceptance of responsibility. *Id.*

    In this case, it is true that Jonathan moved to vacate his plea based, in part, on a claim of actual innocence. The claim of actual innocence, however, was not a denial of the conduct in which Jonathan engaged. Rather, even with the assertion of innocence, Jonathan never denied agreeing to pay a commission to the brokers controlled by the alleged undercover agent and he never denied that he agreed to and did, in fact, pay a $19,000 commission to the Government agent. *See* Letter of Jonathan Randall Curshen, annexed hereto as **Exhibit J**. Rather, Jonathan's claims of innocence relate more to whether he had any intent to defraud anybody in this case. Jonathan, in his motion to vacate the plea maintained a) that there were enough disclosures of fees and commission and a conflict of interest on the Jefferies & Co. website to warn potential customers of the fictitious Jefferies brokers based upon the disclosures and that the so called "hidden" fees were not intended to defraud anyone, and b) that Jonathan had no intent to defraud because he had no obligation to disclose commissions on stock purchases to the fictitious customers/clients of the fictitious brokers in this case. *Id.* Thus, in his motion to withdraw his guilty plea, Jonathan admitted the conduct, but denied criminal intent. The defense posits that this type of motion to vacate should not necessarily preclude an adjustment for acceptance of responsibility because Jonathan admitted the conduct but sought to challenge only the issue of intent. Such a challenge is akin to a defendant who "goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional

Hon. Leonard B. Sand
September 6, 2011
Page 10 of 29

challenge to a statute or a challenge to the applicability of a statute to his conduct)." *See* U.S.S.G. § 3E1.1, Application Note 2.  Indeed, Jonathan was merely challenging the applicability of the law to his conduct in this case.  As such, this Court need not deny Jonathan a reduction for acceptance of responsibility.

## C.    Post *Booker* Sentencing Considerations.

As the Court is aware, the *Booker* decision had a drastic impact on federal sentencing because it eliminated the mandatory nature of the sentencing Guidelines and restored discretion in the imposition of a sentence to the judiciary.

Prior to the *Booker* decision, courts were permitted to vary from the Guidelines only in the context of downward departure motions and only where "extraordinary circumstances" existed.  *See e.g., United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991) (family circumstances); *United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (extraordinary cases where "number of factors that, when considered individually, would not permit a downward departure" but when considered in combination justify departure).

After *Booker*, however, a "downward departure" is not necessary to impose a sentence outside of a specific Guidelines range, and variances from the sentencing Guidelines pursuant to 18 U.S.C. § 3553(a) do not require "extraordinary circumstances."  *See Gall v. United States*, 552 U.S. 38, 47, 128 S. Ct. 586, 595-96 (2007) (rejecting rule that requires "extraordinary circumstances" to justify a non-Guidelines sentence).  Indeed, Judges may now even take into consideration that some Guideline provisions fail to properly reflect the statutory sentencing considerations contained in 18 U.S.C. § 3553(a), that they reflect unsound judgment, or that a variance is appropriate nevertheless.  *See Rita v. United States*, 551 U.S. 338, 339, 356, 127 S. Ct. 2456, 2465, 2468 (2007); *Accord Pepper v. United States*, __U.S. __, 131 S. Ct. 1229, 1247 (2011).

Further, although the Guidelines must be given consideration as one of the statutory sentencing factors, courts should not simply defer to the policy decisions of the United States Sentencing Commission.  *Gall, supra*, 552 U.S. at 45-49, 128 S. Ct. at 594–96.  To that end, in *Kimbrough v. United States*, 552 U.S. 85, 128 S. Ct. 558 (2007), the Court explained that the reason that the Guidelines are the "starting point and the initial benchmark" is because the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.'"  *Id.* 552 U.S. at 108-109, 128 S. Ct. at 574-75.  The Court then specifically found that with  respect to the narcotics Guidelines (U.S.S.G. § 2D1.1), "[t]he Commission did not use this empirical approach in developing the Guidelines sentences for drug-trafficking offenses.  Instead, it employed the 1986 Act's weight-driven scheme."  *Id.* 552 U.S. at 95-96, 128 S. Ct. at 567.

The *Kimbrough* Court went on to state that where a particular Guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role" then a court does not abuse its discretion in rejecting it. *Kimbrough, supra*, 552 U.S. at 93-99, 108-109, 128 S. Ct. at 566–69, 574–75.

Hon. Leonard B. Sand
September 6, 2011
Page 11 of 29

   Indeed, The Second Circuit has repeatedly noted that the Supreme Court meant what it said in Kimbrough, and that a "district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses." *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008) (en banc) (upholding upward departure based on sentencing court's categorical disagreement with Guidelines for gun trafficking offenses). Moreover, the Supreme Court has explicitly held that: "Guidelines are not only not mandatory on sentencing courts; they are not to be presumed reasonable." *Nelson v. United States*, 555 U.S. 350, 129 S. Ct. 890, 892 (2009) (emphasis in the original); *Cavera, 550 F. 3d at 190* (noting that the Second Circuit does not presume that a Guideline-range sentence is reasonable) (citations omitted).

   The Second Circuit has observed further that:

> [a]lthough the sentencing judge is obliged to consider all of the sentencing factors outlined in section 3553(a), the judge is not prohibited from including in that consideration the judge's own sense of what is a fair and just sentence under all the circumstances.

*United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006). Indeed, the Second Circuit has specifically stated that previous limitations on grounds for leniency as articulated in the Guidelines such as age (U.S.S.G. §5H1.1); education (U.S.S.G. § 5H1.2); mental conditions (U.S.S.G. § 5H1.3); drug dependence (U.S.S.G. § 5H1.4); employment record (U.S.S.G. §5H1.5); family ties (U.S.S.G. § 5H1.6); prior good works (U.S.S.G. § 5H1.11) are no more binding on sentencing judges than the calculated Guidelines ranges themselves." *United States v. Jones, supra*, at 194.

