EXHIBIT A



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 21, 2009

**BBY FAX AND HAND**
Anthony Lombardino, Esq.
101-05 Lefferts Boulevard
Richmond Hills, NY 11419

> Re:   **United States v. Jonathan Curshen,**
>        **09 Cr. 33 (LBS)**

Dear Mr. Lombardino:

On the understandings specified below, the Office of the United States Attorney for the Southern District of New York ("this Office") will accept a guilty plea from Jonathan Curshen ("the defendant") to Count One of the above-referenced Information. Count One charges the defendant with participating in a conspiracy to commit securities fraud and commercial bribery, in violation of Title 18, United States Code, Section 371. Count One carries a maximum sentence of 5 years' imprisonment, a maximum fine, pursuant to Title 18, United States Code, Section 3571, of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense, a $100 special assessment, and a three-year term of supervised release.

The defendant hereby admits the forfeiture allegation with respect to Count One of the Information and agrees to forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461: (i) the 20,000 shares of Industrial Biotechnology Corporation ("IBC") stock purchased by the Federal Bureau of Investigation ("FBI") on or about June 27, 2008; (ii) the 20,000 shares of IBC stock purchased by the FBI on or about June 30, 2008; (iii) the 22,500 shares of IBC stock purchased by the FBI on or about July 1, 2008; (iv) the 22,500 shares of IBC stock purchased by the FBI on or about July 2, 2008; and (v) all right, title and interest of the Defendant in the $13,000 in his trading account as a result of the crime (the "Specific Property"). The Defendant agrees that he will not file a claim or a petition for remission or mitigation in any forfeiture proceeding involving the Specific Property and will not cause or assist anyone else in doing so. The Defendant also agrees to take all necessary steps to pass clear title to the Specific Property to the United States, including, but not limited to, the execution of all necessary documentation. It is further understood that any forfeiture of the Defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon him in addition to forfeiture.

Anthony Lombardino, Esq.
May 21, 2009
Page 2

In consideration of the defendant's plea to the above offense, the defendant will not be further prosecuted criminally by this Office (except for criminal tax violations as to which this Office cannot, and does not, make any agreement) for engaging in a scheme to defraud from in or about October 2007 through in or about September 2008, by agreeing to pay a secret cash bribe in exchange for the purchase of Industrial Biotechnology Corporation stock. In addition, at the time of sentencing, the Government will move to dismiss any open Count against the defendant. The defendant agrees that with respect to any and all dismissed charges he is not a "prevailing party" within the meaning of the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), and will not file any claim under that law.

In consideration of the foregoing and pursuant to Sentencing Guidelines Section 6B1.4, the parties hereby stipulate to the following:

A.    Offense Level

1.    The Guidelines provisions in effect as of November 1, 2008, apply to this case.

2.    The Sentencing Guideline applicable to the offenses charged in Count One of the Indictment, is U.S.S.G. §§ 2B4.1 and 2E1.2.

3.    The base offense level is 8. See U.S.S.G. § 2B4.1(a).

4.    Because the value of the improper benefit to be conferred was more than $70,000, but less than $120,000, the offense level is increased 8 levels pursuant to U.S.S.G. §§ 2B4.1(b)(1) and 2B1.1(b)(1)(F).

5.    Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a 2-level reduction would be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, an additional 1-level reduction would be warranted, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

In accordance with the above, the applicable Guidelines offense level is 13.

Anthony Lombardino, Esq.
May 21, 2009
Page 3

B.     Criminal History Category

Based upon the information now available to this Office (including representations by the defense), the defendant has no prior criminal history and his Criminal History Category is I.

C.     Sentencing Range

Based upon the calculations set forth above, the defendant's stipulated sentencing Guidelines range is 12 to 18 months' imprisonment (the "Stipulated Guidelines Range"). In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to §5E1.2. At Guidelines level 13, the applicable fine range is $3,000 to $30,000.

The parties further agree that a sentence within the Stipulated Guidelines Range would constitute a reasonable sentence in light of all of the factors set forth in Title 18, United States Code, Section 3553(a). However, the parties agree that either party may seek a sentence outside of the Stipulated Guidelines Range, suggest that the Probation Department consider a sentence outside of the Stipulated Guidelines Range, and suggest that the Court *sua sponte* consider a sentence outside of the Stipulated Guidelines Range, based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a).

Except as provided in any written Proffer Agreement that may have been entered into between this Office and the defendant, nothing in this Agreement limits the right of the parties (i) to present to the Probation Department or the Court any facts relevant to sentencing; (ii) to make any arguments regarding where within the Stipulated Guidelines Range (or such other range as the Court may determine) the defendant should be sentenced and regarding the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a); (iii) to seek an appropriately adjusted Sentencing range if it is determined based upon new information that the defendant's criminal history category is different from that set forth above. Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, *see* U.S.S.G. §3E1.1, and/or imposition of an adjustment for obstruction of justice, *see* U.S.S.G. §3C1.1, regardless of any stipulation set forth above, should the defendant move to withdraw his guilty plea once it is entered, or should it be determined that the defendant has either (i) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice or (ii) committed another crime after signing this Agreement.

It is understood that pursuant to Sentencing Guidelines §6B1.4(d), neither the Probation Department nor the Court is bound by the above Guidelines stipulation, either as to questions of fact or as to the determination of the proper Guidelines to apply to the facts. In the event that the Probation Department or the Court contemplates any Guidelines adjustments, departures, or calculations different from those stipulated to above, or contemplates any sentence outside of the

Anthony Lombardino, Esq.
May 21, 2009
Page 4

stipulated Guidelines range, the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same.

It is understood that the sentence to be imposed upon the defendant is determined solely by the Court. It is understood that the Sentencing Guidelines are not binding on the Court. The defendant acknowledges that his entry of a guilty plea to the charged offenses authorizes the sentencing court to impose any sentence, up to and including the statutory maximum sentence. This Office cannot, and does not, make any promise or representation as to what sentence the defendant will receive. Moreover, it is understood that the defendant will have no right to withdraw his plea of guilty should the sentence imposed by the Court be outside the Stipulated Guidelines Range set forth above.

It is agreed (i) that the defendant will not file a direct appeal, nor litigate under Title 28, United States Code, Section 2255 and/or Section 2241, any sentence within or below the Stipulated Guidelines Range set forth above; and (ii) that the Government will not appeal any sentence within or above the Stipulated Guidelines Range. It is further agreed that any sentence within the Stipulated Guidelines range is reasonable. This provision is binding on the parties even if the Court employs a Guidelines analysis different from that stipulated to herein. Furthermore, it is agreed that any appeal as to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) the above stipulation.

The defendant hereby acknowledges that he has accepted this Agreement and decided to plead guilty because he is in fact guilty. By entering this plea of guilty, the defendant waives any and all right to withdraw his plea or to attack his conviction, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material, *Jencks* Act material, exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), other than information establishing the factual innocence of the defendant, and impeachment material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement.

By entering this plea of guilty, the defendant also waives any and all right the defendant may have, pursuant to 18 U.S.C. §3600, to require DNA testing of any physical evidence in the possession of the Government. The defendant fully understands that, as a result of this waiver, any physical evidence in this case will not be preserved by the Government and will therefore not be available for DNA testing in the future.

The defendant understands that he is bound by his guilty plea regardless of the immigration consequences of the plea and regardless of any advice the defendant has received from his counsel or others regarding those consequences. Accordingly, the defendant waives any and all challenges to his guilty plea and to his sentence based on those consequences, and agrees

Anthony Lombardino, Esq.
May 21, 2009
Page 5

not to seek to withdraw his guilty plea, or to file a direct appeal or any kind of collateral attack challenging his guilty plea, conviction or sentence, based on the immigration consequences of his guilty plea, conviction and sentence.

It is further agreed that should the conviction following defendant's plea of guilty pursuant to this Agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement (including any counts that the Government has agreed to dismiss at sentencing pursuant to this Agreement) may be commenced or reinstated against defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution.  It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

It is further understood that this Agreement does not bind any federal, state, or local prosecuting authority other than this Office.