   In the aftermath of *Gall* and *Kimbrough,* courts have recently begun the process of scrutinizing Guidelines, finding that many of them are not in fact the product of empirical research or national surveys of sentencing practices. *See, e.g., United States v. Shipley*, 560 F. Supp. 2d 739, 744 (S.D. Iowa 2008) (child pornography Guideline not based upon empirical data). *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1104-05 (N.D. Iowa 2009) (categorically rejecting child pornography Guideline); *United States v. Galvez-Barrios*, 355 F. Supp. 2d 958, 962 (E.D. Wis. 2005) (illegal reentry Guideline not based upon any empirical data or studies); *United States v. Thomas*, 595 F. Supp. 2d 949 (E.D. Wis. 2009) (categorically rejecting powder cocaine Guideline); *United States v. Cabrera*, 567 F. Supp. 2d 271 (D. Mass. 2008) (rejecting powder cocaine Guidelines due to over-emphasis on drug quantity, under-emphasis on minimal role); *Cavera,* 550 F. 3d at 180 (categorically rejecting firearm Guidelines); *United States v. Lenagh*, 2009 WL 296999, *3-4, 6 (D. Neb. Feb. 6, 2009) (imposing below Guideline sentence for conspiracy to commit health care fraud "because the fraud offense Guidelines were promulgated pursuant to Congressional directive rather than by application of the Sentencing Commission's unique area of expertise, [so] the court affords them less deference than it would to empirically-grounded Guidelines. Also the Guidelines calculation is driven by the amount of loss. Although, as a general rule, the amount of loss or damage is one measure of the seriousness of an offense, and should surely determine the amount of restitution, it is not always a reliable proxy for the culpability of an individual defendant."); *United States v.*

Hon. Leonard B. Sand
September 6, 2011
Page 12 of 29

*Parris*, 573 F. Supp. 2d 744, 756 (E.D.N.Y. 2008) (securities fraud where court disagreed with §2B1.1's heavy focus on loss amount and its "one-size-fits-all approach for its number of victims, [and] officer/director and manager/supervisor enhancements"); *United States v. Gardellini*, 545 F.3d 1089, 1092 (DC Cir. 2008) (affirming below Guideline sentence in tax fraud case based on district court's application of § 3553(a) factors and finding that the Guideline sentence would over-punish the defendant).

   In this case, it is respectfully submitted that the Guidelines are not empirically based and this Court need not follow the Guidelines in imposing sentence in this case. Indeed, in *United States v. Lenagh*, 2009 WL 296999 (D. Neb. Feb 06, 2009), the court specifically found that with respect to the fraud and white collar crime Guideline "the Commission did not employ its characteristic empirical approach when setting the Guidelines ranges for white-collar crimes." 2009 WL 296999at *3, *citing,* Fifteen-Year Assessment, Executive Summary at vii, 15, 56. [4]

   i.  The Guideline Calculations in this Case Overstate Jonathan's Culpability.

   The Guidelines in this case were originally calculated based upon a base offense level of 8 and an 8 level increase pursuant to U.S.S.G. § 2B4.1(b)(1) because the amount of the alleged improper benefit was more than $70,000 and less than $120,000. The Probation Department seems to calculate this based upon the value, or lack of value, of the securities purchased by the undercover during the sting operation in this case. This calculation is incorrect.

   Jonathan does not dispute that the applicable sentencing Guideline is found at Section 2B4.1 of the Sentencing Guidelines. The defendant concedes that this is the appropriate Guideline to apply in this case, because he pled guilty to the "bribery" object of the conspiracy charged in the information filed in this case.

   Jonathan also agrees that the applicable Guideline requires that the base offense level be increased based on the greater of value of the bribe paid or the "improper benefit" conferred from the sale of the stock. *See* U.S.S.G. § 2B4.1(b)(1). The PSR, however, incorrectly fixes this amount at $89,500 using the $76,500.00 that was paid for the stock, plus $13,000 which was allegedly the proceeds received by Jonathan.[5]

---

[4] *See* Fifteen Years of Guidelines Sentencing.
http://www.ussc.gov/Research/Research_Projects/Miscellaneous/15_Year_Study/index.cfm

[5] The Probation Department claims that the proper measure of loss is $89,500.00. It arrives at this number based upon the amount paid for the securities and a claim that Jonathan personally received $13,000 for his participation in the offense. Jonathan did not ever receive $13,000 for his role in the offense. The commissions/bribes were paid by Red Sea Management to the Undercover. There is no evidence that Jonathan profited personally. The IBOT stock was sold on behalf of its Chairman and CEO, Andrew Badolato and was never given to Mr. Curshen. Those funds were held in a Red Sea Management account on behalf of Mr. Badolato. Thus, the amount paid for the securities was approximately $76,500.00.

Hon. Leonard B. Sand
September 6, 2011
Page 13 of 29

The commentary to U.S.S.G. 2B4.1 states that "The 'value of the improper benefit to be conferred' refers to the value of the action to be taken or effected in return for the bribe." The commentary then referenced the commentary to §2C1.1 for a better definition.

The commentary to §2C1.1 (note 3) explains that "[t]he value of 'the benefit received or to be received' **means the net value of such benefit**"(emphasis added).[6]

A Guideline analysis based on the fact that the undercover agent paid $76,500 for a certain stock allegedly promoted by the defendant's co-conspirators is flawed. Such an analysis assumes that this entire amount is the "benefit" bestowed, and that, therefore, the entire $76,500 should be compared to the "loss table" set forth in Sentencing Guidelines § 2B1.1(b)(1) when determining what "benefit" was conferred in connection with the bribery scheme described in the information. In other words, the Probation Department and the Government's analysis appears to assume that there was no market at all for the shares purchased by the undercover agent, and that the entire amount paid by the agent was therefore a benefit conferred by the agent, because the agent was bribed to buy worthless stock. That is, the Government's theory must be that the benefit conferred by the undercover agent was the "premium above market" paid by the undercover for the shares, and that the true market price for the shares was zero.

The Government is incorrect. As the enclosed price chart obtained from the discovery produced by the Government in this case demonstrates (**Exhibit K**), the stock purchased by the undercover was far from worthless between June 27, 2008, the date of the first alleged improper transaction, and July 2, 2008, the last day that an alleged improper IBOT stock transaction took place. Indeed, the enclosed summary chart shows that UC bought the stock at prices between 88 and 91 cents per share, and the market for these shares remained active throughout the months of July and August 2008. The shares at issue were priced by the market as high as $1.25 a share on June 11, 2008 (three weeks before the undercover bought them), and the shares were selling at prices ranging from 74 cents per share to $1.17 per share in the weeks that followed the UC's purchase. Thus, there was an active market for the shares. Further, it is not clear that the UC paid any "premium" above market for the shares or bestowed any benefit at all on the defendant or co-conspirators when the shares were purchased. Instead, it appears that

---

[6] The commentary gives some examples, as follows:

(A) A Government employee, in return for a $500 bribe, reduces the price of a piece of surplus property offered for sale by the Government from $10,000 to $2,000; the value of the benefit received is $8,000.