Anthony Lombardino, Esq.
May 21, 2009
Page 6

Apart from any written Proffer Agreement that may have been entered into between this Office and defendant, this Agreement supersedes any prior understandings, promises, or conditions between this Office and defendant. No additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

Very truly yours,

LEV L. DASSIN
Acting United States Attorney

By:

Alexander J. Willscher
Assistant United States Attorney
(212) 637-2736

APPROVED:

Raymond J. Lohier
Deputy Chief, Securities and Commodities
Fraud Task Force

AGREED AND CONSENTED TO:

JONATHAN CURSHEN                          6/24/09
                                          DATE

APPROVED:

Anthony Lombardino, Esq.                  06/24/09
Attorney for JONATHAN CURSHEN             DATE

EXHIBIT B

**MEDICAL  /  PSYCHIATRIC RECORDS REDACTED**

EXHIBIT C

# UPDATED ISSUER INFORMATION FILE

### PURSUANT TO
### SECURITIES AND EXCHANGE COMMISSION
### RULE 15c2-11

### As of November 12, 2009

---

# THE RENEWABLE CORPOATION
### (A Washington Corporation)

---

| TRADING SYMBOL: NUMBER: | CUSIP |
|---|---|
| **RNWB** | **75971W 205** |

---

| TAX ID NUMBER: RECORD: | SHAREHOLDERS OF |
|---|---|
| **34-2053146** | **3,194** |

---

### ISSUER'S EQUITY SECURITIES:

**Common Equity Voting Shares**

**Issued and Outstanding Common Shares: 68,453,397**
**Issued and Outstanding Preferred Shares:  11,265,518**

### TRANSFER AGENT:

**Action Stock Transfer**
**7069 S. Highland Dr. Suite 300**
**Salt Lake City, UT 84121**
**801-274-1088, fax 801-274-1099**
Action Stock Transfer is registered with the SEC

**Information provided pursuant to Rule 15c2-11 of the
Securities and Exchange Act of 1934, as amended**

# THE RENEWABLE CORPORATION
**(A Washington Corporation)**

**CUSIP NUMBER:
75971W 205**

## ISSUER INFORMATION FILE

### AS OF

### November 12, 2009

**Financials
as of
September 30, 2009**

**The information furnished herein has been prepared from the books and records of the issuer by its officers and directors in accordance with the Securities and Exchange Commission Rule 15c2-11 as amended, and is intended only as a securities dealer informational file and:**

**No dealer, salesman or any other person has been authorized to give any information, or to make any representations, not contained herein in connection with the issuer. Such information or representations, if made, must not be relied upon as having been authorized by the issuer, and:**

**Delivery of this information file does not at any time imply that the information contained herein is correct as of any time subsequent to the date first written above.**

# THE  RENEWABLE  CORPORATION

Information required conforming to the provisions of
Subparagraph (a) (4) of Rule 15c2-11 promulgated by the Securities
And Exchange Commission under the Securities Exchange Act of 1934

## PART A GENERAL COMPANY INFORMATION

### Item 1.  Exact name of the issuer and its predecessors:

The exact name of the Issuer is The Renewable Corporation as of 10/24/2008, formerly known as Industrial Biotechnology Corporation since August 2, 2005, formerly known as Newtrack Mining Corporation since August 5, 1999, formerly known as Track II Industries, Inc. and Bare Track Industries, Inc. which was originally incorporated on February 26, 1992., herein referred to as the "Issuer" or the "Company.

### Item 2.  Address of the issuer's principal executive offices:

The address of the Issuer's principal office is:

> 2033 Main Street
> Suite 400
> Sarasota, Florida  34237
>
> Telephone (941) 487-7560
> Facsimile (941) 487-7625
>
> Website: www.therenewablecorp.com
>
> Attn:  ir@therenewablecorp.com

### Item 3.  Issuer's state of incorporation:

The Issuer is a Washington corporation and is registered as a foreign corporation with the state of Florida, the location of the issuer's principal office.

## PART B SHARE STRUCTURE

### Item 4.  Exact title and class of the issuer's securities:

The Issuer has 250,000,000 common shares authorized and has 250,000,000 shares of preferred shares authorized with;

| | |
|---|---|
| 11,250,049 | Preferred Series A outstanding shares |
| 41 | Preferred Series B outstanding shares |
| 158 | Preferred Series C outstanding shares |
| 15,270 | Preferred Series D outstanding shares |
| 68,453,397 | Common outstanding voting shares |
| 3,000,000 | 2009/2010 ISO plan options (3,000,000 authorized) |

CUSIP#:                      **75971W 205**
SIC Code:              2860
Secondary SIC Code:  7340
Symbol:                      RNWB
.

### Item 5.  Par or stated value of the issuer's securities:

The Issuer's 250,000,000 shares of common stock authorized have a par value of $0.001 and the Issuer's 250,000,000 shares of preferred stock have a par value of $0.001.

- All preferred shares issued and outstanding; do not have a dividend, convert into 1 share of common stock, have pari passau liquidation preference, and have one vote per share.
- All common stock issued to management, advisors, and consultants to the company, has one vote and are subject to vesting, milestones, and leak out agreement and are subordinated to the preferred stock subscribers of the company.
- There are not any provisions in the issuer's charter or by laws that would delay, defer or prevent a change of control of the issuer.

### Item 6. Number of shares or total amount of the issuer's securities outstanding at the end of the issuer's 2 most recent fiscal years:

## Common Stock

As of September 30, 2009 There were 250,000,000 authorized common shares with 68,253,397 outstanding and 8,253,397 in the public float.

As of December 31, 2008, there were 45,907,662 shares of common stock issued and outstanding consisting of 27,000,000 shares of Class A common stock and 18,907,662 shares of common stock with 3,660,560 shares in the public float held by an estimated 2,839 holders.

As of December 31, 2007 there were 2,000,000,000 authorized common shares, with 250,234 shares total outstanding and in the public float held by approximately 2,435 holders subsequent to the 4,016 to 1 reverse stock split on December 17, 2007.

4

**Preferred Stock**

As of September 30, 2009, there were 250,000,000 preferred shares authorized consisting of 11,265,518 outstanding. This is comprised of 11,250,049 Series A preferred, 41 Series B preferred, 158 series C Preferred, and 15,270 Series D preferred. Each share of Preferred converts into one share of common stock. There are no preferred shares in the public float.

As of December 31, 2008, there were 6,170,380 shares of preferred stock issued and outstanding consisting of: 1,880 Series A Preferred held by 40 holders, 1,250 Series B preferred held by 10 beneficial owners, 6,104,750 Series D preferred shares outstanding held by 36 beneficial owners. Each share of preferred stock converts to shares of common stock on a 1 for 1 basis. There were no shares of preferred stock in the public float.

As of December 31, 2007, there was 150,000,000 Preferred shares authorized consisting of a total of 66,800,095 outstanding. This was comprised of 11,800,095 Series A Preferred, and 55,000,000 Series B Preferred outstanding.

## PART C BUSINESS INFORMATION

**Item 7.  Name and address of the issuer's stock transfer agent:**

The Issuer's Stock Transfer Agent is:

Action Stock Transfer
7069 S. Highland Dr. Suite 300
Salt Lake City, UT 84121
801-274-1088, fax 801-274-1099

Action Stock Transfer is registered with the SEC under the Exchange Act

**Item 8.  The nature of the issuer's business:**

**A.     Business Development**

1. The Issuer is a Washington corporation and is registered as a foreign corporation with the state of Florida, the location of the issuer's principal office.

2. The Issuer is organized under the laws of the State of Washington since 2004, but was previously organized under the laws of the State of Nevada and the Province of British Columbia, Canada.  The Issuer's inception date of incorporation is February 26, 1992 as Bare Track Investments, Inc. in the Province of British Columbia, Canada.   The Company then changed its name to Track II Industries, Inc. and changed its domicile to the State of Nevada on August 5, 1999.   The Company then changed its name to Newtrack Mining Corporation and then changed domicile to the State of Washington on July 15, 2004 and then changing its name to Industrial Biotechnology Corporation on August 2, 2005. On 10/24/2008 the company changed its name to The Renewable Corporation.

3. The Company's fiscal year end is December 31.

4. The Issuer has never filed bankruptcy.

5. There was a material reclassification of the business via the acquisition of the assets and share exchange of Advanced Bioscience, Inc., a Florida corporation on August 5, 2005 whereby the Issuer entered into the business of the development of certain patents licensed for commercial use on August 5, 2005.