(B) A $150,000 contract on which $20,000 profit was made was awarded in return for a bribe; the value of the benefit received is $20,000. Do not deduct the value of the bribe itself in computing the value of the benefit received or to be received. In the preceding examples, therefore, the value of the benefit received would be the same regardless of the value of the bribe.

Hon. Leonard B. Sand
September 6, 2011
Page 14 of 29

no benefit was bestowed on the defendant's co-conspirators by the purchase of the shares – which was simply executed at the market price in an active market for the shares – and, therefore, the $19,000.00 bribe payment should be used to calculate the upward adjustment in the defendant's sentencing Guidelines range required by Sentencing Guidelines Section 2B4.1(b)(1).

In *United States v. Jason Jadidian*, 08 CR 01l05(RPP) (S.D.N.Y.), the defendant was charged with participating in a securities fraud and commercial bribery scheme virtually identical to the scheme in this case.  There, the defendant pleaded guilty and Judge Patterson imposed a sentence of 3 years probation based, in part, on the argument that the amount of the bribe should be used to calculate the improper benefit under the Guidelines.  Annexed hereto as **Exhibit L** is a copy of the judgment and the indictment in *United States v. Jadidian*, *supra*.  Annexed hereto as **Exhibit M** is a copy of the sentencing transcript in *Jadidian*, *supra,* where, under identical facts,  Judge Patterson used elected to use the amount of the bribe to determine the applicable Guidelines level (at page 33).

Assuming a Guideline analysis as set forth in the plea agreement (without the issues related to the motion to vacate the plea), Jonathan's adjusted Guidelines offense level would have been level 13 and the Guidelines sentencing range would have been 12 to 18 months.  *See* **Exhibit A**.[7]  Assuming, *arguendo*, that Jonathan does not receive the benefit of a downward adjustment for acceptance of responsibility, the adjusted Guidelines offense level would be 16, yielding a Guidelines sentencing range of  21 to 27 months.

Had the proper Guideline calculation been used, the base offense level would be 8, pursuant to U.S.S.G. 2B4.1(a).  There would be 4 level increase because the improper benefit or bribe was between $10,000 and $30,000 (i.e., the $19,000 bribe), pursuant to U.S.S.G. §§ 2B4.1(b)(1) and 2b1.1(b)(C). Assuming a 2 level reduction for acceptance of responsibility, the adjusted offense level would have been level 10 and the Guidelines sentencing range would have been 6-12 months.  Assuming, arguendo, that Jonathan does not receive the benefit of a downward adjustment for acceptance of responsibility, the adjusted Guidelines offense level would be 15, yielding a Guidelines sentencing range of  18 to 24 months.

Further, as outlined above, the proper measure of the "improper benefit" conferred in this case should have been the value of the bribe, not the value of the shares sold.  *See* Sentencing transcript in *United States v. Jadidian*, *supra* (**Exhibit M**).

In light of the above, it is respectfully submitted that the Guidelines in this case are overstated and that a sentence based upon the Guideline analysis set forth herein, *i.e.*, the amount of the $19,000 bribe, is the more appropriate benchmark for the amount of the improper benefit and that a downward sentencing variance should be granted.

---

[7] Base offense of 8 pursuant to U.S.S.G. 2B4.1(a), and 8 level increase because the benefit or bribe was between $70,000 and $120,000, pursuant to U.S.S.G. §§ 2B4.1(b)(1) and 2b1.1(b)(E) and a 3 level reduction for acceptance of responsibility.

Hon. Leonard B. Sand
September 6, 2011
Page 15 of 29

### D.        Other Factors to Consider in Determining What Sentence to Impose.

As set forth above, 18 U.S.C. § 3553(a) also requires that the Court consider other traditional sentencing considerations like the need of the sentence to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to provide adequate deterrence;" "to protect the public;" "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" and "to avoid unwarranted sentence disparities" and "the need to provide restitution."

In this case, it is respectfully submitted that a custodial sentence is not needed to meet any of these goals.

    i.   The Seriousness of the Offense; Promoting
         Respect for the Law; and Providing Just Punishment.

There is no question that a securities fraud that arises out of a commercial bribery scheme is a serious offense and one which deserves punishment.  Certainly, imposing a custodial sentence is one way to promote respect for the law and provide a just punishment.  By the same token, is respectfully submitted that Jonathan is not a seasoned thief.  For most of his life, Jonathan worked hard and followed the law.  It was only in the past few years that he seems to have been accused of participating in illegal activities related to his market activities in penny stocks.  A custodial sentence, however, is not necessary to teach Jonathan a lesson or to promote respect for the law.

In *United States v. Gaind*, 829 F. Supp. 669 (S.D.N.Y. 1993), *aff'd*, 31 F.3d 73 (2d Cir. 1994), the defendant was convicted of making false statements in connection with contracts for testing materials with the EPA. *Id.* at 670.  The defendant's business was effectively destroyed by the discovery of his crime. *Id.* In departing from the then mandatory sentencing Guidelines (which required extraordinary circumstances to warrant a downward departure), theC Court explained that the:

> [e]limination of the defendant's ability to engage in similar or related activities-or indeed any major business activity-for some time, and the substantial loss of assets and income resulting from this have decreased for the foreseeable future his ability to commit further crime of the type he was tempted to undertake, and constitutes a source of both individual and general deterrence.

*Id.*

Similarly, in *United States v. Redemann*, 295 F. Supp. 2d 887, 894 (E. D. Wis. 2003) the court recognized that sometimes the punishment and adversity suffered by a defendant even before sentencing can warrant a non-Guidelines sentence and/or a downward departure. *Redemann*, *supra*, was a bank fraud case where the Guidelines range was 18-24 months.  The

Hon. Leonard B. Sand
September 6, 2011
Page 16 of 29

court departed downward two levels, in part, because the Guidelines sentence was "greater than necessary" to satisfy the "purposes" of sentencing.  295 F. Supp. 2d at 894-95.  The Court explained that defendant had already suffered significant punishment because the case impacted upon him and hurt his personal and professional relationships.  *Id.* Among the issues considered by the Court were the facts that defendant lived in a small community where people began ignoring him on the streets, his children were taunted in school and needed to transfer to another school, his wife became ill and died suddenly, and he was subjected to a civil punishment with significant financial penalties.  *See Redemann, supra*, 295 F. Supp. 2d at 895-896.