6. There have been defaults on indebtedness of the company. Please see financial statements and accompanied footnotes. The company presently has accrued unpaid liabilities and contingent liabilities. THE COMPANY IS A DEVELOPMENTAL STAGE COMPANY WITH NO REVENUES OR ASSETS AND MUST RAISE ADDITIONAL CAPITAL VIA DEBT OR EQUITY IN ORDER TO FUND ITS ONGOING DAILY OPERATIONS AND TO EXECUTE ITS BUSINESS OBJECTIVES. The company underwent a reorganization recapitalization in June 2009 period due to; the impact of the global economic crisis, sudden decline and drop in petroleum prices that impacted the renewable chemicals and renewable fuels business subsidiaries, the United States dollar currency devaluation vs. Brazil and the related cost increase of imported ethanol from brazil to be used by the company for conversion to industrial use renewable plastic chemicals, lack of sufficient operating capital and revenues and the incidents and indirect dealings surrounding and involving a foreign securities dealer. The company was the indirect victim of a Ponzi scheme that severely impacted the company's stock price rendering the inability to raise sufficient capital unless the capital structure was reorganized and consolidated. A third party's free trading shares of the company were pledged in 2008 pursuant to a $2.5 million dollar financing agreement to fund the company and were subsequently deposited at a foreign securities broker dealer/ investment company. This foreign securities dealer was shut down by US Federal authorities in the 4th quarter of 2008. The shares were unknowingly pledged by the investment company as loan collateral without consent from the beneficial owner or the company prior to being shut down by US federal authorities. The securities that were pledged for this loan were aggressively liquidated by the lender in March 2009 resulting in the total collapse of the company's stock price of almost 98%. The company and the beneficial owner have reported this incident and theft to US federal authorities and have engaged counsel to pursue possible civil remedies and recourse. Due to the various

foreign jurisdictional complications and potential legal costs, combined with the assumed inability to collect from the negligent party's, it is management's opinion to not pursue litigation at this time but may do so in the future as more information may be obtained. In the interests of the preferred investors of the company, to maintain and hire management, and in order to facilitate a capital structure suitable to obtain adequate financing, the company effectuated a 400 to 1 reverse stock split in June 2009. The company restructured all of its equity of the company via a 400 to 1 reverse split of all classes of stock including preferred and common on 6/12/09. The preferred stock of the company issued to previous investors was reallocated to those subscribers equivalent to the original purchase and share amount. The company issued par value common shares to management, Directors, Advisors, consultants and other vendors that contain vesting, performance and leak out provisions subordinate to the preferred stock subscribers. The company underwent various measures to reduce its contingent and actual liabilities in the 2nd and 3rd quarters resulting in liabilities of $60,476.00, contingent liabilities of $130,528, and convertible debt of $867,400.00 as of September 30, 2009. The company is currently in process of negotiating and finalizing to convert certain accounts payable, liabilities and accrued unpaid management fees into equity of the company.

7. There was a change of control and reclassification of the business on August 5, 2005 upon the acquisition of the assets of Advanced Bioscience, Inc., a Florida corporation. The Issuer entered into the business of the commercial development of certain licensed patents held by Advanced Bioscience, Inc, and the issuer effected a change of all of its officers and directors.

8. The Issuer increased it's issued and outstanding share capital with the acquisition of the Advanced Bioscience, Inc.'s assets. On August 6, 2005 it acquired 100% of Advance Bioscience, Inc.'s preferred stock outstanding in exchange for 10,000,000 shares of the Company's common stock. On January 18, 2006 the Company acquired 100% of Advanced Flavors & Fragrances, Inc's (AFFI) preferred stock outstanding in exchange for 7,200,095 shares of the Company's common stock. Subsequently AFFI's name was changed to IBC Technologies Corporation. On May 1, 2006 the Company acquired 100% of Bio-Repellant Technologies, Inc.'s preferred stock outstanding in exchange for 3,865,979 shares of the Company's common stock. On August 29, 2006 the Company acquired 100% of Advanced Pheromone Technologies, Inc. common stock outstanding in exchange for 4,642,857 shares of the Company's common stock. The company authorized 15,000,000 Series A Preferred stock at $.020 per share and issued 11,800,095 shares between August 2005 and December 2007.

9. In June, 2009 the company declared a reverse split of all of its common and preferred stock outstanding at a ratio of 400 to 1. The company underwent a reorganization recapitalization in June 2009 period due to the impact of the global economic crisis, drop in petroleum prices, united states dollar currency devaluation vs. brazil and the economic corresponding cost increase of imported ethanol from brazil to be used for conversion to industrial use renewable plastic chemicals, and the lack of sufficient operating capital and revenues. The company restructured all of its equity of the company via a 400 to 1 reverse split of all classes of stock including preferred and common on 6/12/09. The preferred stock of the company issued to previous investors was reallocated to those subscribers equivalent to the original purchase and share amount. The company issued

par value common shares to management, Directors, Advisors, consultants and other vendors that contain vesting, performance and leak out provisions subordinate to the preferred stock subscribers. The Company formed two subsidiaries in the fourth quarter of 2007, Renewable Fuels of America (RFAC) and Renewable Chemicals Corporation (RCC). Renewable products and Services Corporation was formed in the fourth quarter of 2008. At this time, the company does not intent or plan on any future spin-off of any subsidiary.

10. The Issuer's securities have never been de-listed by any securities exchange or NASDAQ.

11. The company was the subject of a lawsuit filed in Sarasota county Florida on February 6, 2008 for the payment of unpaid rent for its principal offices in the amount of $29,203.74 which was disputed by the company. The company settled with the Plaintiff landlord in exchange for common shares of the company. The company has maintained its lease in good standing at the same principal office location from October 2004 to present. The company, its officers, and other related parties were the subject of a threatened legal proceeding by a Series A preferred share subscribed shareholder that purchased 600,000 Series A Preferred stock at $.020 per share in December 2007 and March 2008 for a total of $120,000. The company repurchased the shares retiring them to the treasury of the company in November 2008 for a total of $187,000 including legal fees. The parties executed mutual releases and hold harmless agreements. The company has agreed to rescind and repurchase the shares of other related party subscribers representing purchases of $6,000, $10,000 and $50,000 respectively. There are no other current, past, pending or threatened legal proceedings.

### B.  Business of the Issuer

The Renewable Corporation, including its wholly owned subsidiaries, (collectively "TRC", the "issuer" or the "Company") provides and distributes products, services and technologies in the renewable, sustainable, alternative energy and cleantech industry's. This is provided via operating subsidiaries; TRC Products & Services Corporation, Renewable Chemicals Corporation and Renewable Fuels of America, Inc.

Recently launched TRC products and Services Corporation will provide and distribute renewable, alternative energy, and sustainable products and services via a national network of company authorized independent representatives referred to as the  $E^3$  Network $^{TM}$ , ($E^3$ =energy efficiency experts).  The $E^3$ Network $^{TM}$  members will provide these products and services to businesses, homeowners and consumers.  The company is developing a proprietary software based platform for use by the network members that will capture customer data regarding lifestyle, personal habits, current home energy costs that will then provide specific product recommendations while demonstrating the applicable energy savings, costs, benefits, time to payback and related carbon footprint reduction. This software will also incorporate and provide all applicable state and federal rebates, tax credits, and govt sponsored loan programs and eligibility requirements under the recently enacted alternative energy and other government spending programs. The company will provide network members additional resources including; access to product margins, product marketing materials, sales training, back office administration

and operations, in house licensed mortgage closing agents, and a branded identity package and a personalized website.

TRC via its operating subsidiary Renewable Chemicals Corporation is in the process of developing and establishing renewable chemical plants for the conversion of sugarcane ethanol into renewable chemicals and plastics used in consumer packaging applications. Renewable Chemicals Corporation has an agreement for purchase commitment and right of first refusal from one of the world's largest consumer packaged goods companies, contingent upon competitive pricing to petroleum based high density polyethylene and other terms related to specifications and exclusivity rights. The company has completed various progress milestones, procured key supply chain partners, conducted economic feasibility modeling, technology licensing, and applicable construction costs for a specific plant targeted for location in the gulf coast United States. The company plans to commence final economic feasibility studies year that would provide renewable ethylene at a cost comparative and related to petroleum based ethylene. The economic feasibility and success of the project is dependent upon the fluctuations and global commodity pricing relationship of; Brazilian sugar and ethanol, petroleum, gulf coast and world petroleum based ethylene, and the currency relationship between the US dollar and Brazilian Real.  The initial project calls for imported Brazilian sugarcane ethanol to be converted into ethylene with a capacity of 250,000 Metric tons that will be converted into renewable plastics for use in consumer packaging products. The company has specific agreements with Cosan to provide ethanol to the plant project(s) contingent upon final pricing terms as well as providing COSAN with a 51% controlling interest via an option agreement to purchase common shares at $.001 (par value). The company has a strategic partnership and ethanol feedstock supply relationship with COSAN SA, based in Brazil. COSAN is one of the largest producers of sugar and ethanol in the world with annual crushing capacity of more than 44 million tonnes. The company develops renewable chemical projects using sugarcane ethanol, provided by COSAN, as an alternative to petroleum or *petrochemicals*. COSAN controls each plant project developed by the company via a Right of First Refusal option agreement to purchase 51% controlling interest at par value. The company also works in conjunction with COSAN to import sugarcane ethanol into the United States in selected coastal areas logistically and economically favorable to a port entry supply. The company targets existing independent ethanol distributors of corn ethanol for joint venture partnerships.