Jonathan has already suffered tremendously for his actions and incarceration is not necessary to adequately punish him.  As Joseph Bartel, an attorney and a friend of Jonathan's aptly states:

> Jonathan has already suffered tremendously since his arrest on September 4, 2008. He has been humiliated and impoverished. His career and his business have been destroyed. His name and his reputation have been sullied. His family has been torn apart. He has not seen his wife in years. He has become a single father to his three young children, a task made more difficult by the fact that he is indigent. His travel has been restricted. He has been forced to wear an ankle bracelet. In too many instances to enumerate, I have witnessed Jonathan's deep anguish at his condition.

*See* Letter of Joseph Bartel, annexed hereto as **Exhibit N**.

Imposing a custodial sentence under the facts and circumstances surrounding this case and where Jonathan has otherwise suffered significantly and has demonstrated that he has been a productive member of society, is not necessary and would not promote respect for the law.  Jonathan has lost his business and his ability to work in the securities industry, his assets, and most important his ability to be with his wife for the last three years.  Moreover, any custodial sentence will continue to separate Jonathan from his wife for a significant period of time.  Indeed, as a result of his conduct and his subsequent arrest and prosecution, Jonathan has lost his life and no further punishment is necessary.

      ii.    Providing Adequate Deterrence and Protecting
                the Public from Further Crimes of the Defendant.

A custodial sentence is also not necessary to deter Jonathan from committing further crimes or to protect the public.

First, as noted above, Jonathan is certainly "done" in the securities industry.  Since his arrest, however, he has been trying to make his life over.  From his arrest and until a few months ago, Jonathan was working for Gimme Jimmy's Cookies, a company founded by a friend that baked and distributed cookie products.  Jonathan was the company's sales and marketing manager.  From November 2008 through July 2011, Jonathan worked tirelessly to try to lawfully develop and promote the business.  In late June or early July 2011, the company

Hon. Leonard B. Sand
September 6, 2011
Page 17 of 29

started floundering and lost its physical home.  The company still bakes and distributes cookies "on demand" based upon website sales and some commercial orders.

Further, according to studies conducted by the Sentencing Commission, recidivism rates decline as the age of the offender increases.  *See generally* Measuring Recidivism:  The Criminal History Computation of the Federal Sentencing Guidelines (May 2004).[8] ("Recidivism rates decline relatively consistently as age increases," from 35.5% under age 21 to 9.5% over 50)*; See also* J. Ulmer & C. Van Asten, *Restrictive Intermediate Punishments and Recidivism in Pennsylvania*, 16 FED. SENT. R. 182 (2004) (noting in analysis of sentencing data finding "[r]ecidivism declines considerably with age"); *United States v. Nellum*, 2005 WL 300073 (N. D. Ind. Feb 03, 2005) (NO. 2:04-CR-30-PS) (granting non-Guidelines sentence and noting that recidivism rate for defendants between the age of 41 and 50 with a criminal history category of III is less than half that of defendants under the age of 21).

In this case, Jonathan is already 47 years old, and accordingly, he is not likely to re-offend on that basis alone.  Moreover, the loss of his business, the loss of the ability to be with his wife, and all of the other trials and tribulations he has suffered since his arrest, will serve as enough of a personal deterrent in this case to prevent Jonathan from even thinking about ever committing a crime again.

With respect to the issue of general deterrence, Jonathan's arrest, the publicity surrounding his arrest, the loss of his business, the loss of his good name, the loss of the ability to be with his wife, and the loss of his previous life sends a strong message to anyone thinking about violating the law even without a jail sentence.  Indeed, as noted by the Court in *United States v. Gaind*, *supra*:

> Others engaged in similar activities or considering engaging in them have doubtless already learned through informal sources that loss of the business entity involved is an obvious consequence of such illegal behavior.

*Id. at* 670.  Thus, it is clear that the goal of general deterrence does not require a custodial sentence.

      iii.    Providing the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner.

It is respectfully submitted that this factor also militates against a custodial sentence in this case.  Jonathan has demonstrated a strong desire to rehabilitate himself and there is no need to incarcerate Jonathan to provide him with educational or vocational training or for him to receive any medical care or other treatment.

---

[8] A copy of which is available at: http://www.ussc.gov/publicat/Recidivism_General.pdf.

Hon. Leonard B. Sand
September 6, 2011
Page 18 of 29

With respect to mental health care, which Jonathan needs and desires, such therapy can be administered more effectively when a defendant is at liberty and can attend regular meetings. Incarcerated defendants often wait weeks, if not months, to receive appropriate medical care. If at liberty, however, Jonathan may continue to see and be treated by his current therapist.

> iv.    Avoiding Unwarranted Sentencing Disparities.

It is respectfully submitted that incarceration is also not necessary to avoid any unwarranted sentencing disparities. Indeed, the imposition of a non-Guidelines, non-custodial sentence upon Jonathan would not result in an 'unwarranted' sentencing disparity. In fact, imposition of a non-Guideline, non-custodial type sentence would be consistent with the way similar defendants, who have committed similar crimes with similar dollar amounts have been treated.

In *United States v. Parris*, *supra*, in evaluating the issue of sentencing disparities, Judge Block undertook an analysis of the Guidelines in white collar crimes cases. Judge Block rejected the securities fraud and white collar Guidelines based upon policy considerations. 73 F.Supp. 2d at 754-756. In evaluating what sentence to impose, Judge Block asked for, and received an analysis of sentences imposed in white collar cases from the Government. A copy of that analysis is annexed hereto as **Exhibit O**. That chart shows that in cases like this one, where the amount of the alleged loss, according to the Government, was under $100,000, the sentence imposed did not exceed probation. *See* **Exhibit O**. Concededly, there was only one case where the amount of loss of benefit was under $100,000. *See* **Exhibit O**; *See also United States v. Feeny*, 2002 WL 31426024, (NO. 00 CR 91-09 RWS) (sentence of 3 year's probation).