 The company via its subsidiary Renewable Fuels of America Inc., plans to import Brazilian ethanol provided by COSAN for use as an alternative fuel in those United States coastal areas logistically and economically feasible to a port entry supply. The company's business and distribution strategy is the formation of joint ventures with existing distributors of Midwest corn ethanol and replace or compliment their supply at the same or lower costs in exchange for joint venture participation in the $0.51 cent per gallon federal blender's credit. COSAN provides the ethanol on consignment for each established joint venture and then shares margin interest and revenues with the company.  The company has identified and targeted multiple coastal area ethanol distributors in the SE portion of the United States, including an existing Mid-Atlantic independent with monthly distribution of more than 10,000,000 gallons of corn ethanol. The company has obtained storage tank agreements logistically feasible to the distributor to provide supply and will commence operations and revenue at such time as it becomes economically feasible. The successful importation of Brazilian ethanol as an alternative to corn is subject to many factors including fluctuating prices of sugar, corn, currency exchange as well as shipping costs, import tariffs and duties. The company was anticipating imported shipments in the late 3rd

quarter 2008, until the rapid decline of oil prices, world economic crisis and currency devaluation caused progress to be temporarily halted until prices were stabilized and economically feasible. The historical economic feasibility of importing Brazilian sugarcane ethanol to the United States compared to Midwest corn ethanol pricing has varied widely since the United States renewable fuels mandate commenced in 2006.  Sugarcane is considered the most efficient renewable resource and when compared to corn; has an energy balance 7 times greater, does not rely on a competing food source, yields more than twice as much energy per acre, and has 3 times greater reduction in greenhouse gas emissions.


The Company changed its name to The Renewable Corporation on October 24, 2008 from Industrial Biotechnology Corporation for marketing and branding purposes while maintaining the same overall business development objectives and focus.  The issuer was organized in the jurisdiction of the province of British Columbia on February 26, 1992 as Bare Track Investments, Inc and then changed its domicile to Nevada as Track II Industries, Inc. on August 5, 1999. The Company then changed its domicile to the State of Washington and changed its name to Newtrack Mining Corporation on July 15, 2004. The Company then changed its name to Industrial Biotechnology Corporation on August 2, 2005 simultaneous to a change of management control and the acquisition of Advanced Biosciences. The company acquired various patent licenses for biological chemical related and designer enzyme technologies from Oxford, Rice, and Washington State University. The company ceased all business development efforts related to the licensed patents and designer enzyme technologies in early 2008.  The company shifted its focus to ethanol or biorenewable chemicals as an alternative to petroleum chemicals in 2007 based upon; market and customer feedback, renewable & sustainable political and global trends to decrease dependence on petroleum and global warming concerns.


1.  The issuers primary SIC code is 2860. The issuers secondary SIC code is 7340.

2.  The Company is a business development stage company with no revenues. The company will require additional equity and /or debt financing to maintain ongoing operations.

3.  The issuer has not previously been a shell company as defined by the Securities act rule 405, or an asset backed issuer, as defined by item 1101(b) of regulation AB.


4.  The Renewable Corporation, including its wholly owned subsidiaries, (collectively "TRC", the "issuer" or the "Company") provides products, services and technologies using renewable resources and alternative energy solutions via its operating subsidiaries; Renewable Chemicals Corporation, Renewable Products & Services Corporation and Renewable Fuels of America, Inc. The company has a strategic partnership and ethanol feedstock supply relationship with COSAN SA, based in Brazil. COSAN is one of the largest producers of sugar and ethanol in the world with annual crushing capacity of more than 44 million tons. The company develops renewable chemical projects using sugarcane ethanol, provided by COSAN, as an alternative to petroleum or petrochemicals. COSAN controls each plant project developed by the company via a Right of First Refusal option agreement to purchase a 51% controlling interest at par value with an agreement reached in early 2008. The company works closely in

conjunction with COSAN to import sugarcane ethanol into the United States in selected coastal areas logistically and economically favorable to a port entry supply. The company targets existing independent ethanol distributors of corn ethanol for joint venture partnerships. Renewable Chemical Corporation and Renewable Fuels of America Inc are wholly owned subsidiaries and were formed in the fourth quarter of 2007. Renewable Products and Services Corporation was formed in the fourth quarter of 2008. On August 6, 2005 the company acquired 100% of Advance Bioscience, Inc.'s preferred stock outstanding in exchange for shares of the Company's common stock. On January 18, 2006 the Company acquired 100% of Advanced Flavors & Fragrances, Inc's (AFFI) preferred stock outstanding in exchange for shares of the Company's common stock. Subsequently AFFI's name was changed to IBC Technologies Corporation. On May 1, 2006 the Company acquired 100% of Bio-Repellant Technologies, Inc.'s preferred stock outstanding in exchange for shares of the Company's common stock. On August 29, 2006 the Company acquired 100% of Advanced Pheromone Technologies, Inc. common stock outstanding in exchange for shares of the Company's common stock. The acquisitions were accounted for under the purchase method of accounting, and consolidated financial statements herein reflect the inclusion of all of the subsidiary's results since their respective acquisition dates.

5. The company and its operations are highly subject to government regulation. The ethanol alternative fuel industry is highly regulated with various local, state & federal laws regulating its distribution, transportation, and disposition. There are numerous laws regulations, incentives, duties, tariffs, and taxes that are currently in place for ethanol as an alternative fuel or use for industrial purposes that are in constant state of updating, modification and changes. The conversion of ethanol into ethylene and or plastic polymers is also regulated by local, state and federal agencies including the ATF and OSHA.

6. The company ceased all research and development activities related to the commercial patent licenses acquired from Oxford, Rice and Washington State University in early 2007. The company presently licenses its research for the purposes of renewable chemicals and must typically pay for engineering feasibility studies and costs models for specific projects. This information gathering is overseen by the company and obtained and coordinated from multiple supply chain partners. The company employs in house research staff to procure and update energy efficiency information data and cost modeling on a continual basis.

7. The costs and effects of compliance with environmental law at the local state, and federal level will require significant compliance and legal expenses. The company provides renewable alternative energy products, technologies, and services that improve energy efficiency and reduce environmental impact and carbon emissions currently having many government sponsored programs, incentives, and subsidies.

8. The company currently has 9 employees, 5 outside consultants and numerous other paid advisors as needed by the company.

### Item 9.  The nature of products and services offered

**A.** The Renewable Corporation, including its wholly owned subsidiaries, (collectively "TRC", the "issuer" or the "Company") provides products, services and technologies

using renewable resources and alternative energy solutions via its operating subsidiaries; Renewable Chemicals Corporation, Renewable Products & Services Corporation and Renewable Fuels of America, Inc. The company has a strategic partnership and ethanol feedstock supply relationship with COSAN SA, based in Brazil. COSAN is one of the largest producers of sugar and ethanol in the world with annual crushing capacity of more than 44 million Metric tons. The company develops renewable chemical projects using sugarcane ethanol, provided by COSAN, as an alternative to petroleum or petrochemicals. COSAN controls each plant project developed by the company via a Right of First Refusal option agreement to purchase 51% controlling interest at par value. The company's customers are consumer packaging goods companies that are seeking renewable sustainable solutions that decrease dependence upon petroleum, and to gain a competitive marketing advantage. A global consumer packaged goods company executed an agreement with the company that contained certain right of first refusals for specific product lines, purchase order specifications and timelines, and other terms subject to final pricing. The company provided financing to complete an economic feasibility study that is to be credited towards free goods from the company. The company also works in conjunction with COSAN to import sugarcane ethanol into the United States in selected coastal areas logistically and economically favorable to a port entry supply. The company targets existing independent ethanol distributors of corn ethanol for joint venture partnerships.

TRC, via its operating subsidiary Renewable Chemicals Corporation is in the process of establishing renewable chemical plants for the conversion of sugarcane ethanol into renewable chemicals and plastics used in consumer packaging applications. Renewable Chemicals Corporation has an agreement for purchase commitment and right of first refusal from one of the world's largest consumer packaging goods companies, contingent upon competitive pricing to petroleum based high density polyethylene and other terms related to specifications and exclusivity rights. The company is currently in progress with economic feasibility studies and the commencement of engineering studies and costs for a specific plant to be located in the US gulf coast region that would convert imported Brazilian sugarcane ethanol into ethylene with an annual capacity of 250,000 Metric tons. The company is also involved with the feasibility and development stages for other projects and other ethanol derivative chemicals. The company has specific agreements with Cosan to provide ethanol to the plant project(s) contingent upon final pricing terms as well as providing COSAN with a 51% controlling interest via an option agreement to purchase common shares of Renewable Chemicals corporation at .001 (par value).