In *United States v. Curtis*, 08-CR-00183-01 (LAP), Curtis, like Jonathan in this case, agreed to pay undisclosed bribes to an undercover (upon information and belief, the same undercover as in this case) to be delivered to fictitious brokers in exchange for their purchase of G & S Minerals stock. The FBI then purchased $63,126 worth of G&S Mineral stock and received a "bribe" of approximately $19,000. Defendant pleaded guilty, and like Jonathan in this case, moved to withdraw his previously entered plea of guilty and that motion was denied. *See United States v. Curtis*, 2010 WL 2106168 (NO. 08 CR. 183 (LAP))  (S.D.N.Y. May 19, 2010). Subsequently, for his participation in the offense, notwithstanding the motion to withdraw the guilty plea, Chief Judge Preska sentenced the defendant to a 3 year term of probation[9]; *See also United States v. Jason Jadidian*, 08 CR 01l05(RPP) (S.D.N.Y.), ($5000 bribe for the purchase of $19,000 worth of stock; no cooperation by the defendant and a sentence of 3 years probation); *United States v. Larry Wilcox*, 10-cr-60260-JIC (S.D. Fla) (Sentence of 3 years probation where $40,000 worth of stock purchased in exchange for bribes totaling $16,000); *United States v.*

---

[9] In *Curtis*, the Government asked that defendant not receive credit for acceptance of responsibility primarily because he moved to withdraw his plea and Judge Preska agreed. *See* sentencing transcript in *United States v. Curtis*,  supra, a copy of which is annexed hereto as **Exhibit P**, at pages 17 -20. There, as here, Government did not ask for an obstruction enhancement. *See* **Exhibit P.**

Hon. Leonard B. Sand
September 6, 2011
Page 19 of 29

*Garcia*, 09-cr-00675-JG (E.D.N.Y.) (sentence of 3 years probation in securities fraud conspiracy where defendant profited in an amount in excess of $75,000).

      In light of the above, it is respectfully submitted that a non-custodial, non-Guideline sentence of probation would be appropriate in this case and would be consistent with sentences imposed upon persons who have engaged in similar schemes with similar bribe amounts.  Thus, a non-custodial, non-Guideline sentence would not create any unwarranted sentencing disparities in this case.

      v.      Jonathan's Personal Circumstances, His Family
                       Circumstances and His History of Good Deeds Warrant
                       the Imposition of a Non-Guideline, Non-Custodial Sentence.

      Notwithstanding the fact that Jonathan committed a serious offense, his background, his family circumstances and his good deeds, cry out for some leniency in this case.

      a.     Jonathan's ADHD

      First, as noted above, Jonathan has been suffering from depression and ADHD for most of his life. *See* **Exhibit B**; see also **Exhibit I**.  Dr. Craig Schacher, a medical doctor and a friend who has known Jonathan from the time that he was seven years old describes his observations of Jonathan during his youth.  Dr. Schacher writes:

> Jonathan was a kid who loved and needed to be around people and like most children very badly wanted to fit in, have friends, and be liked. His mind was always going a mile a minute and he could talk your ear off. He was highly intelligent, but had difficulties focusing and paying attention to detail, which in his younger years plagued him especially in school. Traditional schooling at that time was simply not made for kids like Jonathan. Jonathan learned best by reading what he was interested In and doing, and showed exceptional skill at what he set his mind to. But school was set up for kids that could sit still, keep quiet, and focus on what was presented to them whether they were interested in it or not, and that simply was not how Jonathan was wired.

*See* Letter of Dr. Craig Schacher, annexed hereto as **Exhibit Q**.  Dr. Schacher posits further that perhaps Jonathan's ADHD contributed to his commission of the offense.  He explains:

> I cannot help but wonder if his lack of screening abilities with people along with his lack of attention to detail has contributed at all to the horribly serious predicament he is in today.

*See* **Exhibit Q**.

Hon. Leonard B. Sand
September 6, 2011
Page 20 of 29

      b.  <u>Jonathan as a Person and his Good Deeds and Acts of Kindness</u>.

      Notwithstanding the criminal activity in this case, Jonathan is known to all as a good friend and the kind of person who would do anything to help a friend.  To that end, Jonathan has a history of helping strangers as well.

      As noted above, Jonathan is a recovering alcoholic and drug addict.  To that end, Jonathan has helped himself and others in fighting and dealing with their addictions.  Dr. Schacher aptly describes how he has observed Jonathan go out of his way to help people.

> More impressive to me however, was the fact that in the midst of this busy, obviously successful office and all this phone call commotion, everything ground to an immediate halt if one of the individuals Jonathan was sponsoring in narcotics anonymous called and was in need.  I mean everything shut down. The office staff were excused for a while.  Those on the phone were told they would be called back as soon as possible, but "It could be hours". New phone calls were forwarded to voice mail as Jonathan proceeded to talk down his sponsoree who desperately wanted to give In to his addictive cravings and "use". Jonathan would initially get the struggling Individual to agree not to use any drugs or alcohol "just for these next few minutes". As the [insightful] discussion proceeded, Jonathan would empathize and use stories of his own past struggles to calm the person further as he eventually pointed out that an hour or so had already passed.  Eventually, when the person had calmed and strengthened his resolve again to stay clean, and was able with some confidence to agree to not use any drugs or alcohol "just for today" the conversation would end and Jonathan would re-open his office for business. Jonathan was and remains a natural at such counseling and intervention. He really had come so far.

*See* **Exhibit Q**.

      Scott Barr, who is the Executive Director of The Safe Place Inc, a not for profit organization that assists persons in recovery rebuild responsible, productive, healthy life styles, met Jonathan close to 20 years ago at Narcotics Anonymous.  Mr. Barr confirms that Jonathan works tirelessly to help people who are recovering addicts.  He explains:

> I have witnessed Jonathan compassionately go above and beyond the call of duty when it comes to helping people.  Thus is especially true in the area of helping people recover from addictions to drugs and alcohol. Occasionally Jonathan has helped people financially, but more importantly Jonathan has always willingly given of himself, his time, and his energy. Jonathan has truly developed into asset to the community.

Hon. Leonard B. Sand
September 6, 2011
Page 21 of 29

*See* Letter of Scott Barr, annexed hereto as **Exhibit R**.  Mr. Barr explains further that Jonathan's arrest and conviction has not retarded Jonathan's commitment to helping people.  He writes:

> I am saddened to hear to [sic] the trouble that Jonathan got into.  I was shocked to find out that he plead [sic] guilty to fraud. I have also watched a man get humbled and take it in stride. What I mean is that after loosing [sic] everything due to his poor choices Jonathan still continues to help and be an asset to the community. He has willingly done mentoring for The Safe Place Inc and I know he has the constitution to help people anywhere and in anyway [sic] he is asked. He is often pro-active and helps without being asked.

*See* **Exhibit R**.