The company via its subsidiary Renewable Fuels of America Inc., plans to import Brazilian ethanol provided by COSAN for use as an alternative fuel in those coastal United States areas logistically and economically feasible to a port entry supply. The company's business and distribution strategy is to form joint ventures with existing ethanol distributors of Midwest corn ethanol and replace or compliment their supply at the same or lower costs in exchange for joint venture participation in the $0.51 cent per gallon federal blender's credit. COSAN provides the ethanol on consignment for each established joint venture and then shares margin interest and revenues with the company.  The company has identified and targeted multiple coastal area ethanol distributors in the SE portion of the United States, including an existing Mid-Atlantic

independent with monthly distribution of more than 10,000,000 gallons of corn ethanol. The company has obtained storage tank agreements logistically feasible to the distributor and will commence operations and revenue at such time as it becomes economically feasible due to its commodity pricing fluctuations. The successful importation of Brazilian ethanol as an alternative to corn is subject to many factors including fluctuating prices of sugar, corn, currency exchange as well as shipping costs, import tariffs and duties. The company was anticipating import shipments in the late 3rd quarter 2008, until the rapid decline of oil prices, world economic crisis and currency devaluation caused progress to be temporarily halted. The historical economic feasibility of importing Brazilian sugarcane ethanol as compared to Midwest corn ethanol pricing has varied widely since the United States renewable  fuels  mandate commenced in 2006.  Sugarcane is considered the most efficient renewable resource and when compared to corn; has an energy balance 7 times greater, does not rely on a competing food source, yields more than twice as much energy per acre, and has 3 times greater reduction in greenhouse gas emissions.

**B.**  The company relies on the distribution and shipping expertise and relationships of COSAN SA, the issuer's ethanol supplier and joint venture projects partner. COSAN, based in Brazil, is one of the largest producers of sugar and ethanol in the world with annual crushing capacity of more than 44 million tonnes. COSAN trades on the NYSE.

**C.**  The company currently has completed specific economic and technological feasibility studies for the conversion of ethanol, a renewable resource, into plastics such as high density and low density polyethylene used in consumer packaging applications. The company has a signed agreement with a leading gulf coast manufacturer and provider of Low density and high density polyethylene that specifies pursuing mutual engineering and economic feasibility studies to construct a 250,000 metric ton ethanol to ethylene plant with estimated construction costs of $135 million dollars. The plant proposed would be adjacent to the gulf coast manufacturers existing plant. The agreement discusses the establishment of a joint venture to include COSAN that would produce renewable plastics for consumer package applications as an alternative to petroleum based plastics.

**D.**  The technologies, expertise, and conditions to manufacture chemicals and plastics from ethanol is not a new technology development. Some of the first plastics produced were made from ethanol and then replaced by petroleum as it became an abundant feedstock source. There are currently existing ethanol conversion plants in India and many are planned and in construction progress in Brazil. At present, to the best of the company's knowledge there are no current or immediate plans or competitive information to believe that there are plans in the United States, although there is considerable discussions and developments in the field of renewable and sustainable solutions based upon the current cultural and economic "green" climate conditions and the focus on reducing carbon emissions. The majority of the costs involved to produce the targeted chemicals are the costs related to ethanol. The company has an ethanol supplier relationship and joint venture equity partnership with COSAN. Based in Brazil, COSAN   is one of the largest producers of sugar and ethanol in the world with annual

crushing capacity of more than 44 million Metric tons. Sugarcane is considered the most efficient renewable resource and when compared to corn; has an energy balance 7 times greater, does not rely on a competing food source, yields more than twice as much energy per acre, and has 3 times greater reduction in greenhouse gas emissions. The company believes this relationship provides a distinct competitive advantage. The company plans on utilizing the feedstock source for chemicals which is in direct competition with both alternative fuel and uses for sugar.

**E.**   The company's raw materials and renewable resources provider is COSAN. Based in Brazil, COSAN is one of the largest producers of sugar and ethanol in the world with annual crushing capacity of more than 44 million tons. Sugarcane is considered the most efficient renewable resource and when compared to corn; has an energy balance 7 times greater, does not rely on a competing food source, yields more than twice as much energy per acre, and has 3 times greater reduction in greenhouse gas emissions.

**F.**   The company's current gulf coast United States renewable chemical project is dependent upon the interest commitment of a global consumer packaged goods company. The company entered into an agreement with the consumer packaging Goods Company that provides them certain rights of first refusal for specific product lines as well as outlining terms and conditions of pricing and quantity purchase contingent upon satisfactory economic feasibility outcome. The company is currently evaluating specific manufacturing partners in the gulf coast and accumulating pro-forma pricing data proposals for the construction of an ethanol to ethylene plant estimated at 250,000 metric ton annual capacity with construction costs estimated at 135 million dollars. The plant will provide renewable ethylene for the further conversion into renewable plastics to meet customer demand and interest. This agreement and relationship is exclusive to the company only and the packaged goods company is free to utilize other sources and solutions.

**G.**   The company ceased all business activities related to the commercial patent licenses previously acquired via Oxford, Rice and Washington State University's in 2007 to focus on renewable chemicals derived from sustainable natural resource. The company has applied for and or owns various trademarks involving the *Alchemx Production Platforms ™*. The company is applying for the trademark *Renewable Technician™*.

**H.**   There is not any unusual government approval that is contingent or required for the plant construction other than the typically required local state and federal permitting and construction permits applications and guidelines that are normal and customary.

**Item 10. The nature and extent of the Issuers facilities**

The Renewable Corporation corporate headquarters and administrative offices are in Sarasota, Florida which is comprised of approximately 1,500 square feet. The company has maintained this location since October 2004 for $4,379.41 per month. The company utilizes office in Sao Paulo Brazil headquarters of COSAN on an as needed basis. The company pays for a vehicle lease used by the Chairman/CEO of the company at the rate of approximately $700 per month.

**PART D MANAGEMENT STRUCTURE AND FINANCIAL INFORMATION**

**Item 11.  CEO, Directors, officers, and control persons**

A- <u>1-6</u>
<u>Officers and Directors</u>
**Andy Badolato, Chairman, Chief Executive Officer -44-** Mr. Badolato has 22 yrs experience in Venture Capital, Technology Transfer, M&A transactions, Mezzanine and Public equity financings; and the creation, business development, and oversight of public and private companies. Mr. Badolato has been a co- founder and or early stage investor in 23 plus companies that have raised over one billion in private equity and obtained an aggregate high market capitalization of over 29 billion dollars. He was the founder, President and Director of MILCOM Technologies successfully licensing over 1.6 billion dollars of research and development from Lockheed Martin. MILCOM, a leader in commercializing technologies that originate in the defense industry, has launched thirteen companies that have obtained over 600 million dollars in venture capital. Mr. Badolato was VP Corporate finance of St James, the founder and initial seed round investors of Inktomi, a company that obtained a 20 billion dollar public market valuation. Mr. Badolato was the founding President and Director of SinoFresh HealthCare, Inc, a developer and marketer of innovative therapies to treat inflammatory and infectious diseases of the upper respiratory system. Mr. Badolato successfully launched the Company's lead product, SinoFresh(TM) Nasal, Oral & Sinus Care, to a national distribution contract making it available in over 20,000 retail outlets nationwide. Mr. Badolato is a cofounder of The Renewable Corporation and the predecessor company's since 2004. He also is Director of White Knights & Vultures LLC., a Venture Capital incubation & merchant bank. Mr. Badolato graduated from St. Thomas of Villanova University in Miami, Florida, with a Bachelors of Arts in Business. ($90,000 per year plus commissions and milestone bonuses)


**Ron Doran,  Director and Vice President Sales-45-** Mr. Doran has extensive sales and marketing experience in Asian market product development, distribution, outsourcing and manufacturing channels. Mr. Doran has also served as a merchant banker and has overseen development, financing, and strategic relationships for various healthcare and technology companies including Uniphyd Corporation, Milcom, and Terranex. Mr. Doran is a cofounder of The Renewable. (up to $30,000 per year plus commissions and bonuses)

**Daniel Krajewski- Comptroller- 39-** Mr. Krajewski has over 15 years of corporate accounting experience with both public and private companies. He has held senior level positions including financial operations and controller, and as a securities licensed financial operations principal for investment advisory firms and broker dealers. Mr. Krajewski graduated from Rutgers, The State University of New Jersey with a Bachelors of Science degree in Accounting.