> Bob Deighton, a friend of Jonathan's who is also a recovering addict writes:

> I have known Jonathan Randall Curshen for the past 16 years. I consider him a very good friend and have seen how he has had a positive influence on the people in his life. He has personally helped me and many other [sic] with participation in Narcotics Anonymous. I know he has sponsored many men in the United States, Latin America and many other parts of the world who have struggled with the disease of addiction and alcoholism as well as personally staying sober for over 17 years.  He has founded many Narcotics Anonymous meetings both in the United States and Costa Rica that still continue today.  He has been an active participant in the service structure [sic] Narcotics Anonymous, serving as group service representative all the way up to area chair..

*See* **Exhibit S**.

> Another friend, and recovering addict, Mark L. Tishman, reports:

> I have known Mr. Curshen as a friend and fellow recovering addict for almost twenty years. Mr. Curshen was my first Twelve-Step sponsor and I attribute my 12 years of sobriety largely to his earnest efforts to take me to meetings in the beginning of my recovery journey. He has my unending gratitude and saved me from the negative outcome from alcoholism. Jonathan has a true working knowledge of the Twelve Steps and I make it a point each year on my recovery anniversary to call him and thank him again for helping me turn my life around.

*See* **Exhibit T**.  Mr. Tishman also witnessed how Jonathan goes out of his way for people, especially when they are in trouble.  He relates:

Hon. Leonard B. Sand
September 6, 2011
Page 22 of 29

> I watched Jonathan unselfishly take care of his dying cousin Victor from the time of his diagnosis with incurable cancer until we stood at each other's side and we recited the Mourner's *Kaddish* prayer at Victor's interment. Jonathan provided his home, his companionship and money to make Victor comfortable in his last months with no expectation of any repayment from anyone. To borrow from the Yiddish language, Jonathan is a true *mentsch!*

*See* **Exhibit T**.

> Similarly, Ronald Sheridan, Jr., President of Motion Promotions, relates:

> Over the years I have witnessed Jonathan's selfless service to his family, his friends, and his Community. I recall conversations about his work with orphanages in Costa Rica. I have seen him reach out to addicts seeking recovering [sic] offering them food, shelter, and guidance to stay clean. We have attended many 12 step conventions over the years where he has made a point of being an attractive example of a clean, recovering addict. His character and his value system have always been held in the highest regard by everyone who has connected with Jonathan.

*See* **Exhibit U**.

> Rabbi Chaim Steinmetz, the presiding Rabbi of the Chabad Lubavitch of Sarasota and Manatee counties in Florida, further describes Jonathan's history of engaging in acts of kindness/good deeds. Rabbi Steinmetz reports:

> I first met Jonathan when he agreed to be a Spanish interpreter for me and to provide religious services inside the Tampa, FL, immigration prison to several men incarcerated there. During the time that I have known Jonathan, he has become a productive member of our community. He is always active in our community where he helps to setup events, make deliveries and pick ups, attends religious services weekly and works to raise awareness of our Synagogue and the services we offer to the community.

*See* **Exhibit V**. Rabbi Steinmetz explains that Jonathan has been volunteering and engaging in voluntary community service at the Chabad Lubavitch of Sarasota and Manatee synagogue since 1994. *Id.* He relates that Jonathan has been very active in assisting recovering addicts and how Jonathan voluntarily involved himself in The Safe Place Inc, organization that Scott Barr referred to in his own letter to Your Honor. *Id.* Indeed, Rabbi Steinmetz observes that he has had to call on Jonathan to assist others in the community. Rabbi Steinmetz reflects:

Hon. Leonard B. Sand
September 6, 2011
Page 23 of 29

In the time that I have known him, he has become a devoted member of
our congregation and he goes out of his way to help people, not hurt them.
For example he has joined me to support community members who suffer
the loss of a loved one and has spent time with sick and suffering, as well
as people who are confined to their homes to help bring them some joy
with a visit…

I know that Jonathan is a recovering drug addict and alcoholic and still an
active member of Narcotics Anonymous. I have counted on his experience
in that area on several occasions where members of our community have
suffered from the results of active addiction. Jonathan is quick to offer
assistance in directing people to Narcotics Anonymous and Alcoholics
Anonymous meetings.  He has offered to sit with and counsel anyone
whenever I have asked for it. Any questions I have asked him in regards to
recovery he has always done his best to provide assistance.

**Exhibit V.**

Not only is Jonathan engaged in performing acts of kindness or good
deeds to those who are addicted to narcotics, but Jonathan has also given of his time to
help people in other ways.

Kelly Deitz Henderson, who works at the above-referenced Chabad
Synagogue in Sarasota tell about how Jonathan has helped her when her husband became
ill.  He explains:

I am aware Jonathan has pleaded guilty to the charges of fraud. I was
shocked to find this out because it is completely out of character. However
this does not in any way blemish the high opinion I have of him. Jonathan
has always lived up to his responsibilities be it financial or emotional to
his family and friends. When my husband was in the hospital it was
Jonathan who came by the hospital everyday to check on him and to bring
anything that either of us needed during my husband's stay. Without
Jonathan, I do not know how I would have survived my husband's hospital
stay.

*See* letter of Kelly Deitz, annexed hereto as **Exhibit W**.  Indeed, Jonathan has a
reputation for assisting people in need.  Jonathan's cousin, Lawrence Gillston explains:

I do remember how he took care of his cousin Martin who was dying of
cancer. When he felt Martin wasn't getting adequate care, Jonathan took
him into his house and did everything humanly possible to make him
comfortable until he passed. When my father died from cancer, Jonathan
was on the next plane from almost half way around the world just so he
could come to the funeral, pay his respects and say a few words.

Hon. Leonard B. Sand
September 6, 2011
Page 24 of 29

*See* **Exhibit X**.  To that end, Seth Gillston, speaks about how Jonathan has engaged in good deeds by visiting the sick, a very important mitzvah (good deed)  according to Jewish law.  He reports:

> I also have also been impressed by Jonathan's countless visits with the sick. He spent quality time with my father in the months while he was battling terminal cancer, even though my father was thousands of miles from where he lived. He brought my mother and father down to Costa Rica on their first vacation in 10 years and it was the last time my father experienced pleasure until the cancer took over his life. Jonathan was the rock my family needed at one of our lowest points.

> He was there again for my family when he visited my wife on multiple occasions while she was in the hospital on 4-month bed rest while expecting our twins. Jonathan is compassionate and is so moved by the suffering of others that he puts his own personal time last so he can help his friends and family the most. Please allow him the time to continue helping others and to be such a strong role model to his three children and others.