**Harvey Hendler, Strategic Planning-** Mr. Hendler specializes in strategic business planning and operations. His corporate clients include: Dow, Ciba, GlaxoSmithKline, InfoMedics, Monsanto, Pfizer, Roche, Millennium chemicals, FMC Corporation and International Paper. Mr. Hendler has a Master of Science Degree in Management from the New Jersey Institute of

Technology. (Compensation as needed per strategic planning conferences and reimbursement of expenses)

**Gurinder Shahi, MD, PhD, MPH. Chief Technologist & Chairman Scientific Advisory Board-** Dr. Shahi is a physician with training in molecular biochemistry and in international policy and management. He is a leading expert on technology innovation and change management in healthcare and the life sciences, and has a particular interest in the commercialization of promising new bio-technologies to address environmental, energy, health and socio-economic development concerns. He has played a key role in the development of several major international initiatives including the International Vaccine Institute (now based in Seoul, Korea), the Asia-Pacific International Molecular Biology Network and the Global BioBusiness Initiative, and has served as advisor and consultant to leading international organizations, governments, corporations and foundations around the world. He has also been actively involved in establishing and providing strategic and management input to a range of promising technology enterprises including Lynk Biotechnologies (Asia) and The Renewable Corporation (US/Europe/Asia/Latin America). Dr. Shahi has authored over 60 articles, journal papers and conference presentations and served as lead editor for *International Perspectives on Environment, Development and Health: Toward a Sustainable World* (GS Shahi, BS Levy, A Binger, T Kjellstrom and RS Lawrence, Springer Publishing Company, New York, 1997). His books include *BioBusiness in Asia: How Asia Can Capitalize on the Life Science Revolution* (Pearson Prentice Hall, 2004) and *Financing Technology Innovation* (with Joseph Greco, GBI Books, 2007). Dr Shahi holds an MD and PhD (in molecular biochemistry) from the National University of Singapore and an MPH (International Policy and Management) from Harvard University.He has been a Warren Weaver Fellow (Global Environment and Health Sciences) at The Rockefeller Foundation. (Compensation as needed)

**Gary Howell, Ph.D., Advisory Board- Former Vice President Business Development-** Dr. Howell has overseen and led diverse businesses within consumer products, biotechnology, R&D, and technology transfer. He has held leadership roles in organizations ranging from start-ups to Fortune 500 corporations with responsibilities in technology assessment, strategy development, market research and business development. Dr. Howell served as Director of the Cincinnati Center for Clinical Research and Head of Venture Development at Cincinnati Children's Hospital Medical Center; interim CEO of Genomatix (now Intrexon), a biotechnology company; and at Procter & Gamble Analytical Chemistry and Technology/Product Development departments. Dr. Howell holds several degrees, including: a Ph.D. and M.S. in Chemistry from Cornell University and a B.S. in Chemistry, cum laude, from the State University of New York College at Cortland. In addition, his association memberships have included: the Association of University Technology Managers, American Chemical Society, and American Association for the Advancement of Science and Sigma Xi. ( a former paid employees of the company at the rate of $70,000 per annum, compensation as needed plus finders fee agreement for business development in progress)

**Larry Drumm- Advisory Board -**Mr. Drumm has extensive experience in the The Renewable industry. He has served as a senior executive at many companies including; Bio-Technical Resources (A division of Arkion Life Sciences LLC) as Vice-President, Business Development, at DCV (a group of DuPont/ConAgra companies) now called Arkion, as Development Manager of Biochemical Products, Director of Marketing and Strategic Planning and Director of Marketing,  BTR Separations. At Genencor International, formerly Eastman Kodak Company, Mr. Drumm served as Director of Business Development, Manager of Commercial Development and Manager of Marketing Planning. At Eastman Chemical Products, Inc. Mr. Drumm served as Product Supervisor and Marketing Representative. Mr. Drumm holds an M.B.A. from University of Hartford and a B.S. in Chemical Engineering, University of Cincinnati.  Mr. Drumm has also been Commercial Development and Marketing Association two time President which is the Business Development Community for the Chemical Industry. He is a member  of the American Chemical Society and in the Biotechnology Industry Organization, (BIO) has also served as the organizer of the Chief Technical Officer Summit on Biotechnology in the Chemical Industry, as well as a Founding Board Member of BIO's Industrial and Environmental Section. He is a member of the Society for Industrial Microbiology. Mr Drumm is also a member of the Societal Impact Operating Committee of the AIChE and Founding Member of the Society for Biological Engineering. (Compensation as needed, consulting agreement at $5,000 per month.)

**Doug Forde, Audit Committee and Advisory Board Member-** Mr. Forde is a career business professional with a background in finance, taxation capital markets, and mergers and acquisitions. He has held senior level positions in private and public companies, including KPMG Peat Marwick, McGraw-Hill, and Xerox Corporation, and CEO positions with three businesses he helped to transition from the private sector to the public sector.  Mr. Forde's list of accomplishments include tax planning for US companies abroad, tax strategies for foreign companies in the United States, and a role in more than 100 mergers and acquisitions, leveraged buyouts, and corporate divestitures. Mr. Forde is a published author with hundreds of articles and research white papers regarding taxation, auditing and corporate finance industries.  He has lectured at many universities and colleges and holds the title of Visiting Professor at many leafing educational institutions. Mr. Forde has served on the board of directors of public and private companies including Virgin Islands Flight Schools, Eastern Caribbean Airways, Inc., International Banks, Hospitals and Health Care Companies, and Universities. Mr. Forde is a graduate of the University of the Virgin Islands, the University of Illinois Urbana-Champaign, and Baruch College of the City University of New York, and holds degrees in accounting, finance, and taxation. (Compensation as needed)

**<u>Beneficial ownership interest Directors, officers, affiliates, control persons</u>**

| Beneficial Holder | Total Shares | Percentage Ownership |
|---|---|---|
| TRC Management, LLC (1) | 30,000,000 | 43.83% |
| AMB Irrev. Family Trust (2) | 8,000,000 | 11.69% |
| Andrew Badolato (9) | 7,000,000 | 10.23% |
| TRC Reorganization LLC (3) | 5,000,000 | 7.30% |

17

| | | |
|---|---|---|
| Lewis B Moon (5) | 3,400,000 | 4.97% |
| Kevin Horrell (4) | 3,000,000 | 4.38% |
| Thomas Hinz (6) | 2,500,000 | 3.65% |
| Ron Doran  (9) | 2,000,000 | 2.92% |
| Ken Hall (7) | 1,000,000 | 1.46% |
| Ron Westman (8) | 1,000,000 | 1.46% |
| Bob Hillier | 500,000 | 0.73% |
| Others | 5,053,397 | 7.38% |

1- Common restricted shares issued to an LLC for the benefit of company management. The shares are subject to specific vesting, milestones, company repurchase option, and a leak out agreement that is subordinated to the subscribed preferred share investors of the company.
2- The life estate irrevocable trust of Andrew M Badolato, the company's CEO and owned by his children, Robert, William and Michael Badolato. Restricted shares of the company subject to leak out agreement that is subordinated to the investors of the subscribed preferred share investors of the company.
3- Shares allocated for the company's debt to equity conversion and reorganization of actual and contingent liabilities accrued.
4- Individually and as president of Carbon Trade Management Inc. Subscribed via debt conversion of $300,000 in June 2009.
5- Individually and as managing director of Lewann Tangible Asset Management, LLC. Acquired via settlement and debt conversion of $340,000 in June 2009.
6- Acquired via settlement and debt conversion of $250,000 in June 2009.
7- Individually, and as president owner of Rio Trade Partners, Inc. Shares acquired via debt conversion in June 2009.
8- An Investor and company's current landlord building owner. Shares issued via settlement past due rent abatement in June 2009.
9- Subject to milestones vesting, performance, leak out provision as well as a company right of repurchase in conjunction with amended employment agreement dated October 2005.


## B.  <u>Legal /Disciplinary History.</u>

**The above Officers, Directors or control persons have NOT in the last 5 years been:**
1. Convicted of any criminal proceedings or either named or as a defendant.
2.  Has not had an order, judgment, or decree, not subsequently reversed, suspended or vacated, by a court of competent jurisdiction that permanently or temporarily enjoined, barred, suspended or otherwise limited such person's involvement in any type of business, securities, commodities or banking activities.
3.  Has not had a finding or judgment by a court of competent jurisdiction (in a civil action), the SEC, the CFTC, or a state securities regulator of a violation of federal or state securities or commodities law, which finding or judgment has not been reversed, suspended, or vacated.
4. Has not had an entry of an order by a self-regulatory organization that permanently or temporarily barred, suspended or otherwise limited such person's involvement in any type of business or securities activities.

Mr. Andrew M. Badolato, The Chairman and CEO of the company filed Chapter 7 bankruptcy in 2005 and was discharged in 2006. Mr. Badolato intends to file chapter 13 bankruptcy in the 4th quarter 2009.