*See* **Exhibit X**.

> Jonathan's father, in his plea for mercy for Jonathan reiterates:

> I would emphasize strongly to your Honor that my son has never at any time deliberately set out to harm anyone in any way and although my knowledge of the law and this particular case is limited, it is difficult for me to see who exactly has been harmed. He is not a bad person. On the contrary he has made a point of giving aid and comfort to many people in need, both family members, friends and others. When his cousin was dying from cancer Jonathan took care of him in his own home and stayed with him until the moment of his death. Jonathan was instrumental in aiding his Rabbi, Chaim Steinmatz [sic] in establishing a house of worship in Sarasota, Florida. As a member of N.A. for seventeen years he has acted as a sponsor and friend to numerous addicted persons, enabling many of them to overcome their addiction and live useful lives.

*See* **Exhibit Y**.

> It should be clear that whatever Jonathan did in this case, he is not a pariah who needs to be incarcerated to protect the public.  For the last 20 years, if not longer, Jonathan has been the type of person to give back to the community.  He has given back to the community financially, but more importantly, Jonathan has given, and continues to give, freely of his own time to help family members, friend and even strangers.  He has demonstrated some outstanding human and humane qualities that are very rare.  Jonathan's history of good deeds and assisting

Hon. Leonard B. Sand
September 6, 2011
Page 25 of 29

others warrants serious consideration in determining what sentence to impose and militates in favor of a non-Guideline, non-custodial sentence.

c.   <u>Jonathan's Children and Family Circumstances</u>.

Notwithstanding the offense in this case, it is respectfully submitted that Jonathan's family circumstances warrant a variance from the Guidelines range in this case and the imposition of a non-custodial sentence.

If nothing else, it should be clear from the letters of family and friends that are annexed hereto that Jonathan in a loving and caring son, husband and father.  As noted above, when Jonathan was arrested, he and his wife, Merly were faced with an untenable decision.  They had to decide whether to separate the children from their mother in Costa Rica, where they might have only seen Jonathan during vacation, or live with Jonathan for as long as possible so that they could get to experience real life with a real father involved in their lives in the event that Jonathan must serve some time in custody.  In this way, Jonathan and Merly hoped that the children would have an opportunity to have a real full-time dad.  *See* letter of Merly Curshen (Exhibit G).  As Merly notes, the decision was difficult and unthinkable for the mother of 3 young children, but

> Jonathan has proven himself to be an exceptional father and husband, given the situation by raising three young children single-handedly and providing for their care, education and giving them tremendous amount of love and moral support, even during the toughest emotional struggles caused by the ongoing case. Even though it has been a very traumatic and emotionally draining for him, he has managed to stay as the emotional island of stability for the entire family. In a way this has not surprised me a single bit, because knowing Jonathan for 15 years, he has shown to be generous, supportive and giving.

*See* **Exhibit G**.  With respect to Jonathan's children, Bob Deighton adds:

> I have watched Jonathan become a father to his three children. He has been their primary caregiver for the past year and half because of [sic] legal situation in which he has been separated from his wife for coming up on two years.  I know this has been incredibly hard on him because he loves his wife so very much as much as she loves him. In our many conversations he is most concerned welfare of their three children and what role he will be able to play in their lives. Being a father to three teenage boys myself, I know how important it is for children to have a father active in their lives. . . Jonathan is a wonderful father and is one of the most important figures in their lives.

*See* **Exhibit S**.  Similarly, Mark Tishman, also conveys that Jonathan is an excellent parent who is really concerned for his children.  He explains that:

Hon. Leonard B. Sand
September 6, 2011
Page 26 of 29

> Jonathan has much to give the world in any way he can. In my heart of
> hearts I do not believe society would benefit from sending Jonathan to
> prison and a prison sentence will only be detrimental to all concerned,
> especially the members of his immediate family, his children and his
> wife, his ailing mother who just had her leg amputated and his father who
> suffers from debilitating clinical depression. They all love him dearly and
> need him home to help with the healing.

See Exhibit T.  Indeed, it cannot be disputed that Jonathan is an excellent and loving
father and that his children will suffer if he is sent to prison.  *See e.g.*, **Exhibits N, G, S,
T, Q, U, V, W, X and Y**; *See also* letters of other friends and family members annexed
hereto as **Exhibit Z**)

The decision to have the children live with Jonathan during the pendency
of the case has made them extremely close to Jonathan and they fear that they will be
separated from him.  *See* letters of ▮▮▮▮▮▮▮▮▮▮▮▮▮ Curshen, annexed hereto as
**Exhibit AA**.  Indeed, Merly, in her request for leniency explains:

> Dear Judge Sand, I can certainly continue on for pages about the great
> qualities that Jonathan has and how painful this experience has been for
> the entire family.  However, I do want to tell you as a mother, how much
> this has affected our children. Our children have grown to become
> extremely close to Jonathan in the past three years. They absolutely love
> and adore him to a point that Jonathan's presence is quite evident in every
> single moment of their daily lives. I am very fearful for their emotional
> well being and their future. At this point, I know for fact that it is
> unthinkable for them to be faced with the prospect of losing their father,
> even for very short period of time.

See **Exhibit G**.

Jonathan's father, in his letter to Your Honor also begs for mercy, not so much for
Jonathan, but for his grandchildren ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *See* **Exhibit Y**.  He
reasonably fears the impact that a jail sentence will have on the well being of his three
grandchildren. *Id.*

Rabbi Steinmetz, who has witnessed Jonathan interact with his children for the
last 36 months discussed the positive impact that Jonathan has had on his children for the last 36
months.  Rabbi Steinmetz explains:

> He is a doting and loving father and he has been a positive force in the
> lives of his children. In fact, Jonathan's children just made the honor roles
> in their classes at the Ashton Elementary School in Florida, and they have
> been excelling in their studies despite their knowledge that Jonathan may

Hon. Leonard B. Sand
September 6, 2011
Page 27 of 29

be incarcerated in the near future. I am certain that their positive attitude is
the product of the love and attention given to the children by Jonathan. . .

Jonathan's biggest fear is the pain that will be inflicted upon his children
and his wife by a prison sentence in this case. As his Rabbi and as
someone that has seen him interact with his children daily, I ask that when
Your Honor considers the proper measure of punishment, please consider
the fact that his children are affected as well. I would also ask you to take
into account that the emotional upheaval and the destruction of an entire
family over the past thirty six months is punishment in itself that cries out
for leniency. Being separated from his spouse for almost this entire time
has been incredibly painful for both Jonathan and his wife Merly.