C.     **Disclosure of Family Relationships** NA

D.     **Disclosure of related party transactions** N/A

E.     **Disclosure of conflicts of Interest   -**

   **a.** The CEO of the company is a member and investor of White Knights & Vultures LLC, a private company, an incubation, venture capital, and merchant bank currently not involved with any new or existing venture. Mr. Badolato devotes a minimal time to this endeavor and the majority of time to the company's operations**.**

   **b.** Many of the company's scientific advisory board members and outside consultants are active in other ancillary business efforts and roles with other companies in similar, competitive or overlapping technology areas. The company policy is the execution of confidentiality agreements with all outside advisors and the requirement of disclosure by the parties on a case by case basis , and if it is deemed to be a direct or significant business risk to the company, acts accordingly**.**   Management of the company believes that outside business development of the advisors and consultants with overlapping similarities is beneficial to the efforts of company for overall progress, business development and partnering opportunities**.**

## ITEM 12.  Financial information

Please see attached financial information and accompanied footnotes

## Item 13. Similar financial information for the two preceding years

Please see attached financial information and accompanied footnotes

## ITEM 14. Beneficial owners

### Beneficial ownership interest Directors, officers, affiliates, control persons

| Beneficial Holder | Total Shares | Percentage Ownership |
|---|---|---|
| TRC Management, LLC (1) | 30,000,000 | 43.83% |
| AMB Irrev. Family Trust (2) | 8,000,000 | 11.69% |
| Andrew Badolato (9) | 7,000,000 | 10.23% |
| TRC Reorganization LLC (3) | 5,000,000 | 7.30% |
| Lewis B Moon (5) | 3,400,000 | 4.97% |
| Kevin Horrell (4) | 3,000,000 | 4.38% |
| Thomas Hinz (6) | 2,500,000 | 3.65% |
| Ron Doran  (9) | 2,000,000 | 2.92% |
| Ken Hall (7) | 1,000,000 | 1.46% |
| Ron Westman (8) | 1,000,000 | 1.46% |

| Bob Hillier | 500,000 | 0.73% |
| Others | 5,053,397 | 7.38% |

1- Common restricted shares issued to an LLC for the benefit of company management. The shares are subject to specific vesting, milestones, company repurchase option, and a leak out agreement that is subordinated to the subscribed preferred share investors of the company.

2- The life estate irrevocable trust of Andrew M Badolato, the company's CEO and owned by his children, Robert, William and Michael Badolato. Restricted shares of the company subject to leak out agreement that is subordinated to the investors of the subscribed preferred share investors of the company.

3- Shares allocated for the company's debt to equity conversion and reorganization of actual and contingent liabilities accrued.

4- Individually and as president of Carbon Trade Management Inc. Subscribed via debt conversion of $300,000 in June 2009.

5- Individually and as managing director of Lewann Tangible Asset Management, LLC. Acquired via settlement and debt conversion of $340,000 in June 2009.

6- Acquired via settlement and debt conversion of $250,000 in June 2009.

7- Individually, and as president owner of Rio Trade Partners, Inc. Shares acquired via debt conversion in June 2009.

8- An Investor and company's current landlord building owner. Shares issued via settlement past due rent abatement in June 2009.

9- Subject to milestones vesting, performance, leak out provision as well as a company right of repurchase in conjunction with amended employment agreement dated October 2005.

## ITEM 17. List Of Securities Offerings And Shares Issued For Services In The Past 2 Years.

### Common and Preferred Stock Subsequent to December 31, 2007

As of December 31, 2007, there was 2,000,000,000 authorized common shares, with 15,328,329 shares total outstanding and 250, 234 shares in the public float held by approximately 2,435 holders. In April 2008 the Company issued 1,075,000 shares of common stock at par value for services. In August 2008, the Company issued 598,000 common shares at par value to former investors. In August 2008 the Company issued 40,000 shares of common stock in exchange for consulting services. In October 2008, the company issued 733,333 to settle a lawsuit and issued 850,000 shares to be held in escrow as collateral for a subscription rescission settlement agreement which was paid in full in December 2008. The 850,000 shares are to be returned to the treasury of the company from escrow as outlined in the agreement.  In 2008 the company issued 283,000 common shares to former preferred shareholders who elected conversion.  As of December 31, 2008 there was 2,000,000,000 authorized common shares consisting of: 50,000,000 authorized Class A common shares, with 27,000,000 total issued and outstanding to management, advisors and consultants to the company subject to vesting, milestones, and leak out provisions. There were 18,907,662 total common shares outstanding, with 3,660,560 shares in the public float held by an estimated 2,839 holders. As of December 31, 2008, there were a total of 45,907,662 shares of common stock issued and outstanding consisting of; 27,000,000 shares of Class A common stock and 18,907,662 shares of common stock.

 As of December 31, 2007, there was 150,000,000 Preferred shares authorized consisting of a total of 60,722,000 outstanding. This was comprised of 5,722,000 Series A Preferred held by 39 beneficial owners, and 55,000,000 Series B Preferred issued and outstanding held by 10 members of management. In January 2008 the Company issued 135,000 Series B preferred to members of management at par value. In January 2008 the Company issued 250,000 Series A

preferred to an existing investor at par value. Between April and June 2008 the Company issued 1,690,000 Series A preferred shares in a series of transactions that raised $338,000 in proceeds for the Company. In June of 2008 the Company issued 62,500 shares of Series C preferred in a private transaction raising proceeds of $25,000 to the Company. The Series B preferred issued to management was reverse split at 4,000 to 1 in June 2008. The Series A was reverse split in June 2008 at a ratio of 4,000 to 1 and the previous investor subscribers of the company were issued Series D Preferred in the amount of 6,104,750 in June 2008. In June 2008 the Company issued 4,875,000 Series B preferred to management and advisors to the Company at par value which convert into 4 common. In December 2008 all Series B prefered shares of the Company were reverse split 1 for 4,000 in a reorganization of the company.  As of December 31, 2008, there were 6,170,380 shares of preferred stock issued and outstanding consisting of: 1,880 Series A Preferred held by 40 holders, 1,250 Series B preferred held by 23 beneficial owners, 6,104,750 Series D preferred shares outstanding held by 36 beneficial owners. Each share of preferred stock converts to shares of common stock on a 1 for 1 basis. There are no shares of preferred stock in the public float.

## PART F

**ITEM 18.  Material Contracts- no change disclosed and filed in March 2009**

**ITEM 19.  By laws – no change disclosed and filed previously in March 2009**

**ITEM 21.  Issuer Certification**

I, Andy Badolato, certify that:

I have reviewed this disclosure statement, attachments, financial exhibits and footnotes of The Renewable Corporation.

Based on my knowledge, this disclosure statement does not contain any untrue statement of a material factor omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made nor misleading with respect to the period covered by this disclosure statement.

Based on my knowledge, the financial statements, and other financial information included or incorporated by reference in this disclosure statement, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of September 30, 2009, and for the periods presented in this disclosure statement.

Dated as of the 13th Day of November , 2009

/s/ *Andrew M Badolato*

Andrew M Badolato
Chairman of the Board and Chief Executive Officer

EXHIBIT D

# ISSUER INFORMATION FILE

## April 6, 2009

# The Renewable Corporation
### (a Washington Corporation)

## MATERIAL INFORMATIONAL DISCLOSURE AND MANAGEMENT DISCUSSION

**Footnotes:**
In the 1st quarter of 2008, the company entered into an agreement with a Costa Rican based Group for financing of up to $2,500,000 via a convertible debenture, as disclosed in the 3/31/08 financial statements filed on July 7, 2008.

A third party shareholder pledged 3 million shares of stock that were deposited into a brokerage escrow account FBO of this financing agreement at an affiliate of the Costa Rican based company, called Sentry Global Securities. Sentry is a St Kitts Corporation principally operating in Costa Rica who held securities on behalf of many customers and had a clearing arrangement at a major international Wall Street Bank.

The shares were pledged and deposited at Sentry Global Securities on April 8th, 2008 in conjunction with the financing transaction and held in an escrow account controlled by the company. The shares were made available to purchase pursuant to the debenture agreement at an option price of $0.50 per share. In September 2008, the principal parties affiliated at Sentry Global Securities involved with the financing agreement were arrested by Federal authorities related to bribery and stock promotion activities. The Renewable Corporation, formerly Industrial Biotechnology Corporation ('the Company') immediately canceled all agreements related to the transaction.

At the time of the arrests, the Company had received $50,000 of this financing via wire transfer in August, had an outstanding cash balance in the escrow brokerage account of approximately $248,000 and an outstanding security position of approximately 2,300,000 shares. The cash balance of $248,000 although indicated on the monthly financial statements provided to the Company, was disputed by the remaining Sentry Global Securities principals after the arrests.