*See* **Exhibit V**.

There can be no doubt that a prison sentence will impact heavily upon
Jonathan's innocent children.  To that end, annexed hereto as Exhibit BB is a letter from
███████ Curshen's therapist at the Jewish Family and Children's services. In that letter, the
therapist explains:



*See* **Exhibit BB**.  Indeed, all of Jonathan's children are suffering emotionally.  *See*
**Exhibit CC**.

In sum, Jonathan has been a model parent to his children and has been
raising his children singlehandedly for the last 3 years.  While the decision for Jonathan
to raise his children alone for the last 3 years was certainly a personal decision to spend
more time with them, Jonathan and Merly believed that they had no alternative because
Merly was unable to travel to the United States to be with Jonathan and her children.
Further, although it is undisputed that others are available to raise the children if Jonathan
is incarcerated, the children will be devastated if they are separated from their father.

In light of the above, we submit that this factor also militates in favor of a non-
Guideline, non-custodial sentence.

### E.    <u>WHAT SENTENCE TO IMPOSE?</u>

In a post *Booker* environment, where the Guidelines are no longer mandatory, the
decision on what sentence to impose is the most difficult question to answer.  *Booker* and its
progeny require district courts to tailor sentences to reflect an application of the 18 U.S.C. §

Hon. Leonard B. Sand
September 6, 2011
Page 28 of 29

3553(a) factors, with the expectation that post- *Booker* sentences will achieve more "individualized justice." *See United States v. Crosby*, 397 F.3d 103, 114 (2d Cir. 2005).

As outlined above, the Guidelines in this case are overstated and call for a sentence that is out of alignment with sentences imposed on similarly situated defendants who participated in a securities fraud/commercial bribery scheme in New York and other parts of the country. Typically, where a scheme involved a bribe (or benefit) that was under $100,000, the courts have imposed probationary types of sentences. *See e.g. United States v. Jason Jadidian, supra; United States v. Curtis, supra, United States v. Feeny, supra.*

It is respectfully submitted further that a sentence of imprisonment would be greater than necessary to meet all of the objectives of sentencing outlined in 18 U.S.C. § 3553 (a). Although Jonathan has made serious mistakes and had a complete lapse in judgment in getting involved in this case, he is a good man, a good father, son, friend and community activist. He had heretofore led an honest and hardworking life. He has and continues to give back to society by performing community service through the Chabad Lubavich organization and he mentors and counsels recovering addicts to assist them in staying clean and sober. His arrest in this case has been a clear wake up call. Jonathan has lost a job and business that he loved, he lost the ability to see and cohabitate with his wife for the last three years, and he has lost his life partner, i.e., his wife Merly, because she has been unable to travel to the United States to be with Jonathan and to help him raise their children. Jonathan is interested in learning from his mistakes and is anxious to put his mistakes behind him and live a law abiding life. It truly appears that Jonathan has learned his lesson and that he will not engage in any illegal conduct again.

A custodial sentence, such as the sentence called for by the Guidelines, is not necessary to deter Jonathan from engaging in any further criminal conduct or to protect the public. Indeed, Jonathan has indicated that he never intends to engage in any illegal or immoral conduct ever again. Further, a Guidelines sentence is not necessary to deter the general public from engaging in illegal conduct. In fact, there is no evidence to suggest that a Guideline based sentence would effectively meet the goal of general deterrence more than any other sentence that can be imposed in this case. On the other hand, a non-custodial sentence of house arrest, followed by a period of supervised release with a heavy community service component, would punish Jonathan for his offense, would make certain that Jonathan continues to give something back to the community for his misconduct, and would allow Jonathan to continue to be available to care for his family.[10]

In light of the above, it is respectfully submitted further that a sentence of imprisonment is not necessary in this case.

---

[10] It is respectfully submitted that it would also be more cost effective to impose a non custodial sentence. According to the Administrative Office of the United States Courts, in 2009, the annual cost to the Government was $25,894.50 to incarcerate an inmate; $23,881.50 per inmate in a community corrections facility; and $3743.23 for Supervision by Probation Officers. *See* **Exhibit EE.**

Hon. Leonard B. Sand
September 6, 2011
Page 29 of 29

      To the extent the Court believes that some measure of imprisonment might be necessary, we respectfully request that Your Honor impose a significant period of house arrest or community confinement in order to satisfy any such jail term and that such sentence be coupled with a significant amount of community service.  Such a sentence will not only effectively punish Jonathan, but will also allow him to obtain employment, support his family, tend to his mother's needs, and be there for his children.

      If the Court is inclined to impose a non-custodial sentence, Jonathan asks that such a sentence be imposed immediately.  In the event that the Court believes it must impose a custodial sentence in this case, the defense asks that the Court either defer sentencing until the end of January 2012 or that Your Honor defer the execution of sentence until at least January 2012, and permit Jonathan to continue to be at liberty until after his trial in the Southern District of Florida.

      The reason that Jonathan is asking for deferment of sentencing and/or of execution of the sentence, i.e., of surrendering to serve his sentence, is because he is still facing trial in the Southern District of Florida for offenses that took place prior to his arrest in this case. Jonathan is actively involved in preparing for trial and the Government has produced in excess of 250 banker boxes filled with documents it claims are relevant to that offense.  In that regard Jonathan has been reviewing the discovery and assisting his attorney with trial preparation in that matter.  Allowing Jonathan to remain at liberty under the strict bail conditions in this case, coupled with the strict conditions of his bond in the Southern District of Florida, which includes a GPS tracking device, will allow Jonathan the opportunity to properly prepare for his defense at that trial in a more productive manner.  Jonathan has never been a danger to the community and the only other concern would be the risk of flight.  The issue of the risk of flight is adequately eliminated with use of the GPS tracking bracelet that Jonathan wears on his leg as a bracelet.[11]

### CONCLUSION

      In light of the above and for all of the reasons stated herein, it is respectfully requested that this Court temper justice with mercy and impose a lower Non-Guideline sentence than the sentence called for by the Guidelines in this case.

Respectfully submitted,

Joseph A. Grob

cc:    AUSA Avi Weitzman

---

[11] I have previously conferred with AUSA Weitzman with regard to these requests, but he has indicated that he will not consent to any defense request relative to adjourning sentencing in this matter.