In October of 2008, the Sentry Global Securities principle office was raided by federal authorities in San Jose, Costa Rica and all records were confiscated. The Company

pursued legal efforts and information to obtain the funds and the securities from November 2008 to March 2009 after all Sentry Global Securities offices were shut down and management was unable to be contacted. The Company discovered that the funds and securities were held in omnibus or "comingled" with the funds and securities of other Sentry Global Securities customers at a third party intermediary European financial institution and the clearing firm was unable to process any funds request or securities certificate issuance instructions, due to the Company NOT being the direct holder of record and beneficial owner. Only the authorized representatives of Sentry Global Securities were allowed to make such a request due to the comingled single account status. The Company was in the process of filing a court order in its jurisdiction of Sarasota Florida against Sentry Global Securities and other related parties in efforts to obtain the funds and securities, and had a reasonable belief of success based upon discussion with counsel and information obtained. The company did not feel that the cash escrow balances and securities were at risk due to the alleged crimes and arrests.

On March 27, 2009- April 4th, 2009, the Company's share price dropped significantly on very large volume in what appeared to be a liquidation of a large block of stock. It has been concluded that this liquidation was the 2.3 million shares previously held by Sentry Global Securities, based upon confirmation of shareholder reports The Company has no information related to the identity of the individuals or entities responsible or related to this sale of securities, nor was it involved in any discussions of investor relations or promotion related to the liquidation sales or volume.

The Company has reported the theft, securities sales, and all information that it has obtained to federal authorities related to the raid of the securities firm and the previous arrests made.

If it is determined economically and jurisdictionally legally feasible, the Company will vigorously pursue all civil remedies of action to recoup amounts, claims and damages against all parties as further information is obtained. The Company now believes that the individuals related to the arrests and brokerage firm have possibly operated a ponzi scheme by comingling the funds and securities of all its brokerage clients and customers. The Company did previously disclose in its 2008 year end informational disclosure statement filed on March 3, 2009 the $248,000 as contingent funds receivable on its balance sheet and the pursuit of a legal filing seeking court order. At this time, the company does NOT believe that it will receive these funds in light of the recent events and will be adjusting its balance sheet as of the March 31 period.

Subsequently, and as a result of the liquidation and theft of the securities formerly held by Sentry Global Securities and the corresponding decline in the Company's stock price, the Board of Directors may elect a reverse stock split of the company's common stock to effectuate raising additional capital required.

The Company is a developmental stage company with no revenues and negligible working capital. The Company must raise additional capital to meet its ongoing obligations and accrued liabilities and employee payroll. The Company is finalizing

terms and conditions for a rights offering of its securities to its current shareholders and investors.   More information about the company, its operations, business, strategy, and management and directors can be found in the company's disclosure statement filed March 3, 2009 and available at pinksheets.com or at the company's website www.therenewablecorp.com.


 **Certification by Chairman and CEO**

 I, Andrew Badolato, certify that:

1. I have thoroughly reviewed and prepared this disclosure statement of The Renewable Corporation Inc.

2. Based on my knowledge, this disclosure statement does not contain any untrue Statement of a material fact or omit to state a material fact necessary to make the Statements made, in light of the circumstances under which such statements were made, not misleading with respect to the information  covered by this disclosure statement.

April 6th, 2009

/s/*Andrew Badolato*


Andrew Badolato
Chairman /CEO

3

EXHIBIT E

# Jefferies 

ORIGINAL

Jefferies & Company, Inc.
520 Madison Avenue, 12th Floor
New York, New York 10022-4213
tel 212.284.2300

SIPC

001

ACCOUNT NAME: ▮▮▮▮▮▮▮▮▮▮▮▮

ACCOUNT NUMBER: ▮▮▮▮▮▮▮▮

We are pleased to confirm the following transactions.
Processed on: 06/30/08

| Symbol | Cusip/ Security | Action | Acct Type | Quantity | Price | Trade Date | Settle Date |
|--------|-----------------|--------|-----------|----------|-------|------------|-------------|
| IBOT | 456039205 H018085 | BUY | CASH | 20,000 | $0.9 | 06/27/08 | 07/02/08 |

INDUSTRIAL BIOTECHNOLOGY CORP NEW
AS OF 06/27/08
UNSOL

| | | |
|---|---|---|
| PRINCIPAL | | $18,000.00 |
| COMMISSION | | $400.00 |
| NET AMOUNT | | $18,400.00 |

| Symbol | Cusip/ Security | Action | Acct Type | Quantity | Price | Trade Date | Settle Date |
|--------|-----------------|--------|-----------|----------|-------|------------|-------------|
| IBOT | 456039205 H018085 | BUY | CASH | 20,000 | $0.9 | 06/30/08 | 07/03/08 |

INDUSTRIAL BIOTECHNOLOGY CORP NEW
UNSOLICITED
AVG PRICE SHOWN-DETAILS ON REQ
EXECUTED AS AGENT

| | | |
|---|---|---|
| PRINCIPAL | | $18,000.00 |
| COMMISSION | | $400.00 |
| NET AMOUNT | | $18,400.00 |

Subject to conditions on reverse.

This confirmation shall be deemed correct in all respects unless written notice of any inaccuracy is sent to our Compliance Department.



Page 1 of 2

# Jefferies 

ORIGINAL

Jefferies & Company, Inc.
520 Madison Avenue, 12th Floor
New York, New York 10022-4213
tel 212.284.2300

SIPC

001

000127

ACCOUNT NAME:

ACCOUNT NUMBER:

We are pleased to confirm the following transactions -
Processed on: 07/01/08

| Symbol | Cusip/ Security | Action | Acct Type | Quantity | Price | Trade Date | Settle Date |
|--------|-----------------|--------|-----------|----------|-------|-----------|-------------|
| IBOT | 456039205 H018085 | BUY | CASH | 22,500 | $0.88 | 07/01/08 | 07/07/08 |

INDUSTRIAL BIOTECHNOLOGY CORP NEW
UNSOLICITED
AVG PRICE SHOWN-DETAILS ON REQ
COMMISSION STATED IS
COMMISSION EQUIVALENT
WE ARE ACTING AS PRINCIPAL

PRINCIPAL                    $19,800.00
COMMISSION                      $450.00
NET AMOUNT                   $20,250.00

Subject to conditions on reverse.

This confirmation shall be deemed correct in all respects unless written notice of any inaccuracy is sent to our Compliance Department.

Page 1 of 2

 **Jefferies** ORIGINAL

Jefferies & Company, Inc.
520 Madison Avenue, 12th Floor
New York, New York 10022-4213
tel 212 284.2300

 SIPC



002

211-000

ACCOUNT NAME:
ACC

We are pleased to confirm the following transactions -
Processed on: 07/02/08

| Symbol | Cusip/ Security | Action | Acct Type | Quantity | Price | Trade Date | Settle Date |
|--------|------------------|--------|-----------|----------|-------|------------|-------------|
| IBOT | 456039205 H013085 | BUY | CASH | 22,500 | $0.9 | 07/02/08 | 07/08/08 |

INDUSTRIAL BIOTECHNOLOGY CORP NEW
UNSOL
REPORTED PRICE 0.90000

PRINCIPAL                    $20,250.00
COMMISSION                      $450.00
[ NET AMOUNT                 $20,700.00 ]



Subject to conditions on reverse.

This confirmation shall be deemed correct in all respects unless written notice of any inaccuracy is sent to our Compliance Department.



Page 1 of 2

USAO 0000013

EXHIBIT F

```
CLAIMS   -- Transaction Display          MTX007 JONEEL 14-JUL-08 13:46:37

GFPS      1     SWFT      1     CHPS      0     FTPC      0

                     query type GFP    txn number   1 category


AMOUNT            CHIP MBR  IMAD              FED ABA      DATE

19,000.00/USD                                             03-JUL-08

S/R  CHIP SSN   CHIP RSN   FED MRN      TRN       SOURCE  TXNTYP  PXAC
                                        4729000185FS      BOOKER

DRACCT           CRACCT               RSN      FED RCVE-ABA

400912902

       19,000.00/USD TRN 4729000185FS   DR VAL DATE-      TRF TYP-BT   S

DEBIT ACCT                    CREDIT ACCT

DDA/400912902

ACRONYM  FBMENICOSIA      FN 01   ACRONYM              FN 01

FBME BANK LTD

90 ARCHBISHOP MAKARIOS III AVE

NICOSIA 1391 CYPRUS




              CUS ID-        REL:

ORDER BANK                   ORDER CUSTOMER

                             /CY0411501001057387USDCACC001

                             SENTRY GLOBAL SECURITES LIMITED

                             APARTADO 10753 - 1000

                             SAN JOSE



ACCNT

PARTY


                        000.00 000.00 N

                  CHARGES:COM-       PREADV-  0.00

DETAIL  PAYMENT OF SERVICES


--------------------------------------------------------

inquiry note:



action    p1              p2 JONEEL783956829    p3
```

P 1/3                          <<

USAO 0000010